# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STEPHEN H. OLESKEY, | ) | |
| | ) | |
| ON BEHALF OF GUANTANAMO INTERNEES | ) | |
| LAKHDAR BOUMEDIENE, | ) | |
| MOHAMED NECHLA, MUSTAFA AIT IDIR, | ) | |
| SABER LAHMAR, HADJ BOUDELLA, | ) | **Civil Action No. 05 10735 RGS** |
| AND BELKACEM BENSAYAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE AND UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S PROPOSED FOIA DOCUMENT PRODUCTION SCHEDULE FOR REQUEST NOS. 10(f), 14, 15 and 17

Pursuant to the Court's July 28, 2005 instructions at the scheduling conference in this matter, Stephen H. Oleskey, Esq. ("Plaintiff"), on behalf of Lakhdar Boumediene, Mohamed Nechla (Mohammed Nechle), Saber Lahmar, Mustafa Ait Idir, Belkacem Bensayah (Bensayah Belkacem), and Hadj Boudella ("Requesters"), submits this supplemental memorandum showing that Nos. 10(f), 14, 15, and 17 of their September 28, 2004 Freedom of Information Act ("FOIA") request ("the Request"), attached hereto at *Exhibit A*, are more narrowly tailored than

1

related FOIA requests made by the American Civil Liberties Union ("ACLU Request").[1]  Those

ACLU requests are the subject of a court order issued by Judge Hellerstein in the Southern

District of New York ("ACLU Order") (see ACLU v. Department of Defense, et al., No. 04-CV-

4151 (AHK) ("the ACLU case") and seek prisoner-related records from several U.S. facilities

around the world in addition to Guantanamo Bay, Cuba ("Guantanamo").  The ACLU Order,

therefore, governs production of voluminous records Requesters did not seek.  By contrast,

Requesters seek a narrow category of documents concerning policies, procedures and

investigations specifically applicable to *Guantanamo*.  Requesters understand such documents

will exist principally, if not solely at the Guantanamo Naval Base, at U.S. Southern Command

("SOUTHCOM") in Florida, and in Washington.  This Court should not allow Defendants to

delay even further – in fact, indefinitely, given the absence of a final production deadline for the

Department of Defense in the ACLU Order – their obligation to produce a limited set of

Guantanamo-related records.  This Court should order Defendants to produce all responsive,

non-exempt records by September 28, 2005.

I.    **Plaintiff Seeks Four Narrow Categories of Guantanamo-Related Records**

A.    Request Nos. 14, 15, and 17

In the wake of revelations of torture by U.S. military personnel at Abu Ghraib, the

ACLU, which does not represent individual Guantanamo prisoners, filed a FOIA request.  The

ACLU Request seeks information about any and all detainees in the custody of the United States,

in connection with the Global Struggle Against Extremism, at any overseas detention facility,

---

[1] The parties have agreed to a schedule for producing records concerning the six Requesters that was adopted by this Court during the July 28 scheduling conference.  This memorandum addresses only those paragraphs requesting more general records in place at Guantanamo, such as detention policies.

US1DOCS 5225102v3

including facilities in Iraq and Afghanistan.[2]  The ACLU Request specifically sought records

concerning detention, rendition, and deaths of detainees held in U.S. custody.[3]  By contrast,

Requesters, six Bosnian-Algerian men imprisoned at Guantanamo, sought only limited

information about themselves and those policies governing their interrogation, medical care, and

treatment at Guantanamo.  The following chart compares Requests Nos. 14, 15, and 17 with the

related ACLU requests.

| Plaintiff's Request | ACLU Request |
| --- | --- |
| 14) Records relating to policies, procedures or guidelines governing conditions of detention, methods of interrogation, or treatment of detainees at *Guantanamo*. | I(1)  All records setting forth or discussing the legality or appropriateness of subjecting Detainees to torture or other cruel, inhuman or degrading treatment or punishment.  Please include all records discussing the legality or appropriateness of the following methods: using "stress and duress" techniques on Detainees; using force against them; subjecting them to physical injury; requiring them to stand or kneel for prolonged periods; depriving them of sleep, food or water; holding them in awkward and painful positions for prolonged periods; denying them painkillers or medical treatment; administering or threatening to administer mind altering substances, "truth serums" or procedures calculated to disrupt the senses or personality; subjecting them to prolonged interrogation under bright lights; requiring them to be hooded, stripped or blindfolded; binding their hands and feet for prolonged periods of time; isolating them for prolonged periods of time; subjecting them to violent shaking; subjecting them to intense noise; using cold air to chill them; or threatening harm to them or other individuals.<br><br>I(2)  All records setting forth or discussing policies, procedures or guidelines relating to |

---

[2]  The Administration recently renamed the Global War on Terror; it is now referred to as the Global Struggle Against Extremism.

[3]  Rendition is the practice of sending detainees for interrogation to foreign countries that practice torture.

| Plaintiff's Request | ACLU Request |
|---|---|
| | the torture or other cruel, inhuman or degrading treatment or punishment of Detainees, including but not limited to policies, procedures or guidelines relating to the methods listed in Paragraph 1, above.<br><br>I(3)  All records relating to measures taken or policies, procedures or guidelines put in place, to ensure that Detainees were not, are not or will not be tortured or subjected to cruel, inhuman or degrading treatment or punishment.  Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees. |
| 15) Records relating to investigations, inquiries, observations, inspections or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 14, above, including, but not limited to, records indicating the existence of such investigations, inquiries, observations, inspections or disciplinary proceedings. | I(4)  All records indicating or discussing actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 2, above.<br><br>I(5)  All records relating to investigations, inquiries, or disciplinary proceedings initiated in retaliation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 2, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.<br><br>I(6)  All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Detainee. |
| 17) Records of any investigations, inquiries, observations, or inspections relating to conditions of detention or interrogations at *Guantanamo*, including, but not limited to:<br><br>    a)   Records concerning a visit by Admiral Church to Guantanamo on or about May 6, 2004; | See I(5) and (6), above. |

4

| Plaintiff's Request | ACLU Request |
|---|---|
| b)   Records prepared by Admiral Church concerning his visit to Guantanamo on or about May 6, 2004;<br><br>c)   Records concerning any observations of detention at Guantanamo by the Red Cross or any other non-governmental organization. | |

In its description of records requested, see ACLU Request at 1, attached hereto at *Exhibit B*, the ACLU Request makes plain that it seeks responsive records about and from all U.S. military bases or detention facilities where detainees are being held.  Part I of the ACLU Request is captioned "[r]ecords concerning the treatment of Detainees in United States custody."  The ACLU Request encompasses not only the narrow subset of policies and procedures governing treatment of detainees at Guantanamo sought by Requesters, but *all* policies governing treatment of detainees in U.S. custody anywhere around the world.

Documents responsive to ACLU Request Nos. I(4), (5) and (6) may include the subset of records sought in Request Nos. 15 and 17.  Documents responsive to ACLU Request Nos. I(1), (2), and (3) may include documents responsive to Request No. 14.  However, the language of ACLU Request Nos. I(1), (2), and (3) is specifically focused on torture, in contrast to the more general language used in Request No. 14.  For example, ACLU Request No. I(3) states:

> All records relating to measures taken or policies, procedures or guidelines put in place, to ensure that Detainees were not, are not or will not be *tortured or subjected to cruel, inhuman or degrading treatment or punishment*.  Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

5

Compare the following language used in Request No. 14: "Records relating to policies, procedures or guidelines governing conditions of detention, methods of interrogation, or treatment of detainees at Guantanamo." Requesters seek a broader category of policies including, but not limited to, those concerning torture.

       B.      <u>Request No. 10(f)</u>

| Plaintiff's Request | ACLU Request |
|---|---|
| 10(f)  Records concerning any procedures, instructions, orders, or guidance provided to medical personnel with respect to their duties at Guantanamo. | I(7)  All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation.<br><br>I(8)  All records relating to medical, psychiatric or psychological assessment of any Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Detainee. |

There is no numbered ACLU Request that is comparable to Request No. 10(f). The ACLU's requests for records related to medical care are targeted specifically to the interrelationship between medical care and interrogations. ACLU Request Nos. I(7) and (8) seek interrogation-related medical policies, guidance, and assessments from facilities around the world. These requests would not yield production of all documents responsive to Plaintiff's Request No. 10(f).

**II.    The Court Should Not Tie Production of Records Responsive to Request Nos. 10(f), 14, 15, and 17 to the Schedule Set in the ACLU Order**

      The ACLU Order sets no date by which production will be completed by the Department of Defense and no briefing schedule. The ACLU Order reflects the practical considerations

associated with the sheer volume of documents expected to be responsive to the ACLU Request and the broad geographic scope of locations from which ACLU's Respondents must collect responsive information.[4]  Those considerations are not present in this case.

Plaintiff would be substantially prejudiced by the indefinite delay that will result if the ACLU Order is adopted here as to Request Nos. 10(f), 14, 15, and 17.  Given the volume of records to be produced in the ACLU case, it is highly likely that Plaintiff would not receive any records responsive to those requests until long after the briefing schedule proposed by the parties and adopted by the Court in this matter with respect to Plaintiff's remaining requests.  Plaintiff would, therefore, be forced to litigate in separate proceedings any challenges to the agencies' claimed justifications for withholding requested documents.

Almost a year after receiving the September 28, 2004 request, Defendants have produced only a trickle of responsive records, and only after this litigation was filed.  For the reasons stated above, the Court should order Defendants to produce all records responsive to Request Nos. 10(f), 14, 15, and 17 by September 28, 2005, and to file a *Vaughn* index on October 28, 2005, consistent with the Joint Statement Pursuant to Local Rule 16.1(D), adopted by the Court on July 28, 2005.

This Court has jurisdiction to enjoin Defendants from withholding records and to order production of any agency records improperly withheld from Plaintiff.  See 5 U.S.C. § 552(a)(4)(B).  This Court has an obligation "to create as complete a public record as is possible" of the Defendants' grounds for withholding requested records (see Phillippi v. Central Intelligence Agency, 546 F.2d 1009, 1013 (D.D.C. 1976)), and the authority to order the

---

[4]  The ACLU Request seeks numerous records beyond the scope of the Request.  Those broader requests seek documents about rendition by the United States of detainees to foreign governments known to employ illegal interrogation techniques and deaths of any detainees while in U.S. custody.  The entire ACLU Request, including many paragraphs which do not overlap at all with Plaintiff's Request (see, e.g., paragraphs II(1)-(2) and paragraphs III(13)-(21)), is subject to the court order by Judge Hellerstein.  Of the thousands of pages of documents to be produced pursuant to that order, only a small subset also will be responsive to Request Nos. 10(f), 14, 15, or 17.

delinquent agencies to respond to the Request by ordering a production schedule and a *Vaughn* index.  See Church of Scientology v. Department of Justice, 30 F.3d 224, 228 (1st Cir. 1994).  "[C]ourts often direct a government agency seeking to withhold documents to supply the opposing party and the court with a Vaughn index, which includes a general description of each document sought by the FOIA requester and explains the agency's justification for nondisclosure of each individual document or portion of a document.")

An adequate *Vaughn* index serves three functions: (1) it forces the government to analyze carefully any material withheld; (2) it enables the trial court to fulfill its duty of ruling on the applicability of a claimed exemption; and (3) it enables the adversary system to operate by giving the requester as much information as possible.  See Maynard v. CIA, 986 F.2d 547, 556 (1st Cir. 1993).  The Defendants must provide a detailed index of documents withheld, including for each (or portion thereof) the justification for non-disclosure, to ensure that Plaintiff and the Court have adequate information to evaluate the applicability of the claimed exemptions.  See, e.g., Church of Scientology, 30 F.3d at 234 (holding that index of withheld records provided by agency was inadequate to support grant of summary judgment in favor of the agency and observing "the Supreme Court contemplates that the government provide meaningful detail in support of its withholdings").

The Court should order Defendants to inform Plaintiff of the bases for their determinations that any records responsive to Request Nos. 10(f), 14, 15, and 17 are exempt from production in the *Vaughn* index due to be filed on October 28, 2005.  That schedule would not be burdensome to Defendants, since several documents responsive to those requests recently

have been reviewed by the Department of Defense in connection with numerous internal investigations.[5]

Plaintiff asks the Court to (1) set a deadline of September 28, 2005 for Defendants' production of records responsive to Request Nos. 10(f), 14, 15, and 17, consistent with the production schedule for Plaintiff's remaining requests agreed to by the parties, and (2) set a deadline of October 28, 2005 for filing of Defendants' *Vaughn* index, which will provide the agencies' justifications for withholding responsive information.

                                    Respectfully Submitted,


                                    _____/s/ Lynne C. Soutter_____
                                    Robert C. Kirsch (BBO #541755)
                                    Melissa A. Hoffer (BBO #641667)
                                    Lynne C. Soutter (BBO #657934)
                                    Wilmer Cutler Pickering Hale and Dorr LLP
                                    60 State Street
                                    Boston, Massachusetts 02109
                                    (617) 526-6000

Date:  August 4, 2005

---

[5] A listing of recent internal investigations relating to treatment of detainees is available on the DOD website at http://www.dod.gov/news/detainee_investigations.html.

# Exhibit A

# WILMER CUTLER PICKERING
## HALE AND DORR LLP

September 28, 2004

Stephen H. Oleskey

60 STATE STREET
BOSTON, MA 02109
+1 617 526 6544
+1 617 526 5000 fax
stephen.oleskey@wilmerhale.com

H.J. McIntyre
Director, Freedom of Information & Security Review
1155 Defense Pentagon, Room 2C757
Washington, D.C. 20301-1155

Re:    Freedom of Information Act Request

Dear Director McIntyre:

This letter constitutes a request for records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., and corresponding regulations. This request is submitted on behalf of the following individuals (collectively, "Requesters") who are presently detained at Guantanamo Bay Naval Base, Cuba ("Guantanamo"): Lakhdar Boumediene, Mohammed Nechle, Mustafa Ait Idir, Saber Lahmar, Hadj Boudella, and Bensayah Belkacem.

## I.    Records Sought

Requesters seek all records in any way relating to, pertaining to, or mentioning any or all of them and the detention of any or all of them by any and all persons or entities, including all persons acting on behalf of the United States. Without limiting any of the above, Requesters specifically seek all records concerning the Government's custody and interrogations of them. Requests for "records concerning Requesters" will include any records in any form, including electronic media, that in any way concern, relate to, pertain to, refer to, or mention any or all of the Requesters. Accordingly, Requesters seek the following records:

1) Correspondence and records, including, but not limited to, notes, e-mail, and telephone records of communications between the federal government and the government of Bosnia and Herzegovina or any person or organization in Bosnia and Herzegovina concerning Requesters;

2) Records concerning the transfer of custody of Requesters from Bosnia and Herzegovina to the United States in January 2002;

3) Records concerning the transport of Requesters from Bosnia and Herzegovina to Guantanamo, including, but not limited to, records of the transport itinerary, duration of the flight, and measures taken with respect to physically securing Requesters during transport;

4) Records of communications with, interrogations and interviews of (referred to collectively as "interrogations") Requesters while in the custody of Bosnia and Herzegovina, including, without limitation:

H.J. McIntyre
September 28, 2004
Page 2

    a) Any statements made by Requesters;

    b) Any transcriptions of the interrogations;

    c) Any photographs, video, audio, digital or other contemporaneous recordings of the interrogations;

    d) Records concerning the conditions to which Requesters were subject during the interrogations;

    e) Records concerning the mental or physical condition of Requesters during or after the interrogations;

    f) Records containing, or in any way relating or referring to, information provided by or derived from information obtained from Requesters;

5) Records concerning access to Requesters granted or denied to foreign governments or non-governmental organizations, including, but not limited to, records relating to a visit from representatives of the government of Bosnia and Herzegovina to Guantanamo in or about July 2004;

6) Records of interrogations of Requesters while in the custody of the United States, including, without limitation:

    a) Any statements made by Requesters;

    b) Any transcriptions of the interrogations;

    c) Any photographs, video, audio, digital or other contemporaneous recordings of the interrogations;

    d) Any records of the conditions to which Requesters were subjected during the interrogations;

    e) Records concerning the mental or physical condition of Requesters during or after the interrogations;

    f) Records concerning any interaction the Joint Intelligence Group at Guantanamo had with Requesters;

    g) Records containing, or in any way relating or referring to, information provided by or derived from Requesters;

7) Records concerning Requesters that contain information supplied by military police, the Joint Detention Operations Group, or other persons who monitor detainees in Guantanamo;

H.J. McIntyre
September 28, 2004
Page 3

8) Records containing information supplied by intelligence officers, interrogators at Guantanamo, or the Joint Intelligence Group concerning Requesters;

9) Records concerning Requesters that contain statements made by other Guantanamo detainees or terrorist suspects;

10) Medical records and information concerning Requesters, including, without limitation:

    a) Records and information concerning the physical condition of Requesters;

    b) Records of any medical conditions experienced by Requesters;

    c) Records of any medical and/or psychiatric treatments provided, requested, or denied while in U.S. custody;

    d) Records of the mental health or psychological conditions of Requesters;

    e) Records concerning the identities of every person who has or did have any responsibility to observe, record, address, cure, modulate, monitor, or in any way reflect upon the physical or mental health conditions of Requesters;

    f) Records concerning any procedures, instructions, orders, or guidance provided to medical personnel with respect to their duties at Guantanamo;

11) Records concerning any physical or psychological conditions to which Requesters were subject while in U.S. custody, including, without limitation:

    a) Records concerning physical or psychological abuses of Requesters;

    b) Records concerning physical or psychological conditions used to elicit cooperation from Requesters, including, but not limited to: use of shackles; solitary confinement; use of psychoactive drugs; modulation of temperature; withholding of food or water; exposure to weather elements; use of straight jackets; use of dogs to intimidate and/or coerce or attack; threatening the well-being of Requesters' families or otherwise intimating that their families would be harmed; cavity searches; forcing Requesters to hold specific body positions for extended periods of time; sleep deprivation; sensory deprivation or sensory overload, *e.g.*, by exposure to very bright lights at night, by exposure to loud music or noise; withholding or damaging the Koran; withholding communications to or from Requesters' families and/or representatives of the government of Bosnia and Herzegovina.

    c) Records concerning physical or psychological conditions used to punish Requesters, including, but not limited to: use of shackles; solitary confinement; use of psychoactive drugs; modulation of temperature; withholding of food or water; exposure to weather elements; use of straight jackets; use of dogs to intimidate and/or coerce or attack;

H.J. McIntyre
September 28, 2004
Page 4

threatening the well-being of Requesters' families or otherwise intimating that their families would be harmed; cavity searches; forcing Requesters to hold specific body positions for extended periods of time; sleep deprivation; sensory deprivation or sensory overload, *e.g.*, by exposure to very bright lights at night, by exposure to loud music or noise; withholding or damaging the Koran; withholding communications to or from Requesters' families and/or representatives of the government of Bosnia and Herzegovina;

d)  Records concerning treatment of Requesters by interrogators, including, but not limited to, any plans, instructions, orders, guidance or procedures governing interrogations, and any records of any person objecting to or refusing to comply with such instructions;

12) Records concerning any contact, communication, or interaction between the International Committee for the Red Cross ("Red Cross"), or any other non-governmental organization, and Requesters, including, but not limited to, records related to decisions to grant or deny the Red Cross access to any Requester;

13) Records concerning any contact, communication or interaction between any military personnel or special forces unit and Requesters, including, without limitation:

a)  Records concerning any contact or interaction between the Extreme Reaction Force ("ERF") or the Immediate Response Force ("IRF") in Guantanamo and Requesters;

b)  Records concerning any disciplinary action or punishment against Requesters;

14) Records relating to policies, procedures or guidelines governing conditions of detention, methods of interrogation, or treatment of detainees at Guantanamo;

15) Records relating to investigations, inquiries, observations, inspections or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 14, above, including, but not limited to, records indicating the existence of such investigations, inquiries, observations, inspections or disciplinary proceedings;

16) Records concerning any investigation of or disciplinary action taken against any guard, military police, intelligence officer, military personnel or civilian in connection with Requesters;

17) Records of any investigations, inquiries, observations, or inspections relating to conditions of detention or interrogations at Guantanamo, including, but not limited to:

a)  Records concerning a visit by Admiral Church to Guantanamo on or about May 6, 2004;

b)  Records prepared by Admiral Church concerning his visit to Guantanamo on or about May 6, 2004;

H.J. McIntyre
September 28, 2004
Page 5

      c) Records concerning any observations of detention at Guantanamo by the Red Cross or any other non-governmental organization.

## 2.    Requesters Are Entitled to Expedited Processing

Expedited processing of a FOIA request is warranted when there is an "imminent loss of substantial due process rights and humanitarian need." 32 C.F.R. § 286.4(d)(3)(iv). Here, the denial of Requesters' substantial due process rights is not only imminent, but also present and on-going. Requesters' have been detained by the U.S. Military in Guantanamo for more than two years without access to a lawyer or any legitimate legal process. Requesters' families and the public have not been provided with information concerning Requesters' medical health or treatment, and, given recent accounts of abuses of detainees by the military's Extreme Reaction Force, there is reason to believe that Requesters are threatened with unlawful punishments amounting to torture. *See, e.g.,* Shafia Rasul, Asif Iqbal and Rhuhel Ahmed, *Composite Statement: Detention in Afghanistan and Guantanamo Bay, ¶ 300 (available at* www.ccr-ny.org) (former detainees describing abusive conditions at Guantanamo for Algerian-Bosnian detainees); AP, *Three Britons allege abuses under U.S. custody at Guantanamo,* USA Today.com, August 4, 2004; David Rose and Gaby Hinsliff, *US Guards 'Filmed Beatings' at Terror Camp,* Observer.Guardian.uk.com, May 16, 2004; *Bosnian Citizens Imprisoned at Guantanamo Complain About Health Problems,* BBC Monitoring International Reports, August 3, 2004; Department of Justice, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations,* March 6, 2003 (rationalizing that compliance with international treaties and U.S. laws prohibiting torture could be overlooked because of legal technicalities and national security needs).

*    *    *    *

It is our understanding that much of the requested information is maintained together in a manner readily accessible to the Department, because Secretary Gordon England has stated that the Department repeatedly reviews the files of each Guantanamo detainee in order to justify their continued detention and because the Department has an on-going obligation to monitor the health of persons held in U.S. custody.[1] For these reasons, both the health and interrogation records concerning each Requester should be readily accessible to the Department.

FOIA and DoD implementing regulations provide that if some parts of records containing the requested information are exempt from mandatory disclosure, then non-exempt materials shall be disclosed after the exempt material has been deleted. *See* 5 U.S.C. § 552(b); 32 C.F.R. § 286.23(d). Therefore, if you determine some portion of a record that is responsive to this request is exempt, please provide a copy of the remainder of the record. Additionally, if you determine that some or all of the requested records are exempt from disclosure, please provide a list or index of the records withheld, the exemption invoked, an estimation of the volume of records

---

[1] Secretary England, speaking to the BBC on August 5, 2004, said that the status of each detainee had been reviewed eight times before.

H.J. McIntyre
September 28, 2004
Page 6

denied, and the reasons why a discretionary release of the records would not be appropriate under DoD implementing regulations and the agency's FOIA policy. *See* 32 C.F.R. § 286.23(e).

This request has also been sent to the Department of Justice and the Department of Homeland Security. Requesters are willing reimburse up to $5,000 of search and duplication fees incurred, in aggregate, by responding agencies related to this request.

Thank you for your consideration of this request. Please direct all future responses to my attention at:

>Stephen H. Oleskey, Esq.
>Wilmer Cutler Pickering Hale and Dorr LLP
>60 State Street
>Boston, Massachusetts 02109
>Telephone (617) 526-6544
>Facsimile (617) 526-5000

If you need to reach someone by telephone about this request, you also may contact my associate, Lynne Soutter, at (617) 526-6447.

Sincerely,

Stephen H. Oleskey

Attorney for Lakhdar Boumediene, Mohammed Nechle, Mustafa Ait Idir, Saber Lahmar, Hadj Boudella, and Bensayah Belkacem.

# Exhibit B

October 7, 2003

<u>Via Facsimile & U.S. Mail</u>

**Re: Request Submitted Under the Freedom of Information Act**

Dear Freedom of Information Officer:

This letter constitutes a request ("Request") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA). The Request is submitted on behalf of the following organizations (collectively, "Requesters"):

> American Civil Liberties Union (ACLU);
> Center for Constitutional Rights (CCR);
> Physicians for Human Rights (PHR);
> Veterans for Common Sense (VCS); and
> Veterans for Peace (VFP).

We are filing the Request simultaneously with the Department of Defense (including its components, the Departments of the Army, Navy, and Air Force, and the Defense Intelligence Agency), the Department of Justice (including its components, the Federal Bureau of Investigation and Office of Intelligence Policy and Review), the Department of State, and the Central Intelligence Agency. In separate letters, we have applied for expedited processing pursuant to 5 U.S.C. § 552(a)(4)(E).

#### <u>Records Requested</u>

Recent news reports indicate that individuals apprehended after September 11, 2001, and held by the United States at military bases or detention facilities outside the United States ("Detainees") have in some cases been tortured or subjected to interrogation techniques that are prohibited by international and United States law. News reports also indicate that the United States has rendered[1] Detainees and other individuals to foreign powers known to employ torture and illegal interrogation

---

[1] In this Request, "rendition" means the transfer of a person by the United States to a "foreign power," as defined in 50 U.S.C. § 1801, without prior review by an immigration or Article III judge.

techniques.  The Request seeks records relating to the treatment of Detainees and the rendition of Detainees and other individuals.

Both international and United States law unequivocally prohibit the use of torture.  The Convention Against Torture ("CAT"), which the United States has signed and ratified, prohibits the use of torture and the infliction of other cruel, inhuman or degrading treatment or punishment.[2]  The prohibition against torture is also codified in United States law at 18 U.S.C. § 2340A.

The CAT further provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State whether there are substantial grounds for believing that he would be in danger of being subjected to torture."[3]  This provision is implemented in United States law by the Foreign Affairs Reform and Restructuring Act of 1998, which states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which

---

[2] In this Request, the terms "torture" and "cruel, inhuman or degrading treatment or punishment" have the meaning accorded them in the CAT, as interpreted by the United Nations Committee Against Torture. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 1, S. Treaty Doc. No. 100-20 (1998), 1465 U.N.T.S. 85.  The CAT defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.*  The United Nations Committee Against Torture has held that the following techniques constitute "torture" as defined under the CAT: (1) restraining in very painful conditions, (2) hooding under special conditions, (3) sounding of loud music for prolonged periods, (4) sleep deprivation for prolonged periods, (5) threats, including death threats, (6) violent shaking, and (7) using cold air to chill. *See* Report of the Committee Against Torture, U.N. GAOR, 52d Sess., Supp. No. 44, at para 257, U.N. Doc. A/52/44 (1997).  Our use of these terms also encompasses torture and/or "cruel inhuman or degrading treatment or punishment" under any other United States constitutional or statutory provision.

[3] CAT, art. 3.

2

there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."[4]

After the release of news reports indicating abuse of Detainees, the President assured the public that "[t]he United States is committed to the world-wide elimination of torture and we are leading this fight by example."[5] William J. Haynes, General Counsel for the Department of Defense, has confirmed that "it is the policy of the United States to comply with all of its legal obligations in its treatment of detainees," including its obligations under the CAT.[6] Mr. Haynes has also asserted that "[i]f the war on terrorists of global reach requires transfer of detained enemy combatants to other countries for continued detention on our behalf, U.S. Government instructions are to seek and obtain appropriate assurances that such enemy combatants are not tortured."[7]

These assurances, while welcome, have failed to address the numerous credible reports recounting the torture and rendition of Detainees. Nor have they explained what measures, if any, the United States has taken to ensure compliance with its legal obligations with respect to the use of torture and the infliction of cruel, inhuman or degrading treatment or punishment.

To determine whether the United States is honoring its obligations under domestic and international law, Requesters seek the release of agency records as described in the numbered paragraphs below:

---

[4] Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681 (1999) (codified as Note to 8 U.S.C. § 1231).

[5] Statement by the President, United Nations International Day in Support of Victims of Torture, (June 26, 2003), *at* http://www.whitehouse.gov/news/releases/2003/06/20030626-3.html

[6] Letter from William J. Haynes II, General Counsel of the Department of Defense, to the Honorable Patrick J. Leahy, United States Senator (June 25, 2003), *at* http://www.hrw.org/press/2003/06/tortureday.htm.

[7] Letter from William J. Haynes II, General Counsel of the Department of Defense, to Kenneth Roth, Executive Director, Human Rights Watch (April 2, 2003), *at* http://www.hrw.org/press/2003/04/dodltr040203.pdf

## I.  Records concerning the treatment of Detainees in United States custody

Discussing the treatment of individuals detained by the United States at Bagram Airbase in Afghanistan, a December 2002 article from the Washington Post reports:

> Those [detainees] who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods.  At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights – subject to what are known as "stress and duress" techniques. . . .

> According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms.  The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subject to loud noises and deprived of sleep.

Dana Priest & Barton Gellman, *U.S. Decries Abuse but Defends Interrogations*, Washington Post, Dec. 26, 2002, at A01.  A March 2003 article from The New York Times reports:

> Two former prisoners [at Bagram], Abdul Jabar and Hakkim Shah . . . said the conditions to which they themselves were subjected at the time included standing naked, hooded and shackled, being kept immobile for long periods and being deprived of sleep for days on end.

> Such accounts appear to raise troubling questions about the conditions of detention and the interrogation of prisoners in the fight against terror . . . .

> Mr. Jabar and Mr. Shah said they had been made to stand hooded, their arms raised and chained to the ceiling, their feet shackled, unable to move for hours at a time, day and night.

4

Mr. Jabar said he endured this treatment for 13 days. The prisoners, he said, were freed from their standing position only to eat, pray and go to the bathroom.

Mr. Shah said he had spent 16 days in the upstairs rooms, standing for 10 of them until his legs became so swollen that the shackles around his ankles tightened and stopped the blood flow.

He said he was naked the entire time and allowed to dress only when he was taken for interrogation or to the bathroom. Mr. Shah said the cold kept him awake, as did the American guards, who kicked and shouted at him to stop him falling asleep.

None of four former prisoners interviewed said they had been beaten. But some said they had been kicked by their guards and interrogators, either to prevent them from sleeping or during their interrogations.

Carlotta Gall, *Death of an Afghan in Custody*, N.Y. Times, Mar. 4, 2003, at A14.

The Washington Post article cited above suggests that the maltreatment of detainees may be accepted and even encouraged by senior officials:

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA." . . . .

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

5

Priest & Gellman, *supra*.

Please disclose the following records:

1.   All records setting forth or discussing the legality or
     appropriateness of subjecting Detainees to torture or other cruel,
     inhuman or degrading treatment or punishment. Please include
     all records discussing the legality or appropriateness of the
     following methods: using "stress and duress" techniques on
     Detainees; using force against them; subjecting them to physical
     injury; requiring them to stand or kneel for prolonged periods;
     depriving them of sleep, food or water; holding them in awkward
     and painful positions for prolonged periods; denying them
     painkillers or medical treatment; administering or threatening to
     administer mind altering substances, "truth serums" or
     procedures calculated to disrupt the senses or personality;
     subjecting them to prolonged interrogation under bright lights;
     requiring them to be hooded, stripped, or blindfolded; binding
     their hands and feet for prolonged periods of time; isolating them
     for prolonged periods of time; subjecting them to violent shaking;
     subjecting them to intense noise; using cold air to chill them; or
     threatening harm to them or other individuals.

2.   All records setting forth or discussing policies, procedures or
     guidelines[8] relating to the torture or other cruel, inhuman or
     degrading treatment or punishment of Detainees, including but
     not limited to policies, procedures or guidelines relating to the
     methods listed in Paragraph 1, above.

3.   All records relating to measures taken, or policies, procedures or
     guidelines put in place, to ensure that Detainees were not, are not
     or will not be tortured or subjected to cruel, inhuman or
     degrading treatment or punishment. Please include all records
     indicating how any such policies, procedures or guidelines were,
     are or will be communicated to personnel involved in the
     interrogation or detention of Detainees.

---

[8] In this Request, the phrase "policies, procedures or guidelines"
means policies, procedures or guidelines that were in force on September 11,
2001 or that have been put in place since that date.

4. All records indicating or discussing actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 2, above.

5. All records relating to investigations, inquiries, or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 2, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

6. All records relating to the actual or alleged torture or other cruel, inhuman or degrading treatment or punishment of any Detainee.

7. All records relating to policies, procedures or guidelines governing the role of health personnel in the interrogation of Detainees, including but not limited to the role of health personnel in the medical, psychiatric, or psychological assessment of Detainees immediately before, during or immediately after interrogation. Please include all records indicating how any such policies, procedures or guidelines were, are or will be communicated to personnel involved in the interrogation or detention of Detainees.

8. All records relating to medical, psychiatric or psychological assessment of any Detainee or guidance given to interrogators by health personnel immediately before, during or immediately after the interrogation of any Detainee.

9. All records indicating whether and to what extent the International Committee for the Red Cross ("ICRC") had, has or will have access to Detainees, including but not limited to records related to particular decisions to grant or deny the ICRC access to any Detainee or group of Detainees.

10. All records indicating whether and to what extent any other non-governmental organization or foreign government had, has or will have access to Detainees, including but not limited to records related to particular decisions to grant or deny them access to any Detainee or group of Detainees.

## II.  Records concerning the death of Detainees in United States custody

News reports indicate that a number of Detainees have died while held at Bagram Air Base in Afghanistan.  A March 2003 article from The New York Times reports:

> The United States military has begun a criminal investigation into the death of an Afghan man in American custody in December, a death described as a "homicide" by an American pathologist.
>
> A death certificate, dated Dec. 13 and signed by Maj. Elizabeth A. Rouse, a pathologist with the Armed Forces Institute of Pathology, based in Washington, says the man died as a result of "blunt force injuries to lower extremities complicating coronary artery disease."
>
> The Afghan, known by the single name Dilawar, a 22-year-old farmer and part-time taxi driver from this village in eastern Afghanistan, died in December while being held in the main United States air base at Bagram, north of Kabul. . .
> .
>
> Chris Kelly, public affairs director at the Armed Forces Institute of Pathology, speaking from Washington, said Major Rouse had taken part in the autopsies of two Afghan men who died in custody at Bagram last year, one of whom was Mr. Dilawar. . . .
>
> [Another] Afghan man also died in American custody on Dec. 3. He was Mullah Habibullah, brother of a former Taliban commander. He was about 30, from the southern province of Oruzgan, and was held in the same detention center at Bagram.
>
> His family said no American official had given them any information or explanation about the death, which was learned from the International Committee of the Red Cross.

Gall, *supra*; *see also* Barbara Starr, *Afghan detainees' deaths ruled homicides*, CNN.com, Mar. 5, 2003 (noting that the "criminal investigation" into the deaths of two Afghan detainees was in its final stages, and relating

the acknowledgement of one senior military official that "[t]his investigation may not go well for us."); April Witt, *U.S. Probes Death of Prisoner in Afghanistan*, Washington Post, June 24, 2003, at A18 (reporting the death of an Afghan man held at a United States holding facility near Asadabad, in the eastern province of Konar, Afghanistan).

Please disclose:

11.  All records, including autopsy reports and death certificates, relating to any deaths of Detainees.

12.  All records relating to investigations, inquiries, or disciplinary proceedings initiated as a result of any deaths of Detainees, including but not limited to records indicating the existence of such investigations, inquiries, or disciplinary proceedings.

## III.  Records related to the rendition of Detainees and other individuals

News reports indicate that individuals have been rendered to foreign powers known to employ torture or illegal interrogation techniques. One news report states:

> In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services – notable those of Jordan, Egypt, and Morocco – with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means. . . .

> According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them."

Priest & Gellman, *supra*; see also David E. Kaplan, Aamir Latif, Ilana Ozernoy, Laurie Lande, Monica M. Ekman, *Playing Offense: The inside story of how U.S. terrorist hunters are going after al Qaeda*, U.S. News & World Report, June 2, 2003 ("The CIA has helped move dozens of detainees not only to Jordan but also to Egypt, Morocco, and even Syria."). Statements of senior officials suggest that the United States may be complicit in the torture of rendered individuals:

> The CIA's participation in the interrogation of rendered
> terrorist suspects varies from country to country.
>
> "In some cases [involving interrogations in Saudi Arabia],
> we're able to observe through one-way mirrors the live
> investigations," said a senior U.S official involved in Middle
> East security issues. "In others, we usually get summaries.
> We will feed questions to their investigators. They're still
> very much in control."

*Id.* Another news report quotes Vince Cannistraro, former director of the
CIA's counterterrorism center, on the treatment of a Guantanamo Bay
Detainee who was sent to Egypt for "failing to cooperate": "They promptly
tore his fingernails out and he started telling things." Tom Brune, *An
Aggressive Interrogation*, Newsday, Mar. 4, 2003, at A05.

We are interested in obtaining records indicating the circumstances
under which the United States has rendered Detainees or other individuals to
foreign powers that are known or suspected to use torture or to inflict cruel,
inhuman or degrading treatment or punishment.

Please disclose:

13. All records setting forth or discussing the legality or
appropriateness of the rendition of individuals who may be
tortured or subjected to cruel, inhuman or degrading treatment or
punishment after their rendition.

14. All records setting forth or discussing policies, procedures or
guidelines relating to the rendition of individuals who may be
tortured or subjected to cruel, inhuman or degrading treatment or
punishment after their rendition.

15. All records relating to measures taken, or policies, procedures or
guidelines put in place, to ensure that rendered individuals were
not, are not, or will not be tortured or subjected to cruel, inhuman
or degrading treatment or punishment after their rendition.
Please include all records indicating how any such policies,
procedures or guidelines were, are or will be communicated to
personnel involved in the interrogation, detention or rendition of
individuals.

16. All records relating to actual or possible violations of, or deviations from the policies, procedures or guidelines referred to in Paragraph 14, above.

17. All records relating to the involvement of United States personnel in the interrogation of individuals after they have been rendered.

18. All records relating to investigations, inquiries or disciplinary proceedings initiated in relation to actual or possible violations of, or deviations from, the policies, procedures or guidelines referred to in Paragraph 14, above, including but not limited to records indicating the existence of such investigations, inquiries or disciplinary proceedings.

19. All records relating to the actual or alleged torture or cruel, inhuman or degrading treatment or punishment of any Detainee after his rendition.

20. All records related to assurances sought or obtained from foreign powers to whom individuals have been rendered regarding the treatment of those individuals.

21. All records indicating whether and to what extent the ICRC or other non-governmental organizations had, have, or will have access to individuals after they have been rendered.

## Fee Waiver

The ACLU, CCR, PHR and VFP qualify as "representatives of the news media" and the records are not sought for commercial use. Accordingly, fees associated with the processing of the Request should be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II). These organizations are "entit[ies] that gather . . . information of potential interest to a segment of the public, use . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute . . . that work to an audience." *National Security Archive v. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989).

The ACLU is a nationwide, not-for-profit, non-partisan organization with over 400,000 members dedicated to the principles of liberty and equality. It has long believed that our nation's commitment to civil liberties

values is enhanced by adherence to appropriate international human rights norms, including the prohibition against torture.

The ACLU publishes newsletters, news briefings, right-to-know handbooks, and other materials that are disseminated to the public. These materials are widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee through its public education department. The ACLU also disseminates information through its heavily subscribed website, www.aclu.org. The website addresses civil liberties issues in depth, provides features on civil liberties issues in the news, and contains hundreds of documents that relate to the issues addressed by the ACLU. The website includes features on information obtained through the FOIA. *See, e.g.*, www.aclu.org/patriot_foia. The ACLU also publishes an electronic newsletter, which is distributed to subscribers by e-mail. On account of these factors, the ACLU has not been charged fees associated with responding to FOIA requests on numerous occasions.[9]

CCR is a legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights. CCR also publishes newsletters, know-your-rights handbooks, and other similar materials for public dissemination. These materials are available through CCR's Development and Education & Outreach Departments. CCR also operates a website, www.ccr-ny.org, that addresses the issues on which the Center works. The website includes material on topical civil and human rights issues and material concerning CCR's work. All of this material is freely available to the public.

---

[9] The following are recent examples of requests in which agencies did not charge the ACLU fees associated with responding to a FOIA request: (1) The Office of Science and Technology Policy in the Executive Office of the President has told the ACLU that it will waive the fees associated with a FOIA request submitted by the ACLU in August 2003; (2) The Federal Bureau of Investigation did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; (3) The Office of Intelligence Policy and Review did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002; and (4) The Office of Information and Privacy in the Department of Justice did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

PHR is a not-for-profit organization whose mission is to promote health by protecting human rights. It uses scientific methods and clinical medical skills to investigate allegations of human rights violations. PHR has conducted medical investigations of torture throughout the world and played a lead role in developing the principal international instrument for the medical evaluation of torture, the Istanbul Protocol. PHR publishes newsletters, reports, and informational materials for the public, many of which are available on its website, www.phrusa.org. The website contains a section on torture and the means for preventing it. PHR also distributes an email newsletter free of charge to the public.

VCS, a Washington D.C. based, non-profit, United States veterans' organization, is committed to providing a voice of reason on issues of war and national security from the unique perspective of those who have served their country in uniform. VCS stands firm on the principal that our nation's precious youth should only be committed to battle under the gravest of circumstances and therefore seek to return our country to a time when war is truly the policy of last resort. To this purpose, it informs fellow citizens of the terrible costs of war, by challenging policies that abuse the trust of military service members and by speaking out in defense of the values espoused in the oath its members take to support and defend the Constitution of the United States. VCS disseminates information through its website, www.veteransforpeace.org, news briefings, media interviews, published editorials and direct contact through email to the general membership.

VFP is a not-for-profit, non-partisan organization of United States war veterans who served from World War II through Gulf War I. There are 85 VFP chapters across the nation, from Alaska to Florida. VFP consists of men and women who, having dutifully served their nation, now embrace a greater responsibility to serve the cause of world peace. To this end they work with others to: (1) increase public awareness of the costs of war; (2) restrain the United States government from intervening, overtly and covertly, in the internal affairs of other nations; (3) end the arms race and reduce and eventually eliminate nuclear weapons; (4) seek justice for veterans and victims of war, and (5) abolish war as an instrument of national policy. VFP disseminates information through its website, www.veteransforpeace.org, listserves to the general on-line membership, chapter contacts, and a quarterly newsletter.

The records requested are not sought for commercial use, and the requesters plan to disseminate the information disclosed as a result of this FOIA request through the channels described above.

We also request a waiver of fees on the grounds that disclosure of the requested records is in the public interest and because disclosure "is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii). This Request aims at furthering public understanding of government conduct, and specifically to help the public determine whether or not the government's commitment to domestic and international proscriptions against torture is honored in practice.

As indicated above, numerous news articles reflect the significant public interest in the records we seek. *See* articles cited *supra*; *see also Answers about Torture*, Washington Post, Mar. 16, 2003, at B06 ("The Bush administration has categorically denied that it is torturing people. But it has offered no details regarding its policies toward interrogations. . . . The secrecy surrounding U.S. policy makes any objective assessment of these allegations impossible. . . . The public is entitled to a fuller understanding."). Disclosure of the requested records will contribute significantly to the public's understanding of government conduct.

*    *    *

If our request is denied in whole or part, we ask that you justify all deletions by reference to specific exemptions of the FOIA. We expect you to release all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

As indicated above, we are applying in a separate letter for expedited processing of this Request. Notwithstanding your determination of that application, we look forward to your reply to the Request within twenty (20) business days, as required under 5 U.S.C. § 552(a)(6)(A)(i).

Thank you for your prompt attention to this matter.

Please respond to Amrit Singh, Staff Attorney, American Civil Liberties Union, 125 Broad Street, 18th Floor, New York, NY 10004, telephone (212) 549-2609.

Signed by:

STEVEN WATT
BARBARA OLSHANSKY
MICHAEL RATNER
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
Fax: (212) 614-6499

AMRIT SINGH
OMAR C. JADWAT
JAMEEL JAFFER
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2609
Fax: (212) 549-2654