# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| STEPHEN H. OLESKEY, ) | |
| ) | Civil Action No. 05-10735 RGS |
| ON BEHALF OF GUANTANAMO DETAINEES ) | |
| LAKHDAR BOUMEDIENE; ) | |
| MOHAMED NECHLA; MUSTAFA AIT IDIR; ) | |
| SABER LAHMER; HADJ BOUDELLA; ) | |
| BELKACEM BENSAYEH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE and UNITED STATES ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEPARTMENT OF DEFENSE'S MOTION FOR SUMMARY JUDGMENT
## REGARDING THE ADEQUACY OF THE SEARCHES

## PRELIMINARY STATEMENT

This is an action brought by the plaintiff, Stephen H. Oleskey, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, on behalf of six detainees being held at the United States Naval Base, Guantanamo Bay, Cuba – Lakhdar Boumediene, Mohamed Nechla, Mustafa Ait Idir, Saber Lahmer, Hadj Boudella, and Belkacem Bensayeh (hereafter the "Six Detainees").  In his FOIA request, plaintiff sought records pertaining to the ongoing internment of those six detainees, how they came into the custody of the United States, and their treatment since they came into the custody of the United States, including records regarding the health, interrogation, physical coercion, torture, and/or punishment of any or all of the Six Detainees.  See Complaint ¶¶ 1, 3.

The United States Department of Defense ("DoD") conducted a massive search in response to plaintiff's FOIA request, and identified over 10,000 pages of responsive records. The amount of time spent by DoD personnel responding to plaintiff's request was virtually unprecedented. For example, as of July 2006, staff members of the DoD Office of General Counsel ("OGC") had spent over 2000 man hours (a conservative estimate) performing various necessary task to respond to plaintiff's FOIA request, while DoD's Office of Information and Security Review ("DoD FOIA") estimates that as of July 2006, it spent over 3000 man hours responding to plaintiff's FOIA request. See Declaration of John P. Taitt ("Taitt Decl.") ¶ 81 n.82. Similarly, personnel assigned to the Joint Analysis Center ("JAC"), a command subordinate to the U.S. European Command, expended over 6800 man hours for the search, review, and referral process in responding to plaintiff's FOIA request. See Declaration of Captain Joseph B. Hoenig ("Hoeing Decl.") ¶ 19. DoD also agreed to waive any search fees over $5,000. See Docket Entry No. 16 (Defendant U.S. Department of Defense's Consent Motion to Modify Production Schedule ¶ 3).

Pursuant to the scheduling order entered by this Court on March 5, 2008, DoD now moves for summary judgment regarding the adequacy of the searches conducted pursuant to plaintiff's FOIA request. Unlike most civil actions, in which the plaintiff bears the burden of proof, it is the government that has the burden of sustaining its actions in a FOIA case. See 5 U.S.C. § 552(a)(4)(B) ("[T]he burden is on the agency to sustain its action."). The government ordinarily seeks to satisfy this burden by filing a motion for summary judgment together with a supporting agency declaration explaining any exemptions claimed and the adequacy of the search conducted. See North Dartmouth Properties, Inc. v. U.S. Dept. of Housing & Urban Dev., 984 F. Supp. 65, 68 (D. Mass. 1997) ("FOIA cases are often decided on summary judgment."). In this case, DoD has submitted

declarations describing with specificity the searches conducted by various components of DoD to locate documents in response to plaintiff's FOIA request. Because those declarations establish that DoD conducted an adequate search for responsive records, this Court should enter summary judgment on behalf of DoD regarding the adequacy of the search.

<u>**ARGUMENT**</u>

I.     **DoD CONDUCTED AN ADEQUATE SEARCH IN RESPONSE TO PLAINTIFF'S FOIA REQUEST**

   A.     <u>**Standards Governing an Agency's Search for Records**</u>

   The standards by which the adequacy of an agency's search for responsive records under the FOIA is evaluated are well-established. The FOIA generally requires federal agencies to release documents responsive to a properly submitted request, except for those documents (or portions thereof) subject to one of nine statutory exemptions. <u>See</u> 5 U.S.C. §§ 552(a)(3), (b)(1)-(9). In discharging its obligation, the agency must conduct a reasonable search for responsive documents and, in withholding a document (or portions thereof), must release those portions containing reasonably segregable, non-exempt material. <u>See</u> 5 U.S.C. § 552(b) (text following exemptions).

   When a suit is brought challenging an agency's failure to produce or withholding of documents in response to a FOIA request, a court conducts a <u>de novo</u> review to determine the adequacy of the agency's search and whether the agency properly withheld records under any of the FOIA's nine statutory exemptions. <u>See</u> 5 U.S.C. § 552(a)(4)(B). The government bears the burden of justifying non-disclosure, <u>see</u> <u>McCutchen</u> v. <u>U.S. Dep't of Health & Human Servs.</u>, 30 F.3d 183, 185 (D.C. Cir. 1994), and it may satisfy that burden through submission of an agency declaration that describes the search conducted and the withheld material with reasonable specificity as well as the

reasons for non-disclosure.  See U.S. Dept. of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 753 (1989); Summers v. Dept. of Justice, 140 F.3d 1077, 1080 (D.C. Cir. 1998). Jurisdiction to order the agency to release nonexempt records or material exists only if the court concludes that the agency "(1) improperly, (2) withheld, (3) agency records." Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980).  "Unless each of these criteria is met, a district court lacks jurisdiction to devise remedies to force an agency to comply with the FOIA's disclosure requirements." U.S. Dept. of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dept. of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  "In order to establish the adequacy of its search, the agency may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith." Maynard v. CIA, 986 F.2d 547, 559 (1st Cir. 1993).  The agency affidavit should describe in reasonable detail the scope and method by which the search was conducted, and additionally "'describe at least generally the structure of the agency's file system which makes further search difficult.'" Id. (quoting Church of Scientology of Cal. v. I.R.S., 792 F.2d 146, 151 (D.C. Cir. 1986) (Scalia, J.)).

Once an agency "demonstrates that it has conducted a reasonably thorough search, the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith.  An agency's affidavit is 'accorded a presumption of good faith, which cannot be rebutted by "purely speculative claims about the existence and discoverability of other documents."'" Id. at 560 (quoting SafeCard Services v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991), in turn quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

B.    **The Searches Conducted in Response to Plaintiff's FOIA Request**

An overview of DoD's processing of plaintiff's FOIA request and the searches conducted by various DoD agencies is set forth in the accompanying Declaration of John P. Taitt, an Associate Deputy General Counsel in DoD's Office of General Counsel ("OGC") at the time of his declaration in July 2006.  As set forth therein, DoD's Office of Information and Security Review ("DoD FOIA") received plaintiff's FOIA request in October 2004, and determined that the agencies likely to have information responsive to the request were the U.S. Southern Command ("SOUTHCOM"); the Defense Intelligence Agency ("DIA"); the U.S. Army Criminal Investigative Task Force ("CITF"); the Office for the Administrative Review of the Detention of Enemy Combatants ("OARDEC"); the Joint Staff; the office of the Undersecretary of Defense for Policy ("Detainee Affairs"); the U.S. Transportation Command ("TRANSCOM"); the U.S. Special Operations Command ("SOCOM"); and the U.S. European Command ("EUCOM"); as well as other government agencies.  See Taitt Decl. ¶ 3.  In October 2004 and again in August 2005, DoD FOIA tasked each of these agencies to conduct a search and provide any responsive documents to DoD FOIA for review.  Id.

The most significant searches conducted by those offices are detailed below.

1.    **SOUTHCOM and JTF-GTMO**

The search conducted by SOUTHCOM and the Joint Task Force–Guantanamo, Guantanamo Bay, Cuba ("JTF-GTMO"), is a subordinate command to SOUTHCOM, is described in the accompanying Declaration of Captain Peter A. Husta ("Husta Decl."), the Chief of Staff at JTF-GTMO at the time of his declaration in July 2006.

In October 2004, SOUTHCOM transmitted the request to conduct a search for records responsive to plaintiff's FOIA request to JTF-GTMO.  See Husta Decl. ¶ 4.  In November 2004,

JTF-GTMO conducted a search of records maintained by the Joint Detention Group ("JDG"), the Joint Intelligence Group ("JIG"), and the Joint Medical Group ("JMG"), the three JTF-GTMO components determined likely to maintain information responsive to plaintiff's FOIA request. Id. The JDG and JIG identified several documents responsive to plaintiff's request, and the JMG identified the medical records pertaining to each of the six detainees on behalf of whom plaintiff filed his FOIA request, and provided them to DoD FOIA in March 2005. Id. These records, which corresponded to Bates numbers 1-1102, were subsequently released to the plaintiff in August 2005. Id.

On August 2, 2005, DoD FOIA tasked SOUTHCOM and JTF-GTMO with conducting an additional search for documents responsive to plaintiff's FOIA request. Id. ¶ 6. In response, JTF-GTMO tasked the JIG, JDG, and Detainee Operations ("J3") with conducting a search of their respective "systems of records" to identify and produce records responsive to plaintiff's FOIA request and make recommendations regarding information deemed exempt from release under the FOIA. Id. Because the JMG had already identified and produced the medical records pertaining to each of the six detainees on behalf of whom plaintiff filed his FOIA request, they were not tasked with conducting an additional search. Id. ¶ 6 n.4.

By September 2005, each of these three JTF-GTMO components completed a search of their "systems of records" and located responsive records, which are listed on the Vaughn index which has been provided to the plaintiff at Bates ranges 3563-4006, 4007-4654, and 4984-5454. See Taitt Decl. ¶ 6 & n.5. The searches conducted were as follows:

## a.    Joint Intelligence Group ("JIG")

The JIG collects information through interrogation operations and other intelligence gathering methods, and information and records compiled on detainees by JIG personnel in furtherance of their mission, as well as information obtained by from other United States governmental organizations, is stored electronically in the Joint Detention Information Management System ("JDIMS"), a database maintained by JIG.  See Husta Decl. ¶ 7.  This system is a central clearinghouse for intelligence information compiled on each detainee, including interrogation reports, intelligence messages, intelligence reports, analyst products, and periodic detainee assessments, which are produced by the JIG and other organizations, such as CITF.  Id.  All information regarding a particular detainee, if in the possession and control of the JIG, resides in this database.  Id.

Members of the JIG searched for materials responsive to plaintiff's FOIA request by entering a query, consisting of the names and Internment Serial Number ("ISN") of each of the six detainees into a search field within JDIMS.  Id. ¶ 8 & n.5.  Each search pulled up the entire record for each individual detainee.  Id.  Using functions within JDIMS, JIG personnel then retrieved all documents pertaining to each of the six detainees, and reviewed each record to determine if it pertained to that detainee and if it was responsive to plaintiff's FOIA request.  Id.  The JIG identified approximately 264 documents responsive to plaintiff's FOIA request, as well as 128 additional documents which originated with other agencies and were forwarded to those agencies for review.  Id. ¶ 8 & n.6.

## b.    Joint Detention Group ("JDG")

The JDG ensures that the detention mission is performed in a humane manner that protects the security of both detainees and JDG personnel assigned to JTF-GTMO.  Id. ¶ 9.  The JDG

maintains information on each detainee in hard copy files and the Detention Information Management System ("DIMS"), which include, but are not limited to, intake records, inspection records of detainees in segregation, reports of detainee misconduct with accompanying sworn statements, observation logs, and notices to detainees concerning Combatant Status Review Tribunals ("CSRT") and Annual Review Boards ("ARB").  Id.  Any information concerning detention operations as to a particular detainee is maintained in the DIMS.  Id.

Members of the JDG staff reviewed DIMS files for each of the six detainees, and identified approximately 297 documents responsive to plaintiff's FOIA request.  Id. ¶ 10.  Those pages, with FOIA exemptions asserted, are listed on JTF-GTMO's index, which has been provided to the plaintiff, at bates ranges 3628-3898 and 4304-4432.  Id. ¶ 10 & n.7.

### c.     Detainee Operations ("J3")

J3 conducts plans and operations at JTF-GTMO, including oversight of flight and movement operations involving detainees and personnel arriving to and departing GTMO.  Id. ¶ 11.  J3 files are J3 files are maintained in an Excel spreadsheet and in folders maintained on computer hard drives. Id.  J3 personnel conducted a thorough review of its files and databases for "[r]ecords concerning the transport of Requesters from Bosnia and Herzegovina to GTMO, including, but not limited to, records of the transport itinerary, duration of the flight, and measures taken with respect to physically securing Requestors during transport."  Id.  This search did not identify and records pertaining to the six detainees that were responsive to plaintiff's FOIA request.  Id.

### 2.     Criminal Investigation Task Force ("CITF")

The search conducted by CITF in response to plaintiff's FOIA request is described in the accompanying Declaration of Colonel Joe E. Ethridge, Jr. ("Ethridge Decl."), the Commander of

CITF at Fort Belvoir, Virginia, at the time of his declaration in June 2006. Under the direction of the Secretary of the Army, CITF conducts worldwide criminal investigations to substantiate or disprove alleged war crimes or acts of terrorism committed by certain individuals against United States persons, property, or interests.  <u>See</u> Ethridge Decl. ¶ 2.  CITF is a joint, operational, criminal investigative task force comprised primarily of Special Agents from the U.S. Army Criminal Investigative Division, the U.S. Air Force Office of Special Investigations, and the U.S. Navy Criminal Investigation Service. <u>Id</u>.  Special Agents assigned to CITF conduct interviews of persons suspected of involvement in international terrorism at locations throughout the world, and reports of those interviews are memorialized on CITF Form 40s.  <u>Id</u>.  Those forms, in turn, are scanned or transmitted electronically to a database accessible at several locations, including CITF headquarters. <u>Id</u>.  Other CITF documents, such as transfer recommendations, jurisdictional assessments, and case analyses, also are stored electronically in hard copy and in CITF computer databases.  <u>Id</u>.

In response to plaintiff's FOIA request, CITF utilized electronic search programs known as I2MS and Orion Magic, as well as a manual review of files, that employed the names (and aliases/aka's/identifying numbers) of the six detainees on whose behalf plaintiff filed his FOIA request to identify documents that appeared to be responsive to that request.  <u>Id</u>. ¶ 6.  Hard copy records were also manually reviewed by CITF employees to identify other documents responsive to the request.  <u>Id</u>.  The search encompassed all CITF records created since its inception in 2002.  <u>Id</u>. Responsive records located by CITF, which were  bates stamped 1103 through 3076, included, *inter*

*alia*, FM 40 interview summaries, investigative summaries, prosecution memoranda, intelligence reviews and summaries, and other materials.  Id. ¶¶ 6, 55-81[1]

### 3.    U.S. European Command ("EUCOM")

The search conducted by EUCOM in response to plaintiff's FOIA request is described in the accompanying Declaration of Captain Joseph B. Hoenig, the Deputy Director of Intelligence for EUCOM at the time of his declaration in July 2006.  The Directorate of Intelligence for EUCOM is responsible for all theater intelligence, plans, policy, and contingency intelligence activities of United States forces in an area encompassing 92 countries and more than 13 million square miles.  See Hoenig Decl. ¶ 1.

In response to plaintiff's FOIA request, EUCOM tasked the Joint Analysis Center ("JAC"), a command subordinate to EUCOM, to conduct a search for responsive records.  Id. ¶ 5.  During September 2005, the JAC conducted a search of physical files and digital records maintained on classified and unclassified server systems.  Id. ¶ 6.  A search methodology was designed to locate responsive documents, which included: (1) using keywords chosen by subject matter experts to search group public folders and libraries shared by JAC analysts in conducting day-to-day business in maintaining and storing intelligence information; (2) searching individual folders of analysts assigned to work on issues associated with the six detainees on whose behalf plaintiff filed his FOIA action for records that might not be found by the keyword search; and (3) reviewing stored e-mails for this same set of analysts.  Id.  All searches were conducted electronically because any hard copy files in the JAC would be copies of the electronic documents.  Id.

---

[1] Although Col. Ethridge's declaration refers to a range between 1103 and 3075, the accompanying index (which has been provided to the plaintiff) indicates that the range in fact was between 1103 and 3076.

The search conducted by JAC personnel identified approximately 9100 potentially responsive records of all types, many of which were duplicates of other documents located during the search, as the search methods used often resulted in the retrieval of copies of the same document for each detainee. Id. ¶ 7. The JAC also identified numerous documents that originated with thirty-three other commands and United States government agencies, and those documents were inventoried and forwarded to one of sixteen parent commands or organizations for review with instructions to send responses to the OGC and DOD FOIA. Id. ¶ 8. The JAC forwarded 1921 files to the OGC and DoD FOIA for review, which were bates stamped 5600-5825, 6007-6284, 6293-6318, 7001-7046, 8270-9078, 9260-9486, 9553-9682, and 9691-9793. Id. ¶ 9.

The search conducted by JAC personnel was performed by analysts and persons familiar with the JAC's mission. Id. ¶ 10. More than seventy JAC personnel contributed to the initial phases of the search for and review of documents, and a core team of fifteen persons then spent over a month sorting, reviewing, cataloging, and marking documents for redaction. Id. Thereafter, from November 2005 through March 2006, six persons continued this process and prepared documents for referral. Id. In total, JAC personnel expended over 6800 man hours for the search, review, and referral process in responding to plaintiff's FOIA request. Id.

### 4.    Office for the Administrative Review of the Detention of Enemy Combatants ("OARDEC")

The search conducted by OARDEC in response to plaintiff's FOIA request is described in the accompanying declaration of John P. Taitt. OARDEC is an organization within DoD that is responsible for several processes involving detained enemy combatants at GTMO. See Taitt Decl. ¶ 29. Between August 2004 and March 2005, OARDEC conducted Combatant Status Review

Tribunals ("CSRT") for each of the Six Detainees. Id. Following the CSRT proceedings, OARDEC assembled a package containing summaries (both classified and unclassified) of the evidence reviewed by the CSRT and a discussion of the basis for the Tribunal's decision, which included documents from other DoD components and U.S. Government agencies. Id. ¶ 30.

On or about August 19, 2006, OARDEC conducted a search of its system of records in its office in Arlington, Virginia, for documents responsive to the plaintiff's FOIA request, but determined that it did not have any responsive records other than CSRT package created for each of the Six Detainees following their hearings and seven documents that concerned allegations of abuse made by some of the Six Detainees. Id. ¶¶ 31-32. At the time of the OARDEC search, the CSRT packages had already been provided to counsel for the Six Detainees as part of the ongoing habeas corpus litigation underway in the U.S. District Court for the District of Columbia, in both classified and unclassified form. Id. ¶ 31. Consequently, OGC advised OARDEC that they did not need to refer the classified materials to the other agencies, nor re-produce the unclassified version to the plaintiff. Id.

Because OARDEC does not exercise original classification authority, the seven documents which OARDEC identified concerning allegations of abuse made by some of the Six Detainees were referred to GTMO for a classification review and release determination. Id. ¶ 32. Those documents are listed in the Vaughn index which has been provided to the plaintiff at Bates pages 4723, 4724, 4725, 4726, 4727, 4728, 4731, and 4729-30. Id. ¶ 32 & n.27.

        5.    **Joint Staff**

The search conducted by the Joint Staff in response to plaintiff's FOIA request is described in the accompanying Declaration of William J. Kane ("Kane Decl."), the Chief of the Information

Management Division, Joint Secretariat, Directorate of Management, The Joint Staff at the time of his declaration. Mr. Kane's declaration is attached as Exhibit A to the Declaration of John P. Taitt.

In response to plaintiff's FOIA request, Mr. Kane's staff searched the Joint Staff archives by using name and keyword searches for the Six Detainees. See Kane Decl. ¶¶ 3, 4. A search of the Joint Staff Action Tracking System was conducted by the date, name, and keyword, and the Joint Staff shared drive was searched by name and keyword. Id. ¶ 4. Five documents were located as being responsive to plaintiff's FOIA request, which were forwarded to the appropriate Joint Staff component for review. Id. The five documents located by the Joint Staff were, in fact, larger staffing packages containing discrete, segregable documents, resulting in a total number of 32 documents, and listed on the Vaughn index provided to the plaintiff at Bates ranges 3425-3505A. See Taitt Decl. ¶ 33 & n.28.

### 6.     Office of Detainee Affairs

The search conducted by the Office of Detainee Affairs in response to plaintiff's FOIA request is described in the accompanying Declaration of Charles D. Stimson ("Stimson Decl."), the Deputy Assistant Secretary of Defense for Detainee Affairs at the time of his declaration in July 2006. The Office of Detainee Affairs was created in July 2004 to advise the Secretary of Defense on detention planning and strategy and to serve as a focal point for detainee matters within DoD. See Stimson Decl. ¶ 2. Information and records created and compiled on detainees by Office of Detainee Affairs personnel in furtherance of its mission, as well as information obtained from other DoD and U.S. Government organizations, are stored in file cabinets in the office and/or electronically on shared computer drives (both classified and unclassified) maintained by the Policy Automation Office of the Under Secretary of Defense for Policy. Id. ¶7. This information includes,

among other things, e-mails, official correspondence, Public Affairs guidance, interrogation reports, intelligence messages, analyst products, and periodic detainee assessments prepared by U.S. military commands and other U.S. Government organizations, as well as drafts of these types of documents. Id.

In October 2004, DoD FOIA tasked the Office of Detainee Affairs with conducting a search for and providing records in response to plaintiff's FOIA request, and that search was completed in May 2005. Id. ¶ 6. Members of the Office of Detainee Affairs were directed to search for materials responsive to plaintiff's FOIA request by manually reviewing documents withing file cabinets likely to contain responsive information and by conducting an electronic search of the shared computer drives using keywords, including the names and ISN numbers of the Six Detainees. Id. ¶ 8. Fifteen documents were identified as being responsive to the plaintiff's FOIA request as a result of the search. Id. A subsequent review of those documents by the OGC revealed that five documents had previously been referred to JTF-GTMO by the Joint Staff, two documents were not responsive to paragraphs 1-13 or 16 of plaintiff's FOIA request; and one document was a duplicate of a document previously reviewed and determined as exempt from release in its entirety by the Department of State. See Taitt Decl. ¶¶ 37-38. The remaining seven documents, which also were withheld in their entirety, are listed on the Vaughn index provided to the plaintiff at Bates pages 4959-4973.

## 7.    U.S. Transportation Command ("TRANSCOM")

The search conducted by TRANSCOM in response to plaintiff's FOIA request is described in the accompanying Declaration of John P. Taitt. The TRANSCOM FOIA office caused a search to be conducted within TRANSCOM and its component units Air Mobility Command, Military Sealift Command, and Surface Deployment and Distribution Command for responsive records, and

located fourteen responsive documents, which are listed on the <u>Vaughn</u> index at Bates pages 3523-3528 and 3539-3542.  <u>See</u> Taitt Decl. ¶ 39.  In responding to the request, the TRANSCOM FOIA office noted that, in accordance with *Air Force Manual 37-139, Air Force Records Maintenance*, airlift manifest are maintained for a period of 90 days by the Air Mobility Command, and that office consequently no longer had manifest records concerning the Six Detainees at the time of the TRANSCOM search.  <u>Id</u>.

### 8.    DoD Office of General Counsel ("OGC")

The search conducted by OGC response to plaintiff's FOIA request is described in the accompanying Declaration of John P. Taitt.  OGC was not initially identified by DoD FOIA as one of the agencies tasked to conduct a search for records responsive to plaintiff's FOIA request; however, upon reviewing documents provided by GTMO and other agencies in September 2005, members of the DoD staff handling plaintiff's FOIA request determined that a search of OGC files was warranted.  <u>See</u> Taitt Decl. ¶ 81.

OGC personnel conducted a search of OGC's record systems, which included electronic and e-mail file systems, both classified and unclassified.  <u>Id</u>.  The unclassified e-mail system was searched electronically using keywords relevant to the Six Detainees, while the classified e-mail system was searched by an OGC staffer who reviewed the individual e-mail accounts of staff members who regularly handle international law matters related to detainees.  <u>Id</u>.  An OGC staffer also searched the shared drives for both the classified and unclassified systems, using keywords relevant to the Six Detainees.  <u>Id</u>.  Finally, an OGC staffer reviewed hard copy files likely to contain responsive information maintained by OGC's front office and the International Affairs section of OGC.  <u>Id</u>.

As a result of these searches, certain responsive documents were found, many of which originated with other organizations and were referred to those organizations for review and release determinations. Id. ¶ 82. The OGC record system also included various documents relating to the habeas corpus cases brought by the Six Detainees pending in the U.S. District Court for the District of Columbia, including e-mails between DoD organizations and the Department of Justice regarding the government's litigation strategy, comments on draft briefs, and other attorney-client and work product material. Id. These documents were deemed to be not responsive to any of plaintiff's FOIA requests. Id.

### C.     The Search for Records Was Adequate

As has been shown above, DoD engaged in a "good faith effort to conduct a search for the requested records, using methods which [were] reasonably expected to produce the information requested." Oglesby, 920 F. 2d at 68. DoD identified and tasked those agencies likely to have information responsive to the request, and the resulting searches conducted by those components included both electronic and hard copy searches, and resulted in the identification and processing of over 10,000 responsive records. Many of the components searched their computerized databases or indices for the names and/or ISN numbers of the Six Detainees, see Husta Decl. ¶ 8 & n.5; Ethridge Decl. ¶ 6; Hoeing Decl. ¶ 6; Kane Decl. ¶¶ 3, 4; Stimson Decl. ¶ 8; Taitt Decl. ¶ 81, a search protocol that have been held by courts to be adequate. See, e.g., Church of Scientology Int'l v. U.S. Dept. of Justice, 30 F.3d 224, 230 (1st Cir. 1994) (finding agency's search of U.S. Attorney's Office computerized record system to be adequate); Maynard, 986 F.2d at 562 (concluding that Treasury Department properly limited its search to its automated Treasury Enforcement Communications System). DoD also has submitted detailed and nonconclusory declarations by

responsible agency officials establishing the scope and method by which the various searches were performed, and those declarations therefore are entitled to a presumption of good faith. <u>See Maynard</u>, 986 F.2d at 559.

The plaintiff, to be sure, has indicated at least informally his belief that there may be additional records which DoD has not yet located. Any such argument bespeaks a fundamental misunderstanding of what the FOIA requires. As one district court has noted in rejecting a like claim, "speculation that documents may exist is not relevant to the inquiry. * * * [A plaintiff's belief that other documents may exist does not make the search inadequate." <u>Servicemembers Legal Defense Network</u> v. <u>Dep't of Defense</u>, 471 F. Supp.2d 78, 85 (D.D.C. 2007) (citing <u>Oglesby</u>, 920 F.2d at 67 n.13; and <u>SafeCard Services</u>, 926 F.2d at 1200). That is so because the fundamental question in FOIA cases is not "'whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate.'" <u>Steinberg</u> v. <u>U.S. Dept. of Justice</u>, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting <u>Weisberg</u> v. <u>U.S. Dept. of Justice</u>, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). In other words, "the failure to turn up [a specified] document does not alone render the search inadequate; there is no requirement that an agency produce *all* responsive documents," <u>Nation Magazine</u> v. <u>United States</u>, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995) (emphasis in original), and "'[t]he fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency retained it.'" <u>Maynard</u>, 986 F.2d at 564 (quoting <u>Miller</u> v. <u>United States</u>, 779 F.2d 1378, 1385 (8th Cir. 1985). Thus, defendants are "not required by the Act to account for documents which the requester has in some way identified if it has made a diligent search for those documents in places in which they might be expected to be found." <u>Miller</u>, 779 F.2d at 1385.

Accordingly, because the searches conducted by DoD were "reasonably calculated to discover the requested documents,'" <u>Maynard</u>, 986 F.2d at 559 (quoting <u>Safecard Servs.</u>, 926 F.2d at 1201), DoD is entitled to summary judgment regarding the adequacy of its search.

## CONCLUSION

For the foregoing reasons, DoD's motion for summary judgment regarding the adequacy of the search should be granted.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant U.S. Attorney
Appeals Unit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3606

Dated: May 22, 2008

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

 /s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant U.S. Attorney

May 22, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN H. OLESKEY, | ) | |
| | ) | |
| ON BEHALF OF GUANTANAMO DETAINEES | ) | |
| LAKHDAR BOUMEDIENE; | ) | |
| MOHAMED NECHLE; MUSTAFA AIT IDR; | ) | |
| SABER LAHMER; HADJ BOUDELLA; | ) | |
| AND BELKACEM BENSAYEH, | ) | |
| | ) | Civil Action Number |
| Plaintiff, | ) | 1:05-cv-10735-RGS |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE AND UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF CAPTAIN JOSEPH B. HOEING

I, Joseph B. Hoeing, Jr., Captain, USN, declare under penalty of perjury that the following is true and
correct to the best of my knowledge and belief:

1. I am the Deputy Director of Intelligence for the United States European Command

(USEUCOM). This Directorate is responsible for all theater intelligence, plans, policy and contingency

intelligence activities of US Forces in an area encompassing 92 countries and more than 13 million

square miles. As Deputy Director, I am responsible for managing the day-to-day operations of intelligence

activities.

2. I have served in intelligence in various positions such as Senior Intelligence Officer aboard

USS THEODORE ROOSEVELT (CVN 71), Deputy Intelligence Officer for Battle Force Red Sea

aboard USS JOHN F KENNEDY (CV 67), conducted counter-drug operations in the Eastern Pacific Ocean and Caribbean Sea aboard four guided missile cruisers, and held shore assignments including Middle East Analyst (Fleet Intelligence Center Europe and Atlantic), Senior Watch Analyst (Fleet Ocean Surveillance Information Center), Imagery branch chief (U.S. Central Command), and Technical Collections (Office of Naval Intelligence). Having held a succession of increasingly key intelligence assignments for various DoD organizations and worked in intelligence for over 25 years, I can identify classified material related to this topic. I am responsible for complying with Executive Branch and departmental policies for classifying and safeguarding national security information. By regulation promulgated under the authority of the USEUCOM Commander, in the absence of the Director, Intelligence for USEUCOM, I have been designated an original classification authority and a declassification authority pursuant to Executive Order (EO) 12958, as amended, §§ 1.3 and 3.1.

3. The statements made herein are based upon my personal knowledge, upon information made available to me in my official capacity, and upon determinations made by in accordance with regulations.

## PURPOSE OF THIS DECLARATION

4. This declaration describes the search of the systems of records at the United States European Command Joint Analysis Center (EUCOM JAC), provides an accounting of responsive documents identified during a search of these records systems in response to the Plaintiffs' FOIA request, and explains the basis for withholding information from the records identified and reviewed by EUCOM JAC pursuant to FOIA exemptions (b)(1), (b)(2), (b)(3), (b)(5), and (b)(6) in accordance with Vaughn v. Rosen, 484 F. 2d 820 (D.C. Cir. 1973).

## THE SEARCH BY EUCOM JAC

5. In August, 2005, the Department of Defense Office of Freedom of Information and Security Review (DoD FOIA) tasked EUCOM with conducting a search for and providing records responsive to the September 28, 2004 Freedom of Information Act (FOIA) request filed with the DoD by Mr. Stephen Oleskey seeking information concerning six detainees (hereinafter, "Plaintiffs") being held by the Department of Defense at Guantanamo Bay, Cuba. On 9 September, 2005 this request was further tasked to the EUCOM Joint Analysis Center (JAC), as this command is a subordinate to EUCOM. The JAC was specifically tasked with responding to section 1-13, and 16 of the Plaintiff's request

6. Over the month of September, 2005 the JAC conducted a search of physical files and digital records maintained on classified and unclassified server systems. A search methodology was designed to locate all documents, electronic and otherwise, stored at EUCOM JAC that were likely to be responsive. Group public folders and libraries shared by JAC analysts in conducting day-to-day business in maintaining and storing intelligence information were searched using keywords chosen by subject matter experts. In addition individual folders of analysts assigned to work on issues associated with the Plaintiffs were reviewed for potentially responsive records that might not be found by keyword search. Stored emails for this same set of analysts were also reviewed for potentially responsive information. All searches were conducted electronically as any hard copy files in the JAC would be copies of the electronic documents.

7. The searches conducted by the JAC identified approximately 9100 potentially responsive records of all types. These documents were copied into specified folders and later reviewed document by document by teams of analysts for responsiveness to the Plaintiff's request. In conducting this review, JAC personnel identified extensive duplications, as the search methods used often retrieved copies of the same document for each individual Plaintiff. The duplicate documents were reviewed individually to be certain they were indeed duplicates. This was an iterative process as some duplicate

records had different file names. Other documents that were iterative, such as email chains that included previous emails in there entirety were reviewed and sorted so that the fewest number of files that contained all the information were saved. If iterative drafts of documents existed the last version was saved as long as it was determined that all information was saved.

8. During this review, the JAC identified numerous documents that originated with other commands and United States Government agencies. Most of these documents consisted of record message traffic, Intelligence Information Reports (IIRs), and similar documents commonly exchanged between agencies involved in intelligence gathering. In total, these documents originated with thirty-three different DoD components or U.S. government agencies. A JAC team inventoried these documents and then forwarded these inventories to one of sixteen parent commands or organizations[1] for review with instructions to send responses concerning the documents to the Department of Defense General Counsel's Office (DoD GC) and DoD FOIA.

9. After these initial reviews and sorting of referrals, the JAC reviewed each remaining, responsive document to determine which portions could be released to the Plaintiffs. The JAC then noted on each document those portions exempt from release under an applicable FOIA exemption. These files were then forwarded to DoD GC and DoD FOIA for review and redaction. In total, the JAC forwarded 1921 files to DoD GC and DoD FOIA for review. The documents listed on the *Vaughn* index at Bates ranges 5600-5825, 5910-5994, 6007-6284, and 6293-6318 are the non-duplicative, responsive documents determined to be releasable in part to the Plaintiffs. The documents listed on the *Vaughn* index at Bates Ranges 7001-7046, 8270-9078, 9260-9486, 9553-9682, and 9691-9793 are the non-

---

1 Documents were referred to the U.S. European Command (EUCOM), U.S. Southern Command (SOUTHCOM), U.S. Special Operations Command (SOCOM), U.S. Central Command (CENTCOM), U.S. Army Intelligence and Security Command (INSCOM), U.S. Army Criminal Investigation Task Force (CITF), National Ground Intelligence Center (NGIC), Naval Criminal Investigation Service (NCIS), Headquarters of the U.S. Air Force Office of Special Investigations (OSI), U.S. Air Force Air Intelligence Agency(AIA), Defense Intelligence Agency (DIA), Federal Bureau of Investigation (FBI), State Department, DoD FOIA (for Pentagon agencies), and other U.S. Government agencies.

duplicative, responsive documents determined to contain no segregable, non-exempt information and were therefore denied in their entirety.

10. The search by JAC personnel was well planned, thorough, and executed in a manner to reasonably identify and produce all records responsive to the Plaintiff's FOIA request. This task was performed by analysts and persons familiar with the JAC's mission of providing actionable intelligence to operating military units and intelligence agencies for conducting operations in support of the Global War on Terror. Over seventy JAC personnel contributed to the initial phases of the search for and review of documents. A core team of fifteen people then spent over a month sorting, reviewing, cataloging and marking documents for redaction. From November, 2005 until March, 2006, six people continued this process and prepared documents for referral. In total, JAC personnel expended over 6800 man hours for the search, review, and referral process in responding to this FOIA. I believe the JAC search complied with the requirements of the FOIA.

## EXPLANATION OF JUSTIFICATION FOR WITHHOLDING JAC INFORMATION IN FULL OR IN PART FROM THE JTF GTMO AND REFERRED DOCUMENTS

11. All JAC documents were reviewed line-by-line and document-by-document to achieve maximum disclosure consistent with the provisions of the FOIA. This review included a determination for each document withheld in part or in its entirety that no further information could be released without risk of disclosure of the information protected and exempted from disclosure under one or more FOIA provisions.

12. Due to the nature of my official duties, I am familiar with the procedures followed by EUCOM JAC in responding to requests for information from its files pursuant to the provisions of the Freedom of Information Act (FOIA), 5 U.S.C. §552, and the Privacy Act of 1974, 5 U.S.C. § 552a. In the course of my official duties at USEUCOM, I have become personally familiar with EUCOM JAC's processing of the

plaintiff's FOIA request and the ensuing lawsuit. Most of the documents identified by the JAC as

potentially responsive to the plaintiff's request contained classified information falling under one or more

of the provisions of Section 1.4 of Executive Order 12958, as amended. I have determined that those

documents and portions of documents listed on the *Vaughn* index as containing information at the

"Confidential," "Secret," or "Top Secret" levels were properly determined to be and were properly marked

with appropriate classification markings prior to the Plaintiffs FOIA request. The documents have been the

subject of a line-by-line review in which members of JAC have participated. The purpose of the review has

been to ensure that the previously marked "classified" information in the documents is indeed classified and

properly marked. In the case of partially redacted documents the Foreign Disclosure Officer for EUCOM

JAC has reviewed the un-redacted portions and certified that there is no improper disclosure of

information. I have reviewed samplings of these documents as well.

    13.    Based on my professional training and experience and recommendations from members of

my staff and the JAC, I conclude the documents throughout this declaration and listed on the *Vaughn* index

contain classified national security information concerning military operations, intelligence source

information, intelligence methodology/activities, and foreign government relations, and that public release

of the classified information in these documents would cause serious or grave damage to the national security of the

United States. Some documents are redacted in part and the unclassified portions of those documents have been

provided unless exempted from release under another FOIA exemption. Documents containing classified

information which could not be reasonably segregated have been denied in full. The following table articulates the

particular provisions of Section 1.4(c) of Executive Order 12958, as amended, that apply to the JAC documents and

the damage to national security that could reasonably be expected to result from the public disclosure of the

information. I have used a coded format to assist the Court and Plaintiff in determining the type of

information withheld from each document pursuant to these FOIA exemptions[2]. If information was withheld from all or portions of a document based on the reasons set forth in the right column of the table, the corresponding code in the left column appears on the *Vaughn* index entry for that document[3].

| Code | Basis for Exemption | Damage to National Security if Released |
|------|---------------------|------------------------------------------|
| J1.1(a) | (1) 1.4(a) concerning military operations | This is information concerning military operations associated with the movement of detainees or individuals. If released it would reveal methods and procedures that could be targeted or compromise the security and safety of detainees and US personnel or be used to interfere with future military missions undertaken in the Global War on Terror. |
| J1.2(a) | 1.4(a) concerning camp and cell numbers as this relates to JTF GTMO operations. (1.2(a)) | This is information concerning internal detention operations at GTMO. If released it would reveal methods and procedures that could be targeted or compromise the security and safety of detainees and US personnel. |
| J1.1 | B(1) 1.4(c) concerning intelligence information obtained that would reveal intelligence activities | This is information concerning intelligence activities. It includes information provided by a source or one of the requestors that, if released, would tend to reveal the status of intelligence activities, what information the USG has or knows, and what information the USG lacks. Examples include analyst assessments on collection requirements explaining what they know and why further questions are necessary, and information that has been gathered on requesters or other individuals. This also includes compilations of Intelligence Information Report (IIR) and file numbers stringing together information as this would reveal the level of intelligence activity. Release of these types of information could be used to thwart future intelligence gathering activities and tip targets of intelligence efforts as to U.S. efforts in the Global War on Terror. |
| J1.2 | B(1) 1.4(c) concerning a source and information obtained from a source | This is information that, if released, would tend to reveal a source. This includes information obtained from other individuals and the requestors. Revealing the identity of a source or facts that could tie a source to certain information would put the source, their families, and associates at risk of harm from individuals and |

---

2 A similar format is used to explain the other exemptions.

3 For example, if the *Vaughn* entry for a document lists the code J1.1, national security information was withheld from the document because the information would disclose sensitive intelligence activities.

| | | organizations that are the subject of or interest to U.S. intelligence gathering activities. This would have the added impact of discouraging other potential sources from providing information to the United States or its allies which would cause immeasurable harm to intelligence activities and to military components that rely on this information in conducting their missions. |
|---|---|---|
| J1.3 | B(1) 1.4(c) concerning levying intelligence requirements, questions to a source, and requests for information that would reveal methods and intelligence activities | This is information concerning questions of sources and inquiries from one part of the intelligence community to another, such as source directed requirements and coordination between agencies concerning collection and dissemination of intelligence information. This reveals methods. This is also information concerning intelligence activities. This kind of information reveals what the United States government knows and what it does not concerning individuals and organizations intent on causing harm to the United States and the focus of intelligence gathering activities. If released to the public, this information could be used to thwart intelligence gathering activities. |
| J1.4 | B(1) 1.4(c) concerning the activities and associations of one or more requestors which would reveal intelligence sources and activities | This is information concerning travel activities of one of the FOIA requesters or their associations. This would tend to reveal what information the U.S. has accumulated on this requestor. It would also tend to reveal sources from which the United States developed this intelligence information. This would also damage intelligence activities for it would expose the extent of what the U.S. knows and would aid those targeted or of interest to the United States thwart or avoid intelligence gathering efforts. |
| J1.8 | B(1) 1.4(c) concerning analyst comments and insights concerning intelligence gathered and possible approaches for further intelligence which would reveal intelligence activities and methods | This information includes analyst insights concerning the value and meaning of information obtained and suggestions for future intelligence gathering efforts and methods. This also includes information concerning updates and exchanges shared between analysts concerning the status of various investigations and intelligence collection efforts concerning requesters and others. This information could be used to thwart future intelligence gathering efforts and reduce the effectiveness of existing and future intelligence gathering techniques. |
| J1.1d | B(1) 1.4(d) concerning diplomatic exchanges between the U.S. and a foreign government concerning requestors | This information concerns intelligence information exchanged between the United States and a foreign government with the express or written understanding that the information will be held in confidence. This |

|  | information is not publicly revealed and so doing would have the impact of jeopardizing future cooperative exchanges between governments. Maintaining the secrecy of these exchanges is necessary to maintain continued cooperation between the governments and their representatives, and possibly reveal clandestine sources within foreign governments. Public disclosure of such exchanges could lead to damage to the relations between the United States and the foreign government, retaliation against the United States, identification of United States intelligence sources and activities, and permit those hostile to the United States to assess intelligence capabilities and activities in the foreign country. |
|--|--|

## EXEMPTION B(2)

14. Portions of several documents have been withheld under 5 U.S.C. § 552(b)(2). The (b)(2) exemption has been applied to information in these documents that fall within the "high 2" category because disclosure of the withheld information would risk circumvention of the mission of the JAC and other United States government agencies engaged in collecting intelligence and conducting military operations in support of the Global War on Terror.

15. The documents identified by the JAC as responsive to the Plaintiffs' FOIA request consist primarily of intelligence messages, reports analyzing and summarizing intelligence concerning groups or individuals linked to terrorist activities, charts and spreadsheets that contain summaries of intelligence activities and information which is used within the JAC and intelligence community, and e-mail exchanges between JAC analysts and others engaged in operational or intelligence activities. The vast majority of these documents contain classified national security information. By their nature, the JAC documents are internal to the United States Government in that they are used by JAC personnel and shared with other United States Government agencies for conducting their assigned intelligence and military missions.

16. The table that follows provides a more thorough description of the information withheld

under the "high 2" exemption. Where the code in the left column appears on the *Vaughn* index entry for

a particular document, the type of information described in the corresponding blocks has been withheld.

| Code | Type of Information Withheld | Risk of Circumvention |
|------|------------------------------|-----------------------|
| J2.1 | B(2) (high) on non-numeric portion of ISN numbers | Internment Serial Numbers (ISN) are unique numbers assigned to each detainee held by the Department of Defense at Guantanamo Bay, Cuba. These numbers consist of a numeric portion (e.g. 10001) and a non-numeric portion. The non-numeric portion consists of information related to the background concerning the detainee and has unique meaning for JTF GTMO detention operations and within the intelligence community. The full ISN number is often used as a short-hand reference in intelligence messages and intelligence products to identify sources and targets of information. The full ISN, alone or in conjunction with other information, could therefore be used to identify intelligence targets or sources. |
| J2.2 | B(2) (high) on intelligence message file numbers | Intelligence messages created by the JAC and other U.S. Government contain unique numbers used to identify the particular message and its source[4]. Often, these numbers appear as references in other intelligence messages and intelligence products. Since the number is unique, it can be used to easily identify the targets of and sources used in intelligence gathering activities. This number, alone or with other information, could therefore assist a person in identifying the extent of intelligence activities by the U.S. Government as well as sources and targets. Armed with this information, a person or organization hostile to the United States could use this number to evade or thwart intelligence gathering activities. |
| J2.3 | B(2) (high) concerning routing addresses of messages within USG channels, internal serial numbers, and similar header information on messages. | Many of the intelligence messages contain internal information that reveals details of collection, routing, and filing instructions for the messages. Revealing this information would circumvent the JAC and other agencies ability to relay, file, and route information to other agencies. |
| J2.4 | B(2) (high) concerning internal USG instructions on dissemination | Some of the JAC documents contain specific instructions related to handling and further dissemination of |

4 Many raw intelligence reports are published in DoD messages labeled "IIR" or Intelligence Information Report, with serial numbers and consist of a series of numbers separated by spaces. The first four numbers identify the originator of the message. Then there is a four digit sequential number of the report, followed by a two digit number for the FY it was produced.

| | of information contained in a message | information. Revealing this information would risk circumvention of the ability of the JAC and other agencies to control and properly protect sensitive and classified information. |
|---|---|---|
| J2.5 | B(2) High on internal source numbers and GTMO identification numbers | Several documents contain numbers assigned by an agency to identify a source identifying numbers assigned to detainees held by the Department of Defense at Guantanamo Bay. If released these numbers could be used, alone or with other information, to identify the source of intelligence information or the target of intelligence activities. Armed with his information, a person or organization hostile to the United States could use this number to evade or thwart intelligence gathering activities. |

## EXEMPTION B(3)

17. Where the code J3.1 appears on the *Vaughn* index entry for a particular document, information has been withheld that contains the personally identifying information of United States personnel stationed in overseas, sensitive, or routinely deployable units. This exemption primarily applies to information in JAC documents identifying personnel stationed at or deployed to JTF GTMO. I have determined that this information is exempt from release pursuant to 10 U.S.C. §130(b).

## EXEMPTION B(5)

18. Where the code J5.1 appears on the *Vaughn* index entry for a particular document, information has been withheld because it concerns predecisional deliberative assessments concerning policy and the direction of JAC activities related to detainees and intelligence gathering activities. As analysts, JAC personnel regularly make observations and render opinions, expressed in messages and other products, concerning the meaning of particular information gathered during intelligence gathering activities. This is information is shared with the military chain of command and other United States Government agencies to guide decisions concerning intelligence gathering policies and tactics. In this regard, several JAC documents contain assessments concerning the level of threat posed by or relative

intelligence value of a detainee, analyst and interrogator comments and recommendations concerning the continued detention status concerning a particular detainee. Such assessments, observations, and recommendations are a necessary part of intelligence collection and by their nature are predecisional since they are used to guide future intelligence gathering activities. Disclosure of such material, in addition to potentially disclosing classified national security information in some cases, would stifle the free flow of information necessary in developing and properly utilizing information obtained in intelligence gathering. It would also stifle the exchange of views between JAC personnel and other intelligence agencies, thereby hindering the combined effort across the United States government in finding effective strategies and methods to combat terrorism.

19. Many of the passages withheld pursuant to Exemption (b)(5) contain factual material intertwined with opinions, observations, and assessments made by JAC personnel. In these instances, the factual material is also deliberative in nature, as it reflects the analysts determination concerning the significance of portions of information derived from many diverse sources of information. In addition, release of the factual portions of the deliberative passages would tend to reveal the very opinions, recommendations, and observations that are themselves deliberative. For these reasons, I have determined that those potions of the JAC documents that have been withheld may not be further segregated.

## EXEMPTION B(6)

20. The JAC withheld portions of several documents that contain information that identifies an individual under 5 U.S.C. § 552(b)(6). I have determined that the release of the information withheld under exemption (b)(6) would result in an unwarranted invasion of personal privacy of the person so identified in the JAC document. Further, I have determined that the public interest in this information is negligible and does not outweigh the privacy interest of the individuals named. The table that follows

provides a more thorough description of and justification for the information withheld under exemption

(b)(6). Where the code in the left column appears on the *Vaughn* index entry for a particular document,

the type of information described in the corresponding blocks on table has been withheld.

| Code | | **Balancing test** |
|------|------|------|
| J6.1 | (B)(6) on names and other personal identifying information of USG personnel | The public interest in knowing who within the U.S. Government is involved with intelligence gathering activities, operations in support of the Global War on Terror, and detention operations is far outweighed by the privacy interest of the individual employee or military member identified in the document.  Revealing the names of personnel supporting the Global War on Terror would put them, their families, and their associates at risk for retaliation by the very individuals and extremist organizations who seek to do harm to the United States.  This risk is heightened by the fact that the U.S. Government personnel named in the documents are often in sensitive positions and handle classified information. |
| J6.2 | (B)(6) concerning personal identifying information of other detainees at GTMO | The public interest concerning detainees held at JTF GTMO and identified in the JAC documents is outweighed by the privacy interest of each detainee so named.  The nature of the JAC documents differs from a simple listing of all detainees.  The JAC documents identify those detainees who are of interest to U.S. intelligence activities.  In many cases the individual detainee appears as a source or a person of interest of intelligence gathering efforts.  Revealing the identity of a source of information puts that source, as well as his family and associates, at risk of harassment and harm from individuals and organizations that support terrorism and extremist causes.  Revealing the identity of a person of interest to the intelligence community similarly puts that person at risk of harassment and harm.  Since much of the information obtained in collection activities is classified, releasing an individual's name without the classified context would cause speculation by the public concerning that person's activities.  As a result, releasing the identifying information would do no more than associate that person in the public's eye with having involvement with terrorist related activities, thus exposing that person, his family, and associates to public embarrassment and possible harassment. |
| J6.3 | (B)(6) Names and personal | For the same reasons cited in the explanation of Code J6.2, |

| identifying information of other individuals | above, I have determined that the public interest in the names and identifying information of other individuals named in the JAC documents is outweighed by the privacy interest of the persons involved. |
|---|---|

21. All of the documents addressed have been carefully reviewed for reasonable segregation of non-exempt information by members of the JAC. Based upon their recommendations and my review of representative samples of each type of document, I have determined that no further segregation of meaningful information can be made without disclosing information warranting protection under the law.

22. I believe that the information contained in this declaration will assist the Court in determining that summary judgment is warranted as to protection of the sensitive information in the documents that are responsive to the plaintiffs' FOIA requests that are the subject of this litigation. I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ___ day of July 2006.

Joseph B. Hoeing, Jr., Captain, USN

**UNCLASSIFIED**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN H. OLESKEY | ) | |
| | ) | |
| ON BEHALF OF GUANTANAMO INTERNEES | ) | |
| LAKHDAR BOUMEDIENE, | ) | |
| MOHAMED NECHLA, MUSTAFA AIT IDIR, | ) | |
| SABER LAHMAR, HADJ BOUDELLA, | ) | Civil Action No. 05-10735-RGS |
| AND BELKACEM BENSAYAH | ) | |
| | ) | |
| Plaintiff, | ) | DECLARATION OF |
| | ) | CAPTAIN |
| v. | ) | PETER A. HUSTA |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE AND UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pursuant to 28 U.S.C. §1746, I, Captain Peter A. Husta declare as follows:

1. I am a Captain in the United States Navy, with 28 years of active duty service. I currently serve as the Chief of Staff at Joint Task Force – Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I have held this position since June 2006.

2. In my capacity as Chief of Staff, I have been delegated the approval authority to respond to Freedom of Information Act (FOIA) requests and related matters. I am aware of the actions that have been taken in response to the 28 September 2004 request of Stephen Oleskey for records concerning Guantanamo detainees Lahkdar Boumediene, Mohammed Nechle, Mustafa Ait Idir, Saber Lahmar, Hadj Boudella, and Belkacem Bensayah (collectively referred to as "Plaintiffs"), including the actions taken by the Commander, Rear Admiral Harry B. Harris, Jr., and his

predecessor, Army Major General Jay W. Hood, and members of his staff.[1] The statements

contained in this declaration are based upon my personal knowledge, information provided to me

in my official capacity, and conclusions and determinations reached and made in accordance

therewith.

## PURPOSE OF THIS DECLARATION

3.  This declaration describes the search of the "systems of records" maintained at JTF-

GTMO, provides an accounting of responsive documents identified during a search of this system

of records, describes the documents referred to JTF-GTMO from other organizations, and explains

the basis for withholding information withheld from the records identified and reviewed by JTF-

GTMO pursuant to FOIA Exemptions (b)(2), (b)(3), (b)(5), and (b)(6) and Vaughn v. Rosen, 484

F. 2d 820 (D.C. Cir. 1973),[2] as well as Executive Order 12958, as amended and 10 U.S.C. §130b.

## THE SEARCH BY JTF-GTMO

4.  In October 2004, the Department of Defense Office of Freedom of Information and

Security Review (DoD FOIA) tasked United States Southern Command (USSOUTHCOM) with

conducting a search and providing records responsive to Plaintiffs' 28 September 2004 FOIA

request.  The request was thereafter transmitted to JTF-GTMO, since this command is a

subordinate command to USSOUTHCOM.  In November 2004, JTF-GTMO conducted a search

of records maintained by the Joint Detention Group (JDG), Joint Intelligence Group (JIG), and

Joint Medical Group (JMG); the three JTF-GTMO components determined likely to maintain

information responsive to Plaintiffs' request.  The JDG and JIG identified several documents

responsive to Plaintiffs' request.  The JMG identified the medical records pertaining to the each

---

[1]  MG Hood's staff included my predecessor, Army Colonel Gregory Hager who served as Chief of Staff from July 2005 to June 2006.
[2]  Withholdings were also made under FOIA Exemption (b)(1).  Exemption (b)(1) will primarily be discussed in the Declaration provided by Rear Admiral Harry B. Harris, Jr.

Plaintiff, and provided them to DoD FOIA in March 2005. These records were subsequently provided to the Plaintiffs in August 2005.[3]

5. On 13 April 2005, Plaintiffs filed a Complaint in United States District Court for the District of Massachusetts. In the Complaint, Plaintiffs alleged that the United States Department of Defense (DoD) and the United States Department of Justice (DoJ) failed to produce responsive records relating to the Plaintiffs FOIA request. On 28 July 2005, the Court issued an order directing DoD to produce all responsive, non-exempt records, or portions thereof, to Plaintiffs no later than 28 September 2005. The scope of this review was limited to producing items responsive to paragraphs 1-13 and 16 of Plaintiffs' FOIA request, since the remaining information was previously provided under the American Civil Liberties Union FOIA litigation.

6. On 2 August 2005, in response to the Court Order, DoD FOIA tasked USSOUTHCOM and JTF-GTMO with accomplishing an additional search for documents responsive to Plaintiffs' FOIA request. In response, JTF-GTMO FOIA personnel tasked the JIG, JDG, and Detainee Operations (J3)[4] with conducting a search of their "systems of records" to identify and produce records responsive to Plaintiffs' request and to make recommendations concerning information deemed exempt from release under the provisions of the FOIA. By the end of August 2005, each of these organizations completed a search of their respective "system of records" in a manner reasonably likely to identify records responsive to the Plaintiffs' FOIA request. The following is a breakdown of the search for responsive records conducted by JIG, JDG, and J3.

7. The JIG collects intelligence through interrogation operations and other intelligence gathering methods. Information and records compiled on detainees by JIG personnel in

---

[3] Bates numbers 1 – 1102. Names of United States military personnel were redacted under exemption (b)(3), citing to the provisions of 10 U.S.C. § 130(b) and Exemption b(6). Bates numbers are simply sequential numbers assigned to each page of the documents provided under the FOIA.

[4] As stated, JMG previously provided responsive records in March 2005, thus they were not subsequently tasked.

furtherance of this mission, and information obtained from other United States Government (USG) organizations, is stored electronically in the Joint Detention Information Management System (JDIMS), a database maintained by the JIG. This system is a central clearinghouse for intelligence information compiled on each detainee and is used by other organizations within the USG in conducting intelligence activities and in prosecuting the Global War on Terrorism (GWOT). Information stored on this database includes interrogation reports, intelligence messages, intelligence reports, analyst products, and periodic detainee assessments produced by the JIG and other USG organizations, such as the Criminal Investigation Task Force (CITF). All information concerning a particular detainee, if in the possession and control of the JIG, resides in this database.

8.    Members of the JIG staff searched for materials responsive to Plaintiffs' request by entering a query, consisting of the names of each Plaintiff and Internment Serial Number (ISN)[5] into a search field within JDIMS. Each search pulled up the entire record for each individual detainee. Using functions within JDIMS, JIG personnel then retrieved all documents pertaining to each requestor. The JIG then reviewed each record to determine if it pertained to the Plaintiffs and if it was responsive to the FOIA request. The JIG identified approximately 264 documents responsive to the Plaintiffs' request.[6]

9.    The JDG ensures that the detention mission is performed in a humane manner that protects the security of both the detainees and the safety of JDG personnel assigned to JTF-GTMO. The JDG maintains information on each detainee in hard copy files and the Detention

---

[5] ISN numbers are unique to each detainee. These numbers are used at JTF-GTMO, and throughout the USG, in messages, reports, and other documents concerning detainees to identify a particular Detainee. These numbers will be discussed more thoroughly under the Exemptions.

[6] The JIG identified approximately 128 additional documents that were responsive to the Plaintiffs' FOIA request. These documents originated with the FBI, United States Army Europe (USAEUR), the United States European Command (EUCOM), Department of State, and another USG Agency. DoD FOIA referred these files to the appropriate agencies for review.

Information Management System (DIMS). These records include, but are not limited to, intake records, inspection records of detainees in segregation, reports of detainee misconduct with accompanying sworn statements, observation logs, and notices to detainees concerning Combatant Status Review Tribunals (CSRT) and Annual Review Boards (ARB). Any information concerning detention operations as to a particular detainee is maintained in DIMS.

10. In response to Plaintiffs' request, members of the JDG staff reviewed DIMS files for each Plaintiff. Since files are maintained on each individual Plaintiff, this search method was reasonably likely to identify all records responsive to the Plaintiffs' request. The JDG identified approximately 297 documents responsive to the Plaintiffs' request.[7]

11. Detention Operations (J3) conducts plans and operations at JTF-GTMO. This includes oversight of flight and movement operations involving detainees and personnel arriving to and departing from GTMO. The J3 files are maintained in an Excel spreadsheet and in folders maintained on computer hard drives. The J3 conducted a thorough review of its files and databases for, "[r]ecords concerning the transport of Requesters from Bosnia and Herzegovina to GTMO, including, but not limited to, records of the transport itinerary, duration of the flight, and measures taken with respect to physically securing Requestors during transport." This search did not identify any records pertaining to the Plaintiffs that were responsive to the FOIA request.

## ADDITIONAL ITEMS REQUESTED BY PLAINTIFFS

12. On 21 April 2006, counsel for the Plaintiffs, Mr. Rob Kirsch, sent an e-mail request to Assistant United States Attorney, Mark Quinlivan, requesting that DoD locate certain materials that were believed to exist, but were not among the materials included in earlier productions. The portion of the e-mail pertinent to JTF-GTMO requested the following items:

---

[7] These responsive pages, with FOIA exemptions asserted, are listed on the Vaughn index at Bates ranges 3628-3898 and 4304-4432.

2. Video or digital recording of the events involving Mr. Ait Idir [10004] in February or March 2004 -- an incident when JTF required him and 40+ other prisoners to turn in their pants to camp authorities.

3. Written materials evaluating item(s) covered under 2.

4. Logs reflecting contact between camp personnel and the detainees listed above.

13. This request was forwarded to JTF-GTMO by Department of Defense Office of General Counsel (OGC) on 21 April 2006. Upon receipt of the request, JTF-GTMO personnel determined that the information sought by Mr. Kirsch would be maintained by the JDG and J3. Accordingly, JDG and J3 personnel conducted a search of their system of records and located a videotape and documents responsive to each of Mr. Kirsch's requests.[8] Although the previous search appeared to identify documents responsive to Plaintiffs' 21 April 2006 supplemental request, as a result of changing JTF-GTMO personnel, this information cannot be located at the present time. JTF-GTMO is conducting an additional search to locate the responsive documents. Additional information will be provided as it becomes available.

## DOCUMENTS REFERRED TO JTF-GTMO

14. In conducting searches in response to the Plaintiffs' FOIA request, several agencies identified classified records containing information derived from JTF-GTMO documents or originating with JTF-GTMO units. As required by Executive Order 12958, as amended, these documents were referred to JTF-GTMO for classification review and a determination concerning release under the FOIA. In total, JTF-GTMO received documents from the Office for the

---

[8] The responsive videotape is listed as Bates number 10063 on the <u>Vaughn</u> index.

Administrative Review of the Detention of Enemy Combatants (OARDEC), the Defense

Intelligence Agency (DIA), the Joint Staff, DoD OGC, and the Joint Analysis Center (JAC).[9]

### Documents referred to JTF-GTMO from OARDEC

15.  In total, JTF-GTMO received 5 records from OARDEC.[10]  These documents were

reviewed by the JIG and JDG, and were determined to be releasable in part.

### Documents referred to JTF-GTMO from DIA

16.  DoD FOIA referred twenty documents identified by the DIA to JTF-GTMO for

review.[11]  These documents were reviewed by the JIG, which determined that the documents

should be withheld in their entirety under FOIA Exemption b(1), citing to section 1.4(c) of

Executive Order 12958, as amended.[12]

### Documents referred to JTF-GTMO from CITF

17.  DoD FOIA referred approximately eighty-three documents to JTF-GTMO that were

created by CITF.  CITF initially determined all of these documents were exempt from release

under exemption (b)(7)(A).[13]  These documents, most of them classified at the "Secret" level,

contained information derived from documents or information originating with the JIG.

### Documents referred to JTF-GTMO from the DoD OGC

18.  DoD FOIA referred three documents to JTF-GTMO that originated with the DoD

OGC.[14]  These documents, solely consisting of e-mails, were referred because portions of the e-

mails contained information provided by JTF-GTMO personnel.

---

[9]  The Joint Analysis Center is a component of the United States European Command (USEUCOM).
[10]  These documents are listed on the <u>Vaughn</u> index as Bates numbers 4724, 4725, 4726, 4728 and 4731, and 4729-4730.
[11]  These documents are listed on the <u>Vaughn</u> index as Bates numbers 4732-4802.
[12]  For a complete discussion on FOIA Exemption (b)(1) refer to Declaration of Rear Admiral Harris.
[13]  See June 16, 2006 Declaration of Colonel Joe E. Ethridge, Commander, CITF.
[14]  These documents are listed on the <u>Vaughn</u> index at entries beginning with Bates numbers 9221, 9244, and 9487.

## Documents referred to JTF-GTMO from the JAC

19.  In September 2005, the JAC began a search of its files for records responsive to the Plaintiffs' FOIA request.  Over the course of this search and review, the JAC identified numerous documents that originated with JTF-GTMO.  On February 15, 2006, the JAC transmitted two spreadsheets via SIPRNET[15] to USSOUTHCOM FOIA and JTF-GTMO FOIA, which listed approximately 422 files that originated within elements of JTF-GTMO.  On February 17, 2006, the JAC transmitted three additional spreadsheets via JWICS[16] to SOUTHCOM FOIA and JTF-GTMO FOIA, which listed an additional 120 documents that originated within elements of JTF-GTMO.  For each document, the spreadsheet provided the file names assigned by the JAC to the documents, intelligence report message numbers unique to each document, date/time/group information reflecting when the document was created, and other information to be used by JTF-GTMO personnel in retrieving the document from JWICS and other databases.

20.  JTF-GTMO's review of the August 2005 search and the JAC spreadsheets identified numerous documents that were named differently than documents on the JDIMS database.  At the request of JTF-GTMO, the JAC sent each of these files electronically to JTF-GTMO.  JTF-GTMO FOIA and the JIG reviewed each file to determine if each was responsive to the Plaintiffs' request and was not otherwise duplicative of other documents previously reviewed.[17]  Over the course of this review, JTF-GTMO personnel determined that many of these documents were duplicates of documents previously reviewed and released in September 2005, or otherwise duplicative of other documents contained on the JAC listing.  In the case of the JAC listing, many documents that referenced multiple Plaintiffs appeared on the spreadsheets in several places.  The only variation

---

[15] SIPRNET is a classified network.  Classified information up to the "Secret" level resides on this system and may be transmitted via e-mail on this system.

[16] JWICS is a classified network.  Classified information up to the "Top Secret" level resides on this system and may be transmitted via e-mail.

[17] This review also required a large commitment of manpower and resources.

existing between these documents occurred in the file name assigned to the document, not in the

text of the actual document.  In addition, several files on the spreadsheets provided to JTF-GTMO

on the JWICS system were duplicative of files listed on the spreadsheets sent on the SIPRNET

system.

21.  Of the approximately 542 documents referred to JTF-GTMO, the JIG identified 50 that

were responsive to the Plantiffs' FOIA request and not otherwise duplicative of other records

previously reviewed and produced by JTF-GTMO.[18]

## EXPLANATION OF JUSTIFICATION FOR WITHHOLDING JTF-GTMO INFORMATION IN FULL OR IN PART FROM THE JTF-GTMO AND REFERRED DOCUMENTS

22.  All JTF-GTMO documents and documents referred to JTF-GTMO for review and

release determinations were reviewed line-by-line and document-by-document to achieve

maximum disclosure consistent with the provisions of the FOIA.  This review included a

determination for each document withheld in part or in its entirety that no further information

could be released without risk of disclosure of the information protected and exempted from

disclosure under one or more FOIA provisions.  The following paragraphs describe JTF-GTMO's

rationale for withholding entire documents, or portions of documents, pursuant to FOIA

Exemptions (b)(1), (b)(2), (b)(3), (b)(5), and (b)(6), as well as Executive Order 12958, as

Amended and 10 U.S.C. §130b.  The bases for the particular exemptions are explained later in this

Declaration and on the <u>Vaughn</u> index.

## EXPLANATION OF FORMAT UTILIZED FOR THE JUSTIFICATION OF WITHHELD JTF-GTMO DOCUMENTS AND JTF-GTMO INFORMATION

23.  The exemptions asserted for withholding JTF-GTMO information contained in JTF-

GTMO documents and referred documents to JTF-GTMO are FOIA Exemptions (b)(1), (b)(2),

---

[18] These documents are listed on the <u>Vaughn</u> index as Bates numbers 6319-6432, 9794-9803, and 10077-10080.

(b)(3), (b)(5), and (b)(6). A coded format is used in this case to assist the Court and Plaintiffs in determining the type of information withheld from each document pursuant to the above-stated FOIA exemptions. Each instance of information withheld is described by a coded designation that corresponds to the categories listed below. Those portions of the DoD <u>Vaughn</u> index pertaining to documents reviewed by JTF-GTMO list the applicable codes to indicate the reasons for withholding JTF-GTMO information from each document, along with a brief description concerning the nature of the information withheld. For example, if G2.1 through G2.5 appears on a <u>Vaughn</u> index entry for a particular document, that designation refers to FOIA Exemption (b)(2), concerning information internal to the USG, the disclosure of which would risk the circumvention of a statute or agency regulation. Listed below are the categories used to explain the FOIA exemptions asserted to withhold protected JTF-GTMO documents and JTF-GTMO information within the referred documents reviewed:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(1), Paragraph 1.4(c) of E.O. 12948, as amended** | |
| G1.1 | Information concerning intelligence information obtained by JTF-GTMO that would reveal the nature of intelligence activities |
| G1.2 | Information concerning a source or information obtained from a source. |
| G1.3 | Information requested or contained in intelligence levies, source questions, and requests for information that would reveal intelligence methods and activities |
| G1.4 | Information concerning the activities and associations of one or more of the requestors that would reveal intelligence sources and activities. |
| G1.5 | Analyst comments and insights concerning intelligence gathered and possible approaches for further intelligence, which would reveal intelligence activities and methods. |
| **Category (b)(1), Paragraph 1.4(a) of E.O. 12948, as amended** | |
| G1.6 | Information concerning military operations. |

| G1.7 | Information concerning camp and cell numbers at JTF-GTMO |
|---|---|
| **Category (b)(2)** | |
| G2.1 | Non-numeric portions of Detainee Internment Serial Numbers (ISNs) |
| G2.2 | Intelligence message file numbers |
| G2.3 | Information internal to the United States Government |
| G2.4 | Internal United States Government instructions concerning dissemination of information contained in messages |
| G2.5 | Source numbers and JTF-GTMO identification numbers assigned to Detainees |
| **Category (b)(3)** | |
| G3.1 | 10 U.S.C. §130(b): Names of routinely deployable units. |
| **Category (b)(5)** | |
| G5.1 | Internal deliberative assessments containing analysis or recommendations regarding matters related to detainees or intelligence gathering activities |
| G5.2 | Attorney-client privilege |
| **Category (b)(6)** | |
| G6.1 | Names and identifying information of United States Government personnel |
| G6.2 | Personal identifying information of other Detainees |
| G6.3 | Names and personal identifying information of other individuals named in intelligence and detainee related documents |

24. In the following paragraphs, I will discuss each of the aforementioned exemptions claimed by JTF-GTMO and JTF-GTMO's rationale for withholding the information contained therein. I will not discuss FOIA Exemption (b)(1) in this Declaration as that information has been addressed by Rear Admiral Harry B. Harris, Jr.'s Declaration.

## EXEMPTION 2
## INTERNAL AGENCY RULES AND PRACTICES

25. Under the FOIA, 5 U.S.C. §552 (b)(2) exempts from disclosure information "solely related to the internal personnel rules and practices of an agency." FOIA Exemption (b)(2) will either be "Low" or "High." FOIA Exemption (b)(2)(low) protects routine internal administrative matters and functions of JTF-GTMO, which have no effect on the public at large. Disclosure of this information could impede the effectiveness of JTF-GTMO's internal procedures. Moreover,

FOIA Exemption (b)(2)(high) also protects internal personnel rules and practices of JTF-GTMO where disclosure may risk circumvention of the law. The following paragraphs explain the (b)(2) exemptions asserted by JTF-GTMO and the corresponding entries for individual documents listed on the Vaughn index.

### G2.1    Non-Numeric Portions of Detainee Internment Serial Numbers (ISNs)

26. Where the code G2.1 appears in the description column for a particular entry in the Vaughn index, information containing the non-numeric portion of a Detainee's ISN was withheld from the document. Each Detainee at JTF-GTMO is assigned an ISN. The non-numeric portion of this number contains information specific to the Detainee that is used to identify certain information pertinent to detainee operations and intelligence gathering operations. The full ISN number is often used in intelligence message traffic and reports to identify a particular detainee as a source for information. Disclosure of the full ISN number to the public could allow persons to potentially access information concerning detainees from DoD databases and other sources and then cross-reference these detainee numbers with other information in the public domain to identify specific detainees, DoD personnel associated with detainee operations and intelligence gathering activities, and other individuals mentioned in other DoD documents. Access to this information, much of it classified, would have the potential effect of impeding JTF-GTMO detention and intelligence gathering operations. Providing routine, internal administrative information such as these numbers serves no public benefit and there is no indication that releasing the non-numeric portion of these ISN numbers would serve a legitimate public interest.

### G2.2    Intelligence Message File Numbers

27. Where the code G2.2 appears in the description column for a particular entry the Vaughn index, information containing file numbers associated with intelligence messages has been

withheld.  DoD and other USG agencies assigned unique file numbers to the intelligence reports

that they generate.  These reports are often referenced by DoD agencies as IIRs, or Interim

Intelligence Reports.  Other USG agencies use similar, unique references to individual intelligence

reports.  From these numbers, a person would be able to ascertain the agency that collected

information in a report, and could cross-reference other reports from varying agencies.  This would

risk revealing intelligence activities and the interplay between various USG agencies in collecting

intelligence.  Additionally, where an intelligence report pertains to a particular source, release of a

file number would also risk revealing a source to the public and to those who would do harm to the

source.

    28.  Providing routine, internal administrative information such as these numbers serves no

public benefit and there is no indication that there is a legitimate interest in the disclosure of these

numbers.  Release of these numbers would cause potential harm to intelligence gathering activities

and the accomplishment of the missions assigned to JTF-GTMO and other intelligence agencies.

For these reasons, information pertaining to intelligence file numbers has been withheld from the

documents reviewed by JTF-GTMO.

### G2.3    Information Internal to the United States Government

    29.  Where the code G2.3 appears in the description column for a particular entry in the

Vaughn index, information concerning sensitive administrative notations on certain documents has

been withheld.  Many of these notations contain internal information that reveals details of

collection, routing, and filing instructions for reports and messages.  Revealing this information

would circumvent the ability of the JAC and other agencies to relay, file, and route information to

other agencies.  This information was redacted because it contains information from which persons

could ascertain how the information is handled in USG channels and collection techniques.

**G2.4    Internal United States Government instructions concerning dissemination of information contained in messages**

30.  Where the code G2.4 appears in the description column for a particular entry on the Vaughn index, information concerning handling instructions of sensitive information contained in intelligence reports and messages has been withheld.  This information is purely internal to the USG as it provides other USG agencies guidance concerning dissemination and authorizations needed to share sensitive information.   Revealing this information would risk undermining the ability of JTF-GTMO and other agencies to control, and properly protect, sensitive and classified information.  Release of these handling instructions would serve no public benefit and releasing this information would not serve a legitimate public interest.

**G2.5    Source numbers and JTF-GTMO identification numbers assigned to Detainees**

31.  Where the code G2.5 appears in the description column for a particular entry on the Vaughn index, information concerning unique numbers assigned by JTF-GTMO and sources has been withheld.  In addition to ISN numbers, detainees are assigned separate, JTF-GTMO unique identification numbers.  Additionally, some documents contain source numbers that identify a particular detainee.  The JTF-GTMO identification numbers and source numbers are used in conducting camp operations and identifying particular detainees in intelligence reports and messages.

32.  If JTF-GTMO released these unique numbers, persons not affiliated with JTF-GTMO or U.S. intelligence operations could reference other Government database systems and information from other sources to retrieve information about a particular detainee. This information could also be used to associate a particular detainee with intelligence gathering operations by JTF-GTMO and other U.S. government agencies engaged in the GWOT.  As noted above, association of a particular detainee with an intelligence gathering activity risks the

disclosure of source and information obtained from sources, possibly jeopardizing JTF-GTMO's ability to conduct its mission, as well as the safety and well being of intelligence sources. Further, release of these handling instructions would serve no public benefit and releasing this information would not serve a legitimate public interest.

**GTMO Standard Operating Procedures.**

33. Many of the JMG and JDG Standard Operating Procedures (SOPs) referenced on the Vaughn index at Bates range 4984-5454, contain redactions under FOIA Exemption (b)(2), not referenced using the coding system described in paragraph 27. These SOPs are internal documents created to guide JMG personnel in the provision of medical care to detainees. The information withheld from these documents under FOIA Exemption (b)(2) pertains to guidelines for medical intervention, response to medical and other emergencies, and procedures for movement of detainees at JTF-GTMO. Disclosure of the information contained within these documents would impede the ability of the JDG and JMG to conduct operations and fulfill their respective missions. A detainee armed with the knowledge of these procedures would be able to undermine the ability of the JMG and JDG to effectively carry out the requirements of the SOP and maintain order in the camps. Many of the procedures withheld from the SOPs are designed to protect the safety of detainees and JTF-GTMO personnel. Providing an avenue for a detainee to manipulate these procedures to his advantage jeopardizes the safety of that detainee, other detainees, and USG personnel. Furthermore, release of these internal procedures would serve no public benefit and would not serve a legitimate public interest.

34. The business telephone numbers, facsimile numbers, and addresses that are used by individuals during the performance of their duties have been redacted from the documents because disclosure of the information could subject the individuals to harassing phone calls and mail,

which could disrupt official business.  In addition, routine internal administrative information, such as telephone numbers and addresses, serve no public benefit, and there is no indication that there is a genuine public interest in the disclosure of these numbers.  Accordingly, since the internal business telephone numbers and addresses are solely related to JTF-GTMO's internal practices, the disclosure would not serve any public benefit, and the disclosure would impede JTF-GTMO's effectiveness, the information should be withheld from release.

**EXEMPTION 3**
**INFORMATION WITHHELD PURSUANT TO STATUTE**

**G3.1   10 U.S.C. § 130b**

35.  Under the FOIA, 5 U.S.C. §552 (b)(3) allows for the withholding of information if such information is identified for withholding by another statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue or establishes particular criteria for withholding or refers to particular types of matters to be withheld.  This provision of the FOIA was included in recognition of the existence of other statutes limiting the disclosure of information held by the government, and thus incorporates such statutes within the exemptions of the FOIA provided that these statutes meet specific criteria.  In this case, JTF-GTMO has withheld information from Plaintiffs because such information falls within the provisions of 10 U.S.C. §130b.

36.  This statute allows for the withholding of names, rank, duty address, and official titles of U.S. personnel in overseas, sensitive, and routinely deployable units.  Because this statute is a statute within the purview of the FOIA Exemption (b)(3), the only remaining question is whether the information withheld falls within the scope of the statute.  JTF-GTMO has withheld names, ranks, duty addresses and titles of those persons engaging in JTF-GTMO operations.  Clearly, the

information falls within the provisions of 10 U.S.C. §130b discussed above.  Much of this

information may also be redacted under the FOIA Exemption (b)(6).

**EXEMPTION 5**
**DELIBERATIVE PROCESS PRIVILEGE, ATTORNEY-CLIENT PRIVILEGE,**
**AND WORK-PRODUCT DOCTRINE**

37.  Under the FOIA, 5 U.S.C. §552(b)(5) exempts from disclosure "inter-agency or intra-

agency memorandums or letters which would not be available by law to a party other than an

agency in litigation with the agency."  This exemption has been construed to exempt those

documents or information normally privileged in the civil discovery context, which includes the

deliberative process and attorney work-product.  The deliberative process privilege protects the

internal deliberations of the government by exempting from release recommendations, analyses,

opinions, speculation, and other non-factual information prepared in anticipation of decision-

making.  Generally, attorney-client privilege protects confidential communications between an

attorney and his/her client relating to a legal matter for which the client sought professional advice.

This privilege encompasses any opinions given by an attorney to his/her client based upon the

information provided, as well as communications between attorneys that reflect client–supplied

information.  The attorney-client privilege also protects confidential communications made to the

attorney not only by decision-making personnel, but also by lower echelon employees.

**G5.1     Internal deliberative assessments containing analysis or recommendations**
**regarding matters related to detainees or intelligence gathering activities**

38.  Where the code G5.1 appears in the description column for a particular entry on the

Vaughn index, information has been withheld because it involves the deliberative process

involving detainees and intelligence gathering activities that include the opinions, advice,

comments, evaluations, deliberations, policy formulation, proposals, and recommendations

prepared in anticipation of decision making. The portions of documents that were withheld under this deliberative process privilege fall into two general categories.

39. The first category involves the observations, comments, and recommendations made by analysts and intelligence personnel in intelligence documents, such as Summary Interrogation Reports and Information Reports.[19] These documents are created by JTF-GTMO personnel to share intelligence information with other JTF-GTMO personnel, the JTF-GTMO leadership, and other USG agencies involved in the intelligence-gathering process. As such, they are inter-agency and intra-agency documents. The observations, comments, and recommendations contained in these documents are intended to guide ongoing intelligence collection efforts concerning extremist organizations and individuals in the GWOT. Consequently, the comments are predecisional in nature. Publicly releasing these sorts of comments and recommendations to the public would seriously degrade the effectiveness of intelligence collection. Key to any intelligence collection process is the ability of analysts, interrogators, and others involved in the process to share candid assessments and advice. Intelligence personnel would be stifled from sharing these important observations out of fear that such observations, opinions, and recommendations would be used by others to interfere with intelligence collection efforts.

40. The second category of predecisional information in the documents provided by JTF-GTMO involves detainee assessment briefs created by JTF-GTMO personnel to provide advice and recommendations to higher echelons within DoD concerning the status of a detainee. These briefs provide observations and recommendations concerning release, continued detention, or transfer of detainees as well as assessments concerning threat levels and intelligence value. By their nature, these documents are predecisional as they are used to guide senior leadership in

---

[19] These comments and observations in many cases were also exempted under exemption (b)(1) pursuant to Section 1.4(c) of E.O. 12958, as amended.

**EXEMPTION 6**
**UNWARRANTED INVASION OF PERSONAL PRIVACY**

43.  Under the FOIA, 5 U.S.C. §552(b)(6) exempts from disclosure "personnel and medical

files when the disclosure of such information would constitute a clearly unwarranted invasion of

personal privacy." In asserting this exemption, JTF-GTMO examined each document containing

personal information that identified civilian employees and military members of the United States,

detainees other than the Plaintiffs, and other individuals named or identified in the document and

balanced the privacy interest of each against the public's interest in disclosure of the information.

The only public interest in the disclosure of this identifying information is its tendency to inform

the Plaintiffs and the general public about the performance of the mission by the JDG, JIG, and

JMG, as described earlier in this declaration. In each instance where information was withheld, I

approved my staff's recommendations that the individual privacy rights of the persons identified

outweighed the public interest in the information and that revealing the names and identifying

information of individuals named in these documents, as described more thoroughly below, could

reasonably be expected to cause humiliation, harassment, and a threat to USG personnel and their

families.

### G6.1   Names and identifying information of United States Government personnel

44.  Where the code G6.1 appears in the Description column for a particular entry on the

Vaughn index, information has been withheld because it contains the names or other information

which could be used to identify civilian and military personnel assigned to JTF-GTMO units and

deployed to JTF-GTMO in support of the mission. As noted earlier, the JIG, JDG, and JMG

perform an important mission in support of the GWOT. Their duties regularly bring them into

contact with detainees, all of whom are members of extremist groups or terror organizations.

Additionally, civilian and military personnel, especially those assigned to the JIG and its

making the final decision concerning release, transfer, or continued detention of a detainee.  The

assessments and recommendations contained in these documents are intended to provide senior

leadership candid advice from which to make these decisions.  If such recommendations and

assessments contained in these documents were released to the public, JTF-GTMO personnel

would be reluctant to provide the candid recommendations needed by senior leadership in making

decisions of great importance to the individual detainees and the USG.

41.  Many of the passages withheld pursuant to Exemption (b)(5) contain factual material

that is inextricably connected with the recommendations and assessments made by GTMO

personnel.  In these instances, the factual material itself reflects the thought process of the person

making the recommendations and assessments and his or her focus on selected pieces of

information obtained from a larger intelligence database.

### G5.2    Attorney-Client Privilege

42.  Where the code G5.2 appears in the description column for a particular entry on the

Vaughn index, information has been withheld because it involves advice provided by attorneys

within JTF-GTMO on legal matters affecting JTF-GTMO operations and activities.  Disclosure of

material protected by the attorney-client privilege would have a repressive and stifling effect on

the attorneys within JTF-GTMO who would be reluctant to communicate with their clients, the

USG, as well as clients who may limit information they provide their attorneys when seeking legal

advice out of fear that the communications may be exposed to the public.  Ultimately, disclosure of

legal communications prepared by JTF-GTMO attorneys would diminish the value of attorney-

client privileged communications.

intelligence-gathering mission, regularly review sensitive information concerning organizations and individuals with ties to extremist causes. These factors make JTF-GTMO personnel prime targets for harassment and harm by individuals or groups hostile to the mission performed by JTF-GTMO personnel and United States efforts in the War on Terror. The risk of harassment and the invasion of privacy are heightened by the extensive scrutiny of JTF-GTMO operations by the media, various human rights groups, and attorneys representing individual detainees. This intense scrutiny makes it more likely that a release of information that identifies a particular civilian or military member assigned to JTF-GTMO would lead to harassment, humiliation, or threat to his or her safety. Accordingly, any possible public interest in releasing the names of United States Government personnel is far outweighed by the privacy interests of the individual so identified in the documents.

### G6.2    Personal Information that Identifies Other Detainees

45. Where the code G6.2 appears in the description column for a particular entry on the Vaughn index, information has been withheld because it contains the name, ISN, or other information which would identify another current, or former detainee at JTF-GTMO. The names and identifying information of other detainees generally appears in documents where that Detainee is either the source of intelligence information, is a person identified in an intelligence interview as having affiliations or associations with organizations or persons of interest to the intelligence community, or was involved in a disciplinary matter recorded by the JDG.

46. Detainees who have provided information to the USG have an inherent expectation that their identities will not be revealed to the general public. Detainees who provide information to USG personnel routinely request that they not be associated with the information they are providing or identified as the source of this information based on a fear of retaliation,

embarrassment, and harm to themselves and members of their family. This very real concern by these detainees far outweighs any public interest that may exist in revealing their identities as sources to the general public.

47. Detainees who are identified or named during the course of intelligence-related interviews likewise have a privacy interest that outweighs any public interest in knowing their identities. Most of the enemy combatants held at JTF-GTMO have been determined to be enemy combatants because of their association with terrorist organizations and extremist groups. Information that identifies a Detainee with specific information regarding those organizations or individuals associated with those organizations places that detainee, his family members, and associates at risk of harm or retaliation.[20]

### G6.3  Names and personal identifying information of other individuals named in intelligence and detainee related documents

48. Where the code G6.3 appears in the description column for a particular entry on the Vaughn index, information has been withheld because it contains the name or other identifying information of a third party named during the course of an intelligence interview or obtained in the course of intelligence collection activities.[21]

---

[20] This information is more thoroughly addressed in Admiral Harris' Declaration.
[21] This information is more thoroughly addressed in Admiral Harris' Decalration.

## **CONCLUSION**

49.  In this declaration, I have provided a more detailed description of the search conducted in response to the Plaintiffs' FOIA request, review of documents referred to JTF-GTMO, and an explanation of FOIA Exemptions (b)(2), (b)(3), (b)(5), and (b)(6), which were asserted to withhold information from JTF-GTMO documents.

Date: 7 JULY 06

PETER A. HUSTA
CAPT, US Navy
Chief of Staff

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN H. OLESKEY | ) | |
| | ) | |
| | ) | |
| ON BEHALF OF GUANTANAMO INTERNEES | ) | |
| LAKHDAR BOUMEDIENE, | ) | |
| MOHAMED NECHLA, MUSTAFA AIT IDIR, | ) | |
| SABER LAHMAR, HADJ BOUDELLA, | ) | Civil Action No. 05-10735-RGS |
| AND BELKACEM BENSAYAH | ) | |
| | ) | |
| *Plaintiff,* | ) | DECLARATION OF |
| | ) | CHARLES D. STIMSON |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE AND UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

Pursuant to 28 U.S.C. §1746, I, Charles D. Stimson, declare as follows:

1. I am the Deputy Assistant Secretary of Defense for Detainee Affairs. I have held this

position since January 25, 2006. I report directly to the Principal Deputy Under Secretary of

Defense for Policy who is responsible for providing advice and assistance to the Secretary of

Defense, Deputy Secretary of Defense and the Under Secretary of Defense for Policy on national

security policy, military strategy, and defense policy.

2. In my capacity as the Deputy Assistant Secretary of Defense for Detainee Affairs, I oversee

the Office of Detainee Affairs (hereinafter "DA"). This office was created in July 2004 to advise

the Secretary of Defense on detention policy and strategy and to serve as a focal point for

detainee matters within the Department of Defense.

- 1 -

3.  I am familiar with the procedures followed by Detainee Affairs in responding to requests for

access to records and information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C.

§ 552.  I am aware of the actions that have been taken by my office in response to the September

28, 2004 request of Stephen Oleskey for records concerning Guantanamo detainees Lahkdar

Boumediene, Mohammed Nechle, Mustafa Ait Idir, Saber Lahmar, Hadj Boudella, and Bensayah

Belkacem (collectively referred to as "Plaintiff").  The statements contained in this declaration

are based upon my personal knowledge, upon information provided to me in my official capacity

by personnel under my supervision, upon information provided to me by the Department of

Defense Office of the General Counsel, and upon conclusions and determinations reached and

made in accordance therewith.

4.  My responsibilities include oversight of the review of Detainee Affairs information for

classification purposes as mandated by Executive Order ("EO") 12958, as amended.[1]  The

Principal Deputy Under Secretary of Defense for Policy has been designated by the Under

Secretary of Defense for Policy (OUSD) as an Original SECRET Classification Authority and

declassification authority pursuant to EO 12958, as amended, Sections 1.3 and 3.1.  Through my

position, I am aware of the substantive requirements within my organization for classifying

documents pursuant to this authority.  I am familiar with the requirements for classification of

information under EO 12958, as amended.  In my present position, I am responsible for matters

relating to individuals detained by the Department of Defense and I read, review and draft

classified documents concerning this subject on a daily basis.  Based on this experience and

information available to me in my official capacity, I am aware of the classification requirements

for documents within my area of responsibility.

---

[1] 60 Fed. Reg. 19825 (1995), and 68 Fed. Reg. 15315 (2003).

5.  This declaration describes the search for responsive documents within the systems of records in the Office of Detainee Affairs and also provides an accounting of responsive documents identified during a search of these records systems, describes the documents referred to Detainee Affairs from other organizations, and explains the basis for withholding information from the records identified and reviewed by Detainee Affairs pursuant to FOIA exemptions (b)(1), (b)(5), and (b)(6) in accordance with *Vaughn v. Rosen*, 484 F. 2d 820 (D.C. Cir. 1973).

## THE SEARCH BY DETAINEE AFFAIRS

6.  In October 2004 (prior to my arrival), the Department of Defense Office of Freedom of Information and Security Review (DoD FOIA) tasked Detainee Affairs with conducting a search for and providing records responsive to Plaintiff's September 28, 2004 request.  In May of 2005, Detainee Affairs personnel completed a search of its records and identified several documents responsive to Plaintiff's request.  These documents were withheld as exempt from release under the provisions of 5 U.S.C. § 552(b)(1), (b)(5) and (b)(6). Detainee Affairs provided the documents to DoD FOIA in August 2005.

7.  Information and records created and compiled on detainees by Detainee Affairs personnel in furtherance of its mission, as well as information obtained from other Department of Defense and U.S. government organizations, are stored in file cabinets in the office and/or electronically on shared computer drives (both classified and unclassified) maintained by the OUSD Policy Automation Office.  Information stored in these file cabinets and on the shared computer drive includes, among other things, e-mails, official correspondence, Public Affairs guidance, interrogation reports, intelligence messages, analyst products, and periodic detainee assessments prepared by U.S. military commands and other U.S. Government organizations, as well as drafts of those types of documents.

8.   Members of the Office of Detainee Affairs staff were directed to search for materials

responsive to Plaintiff's request by manually reviewing the documents found within file cabinets

likely to contain responsive information and by conducting an electronic search of the shared

computer drives using key words, including the names and Internment Serial Number[2] (ISN) of

each Plaintiff.   The search by Detainee Affairs personnel identified 15 documents responsive to

the Plaintiff's request.[3]   Having been informed of the details of this search, I have determined

that the search conducted by Detainee Affairs personnel was such that it would reasonably locate

any records responsive to the Plaintiff's request.

9.   After conducting a line-by-line review of each record, my office determined that the

documents contained information exempt from release under FOIA exemptions (b)(1),  (b)(5)

and (b)(6), as discussed further below.  We further determined that no meaningful segregable

information remained in the documents after these exemptions were exerted and therefore

recommended withholding the documents in their entirety.   The *Vaughn* index reflects the

particular exemptions asserted as to each document.

## DOCUMENTS REFERRED TO DETAINEE AFFAIRS

10.   In conducting searches in response to the Plaintiff's FOIA request, several other agencies

identified classified records containing information derived from information or documents that

originated in my office.   As required by EO 12858, these documents were referred to Detainee

Affairs for review and a determination concerning release under the FOIA.  Detainee Affairs

---

[2] ISN numbers are unique to each detainee.  These numbers are used at JTF GTMO and throughout the U.S.
government in messages, reports, and other documents concerning detainees to identify a particular detainee.
[3] Following its review, DoD GC determined that 7 of these documents were duplicative of records already being
reviewed by JTF GTMO as part of this FOIA response or were not actually responsive to the Plaintiff's request. *See*
Declaration of John Tait, Associate Deputy General Counsel (Legal Counsel), Department of Defense.  The 8
responsive documents are listed on the *Vaughn* index at Bates numbers 4959, 4960-4961, 4962-4964, 4965-4967,
4968, 4969, 4970-4971, and 4972-4973.

ultimately received such documents from the United States European Command Joint Analysis

Center (JAC), the Joint Staff and the DoD Office of the General Counsel (OGC).

### Documents Referred to Detainee Affairs by the Joint Analysis Center (JAC)

11. My office was tasked to review one document[4] that was referred to us by the United States

European Command Joint Analysis Center (JAC). Following our review, it was determined that

this five page document contained information exempt from release under exemption (b)(1),

citing section 1.4(a) and (c) of Executive Order 12958, as amended. In addition, portions of the

document were determined to be exempt under (b)(5) and (b)(6). It was further determined that

no meaningful segregable information remained in this document after asserting the exemptions

and therefore we recommended withholding the document in its entirety.

### Documents Referred to Detainee Affairs by the Joint Staff

12. My office also received four documents[5] that were referred to us by the Joint Staff.

Following our initial review, it was determined that they were exempt from release in their

entirety under exemption (b)(1), citing section 1.4(a) and (c) of Executive Order 12958, as

amended. Additionally, portions of the documents were determined to be exempt under

exemption (b)(5) and (b)(6). In May 2006, we re-reviewed these documents and, while they

were still largely exempt under the provisions previously cited, we determined that there were

segregable portions of the documents that could and would be provided to the Plaintiffs.

### Documents referred to Detainee Affairs by the DoD Office of General Counsel

13. My office received 21 documents[6] that were referred to us by the DoD General Counsel's

Office. These documents, consisting of e-mails and memos, were referred to Detainee Affairs

---

[4] This document is listed on the *Vaughn* index at 10081-10085.
[5] These documents are listed on the *Vaughn* index at 3476, 3485, 3492 and 3500.
[6] These documents are listed on the *Vaughn* index at entries beginning with Bates numbers 5502, 5520, 9103, 9132, 9141, 9147, 9149, 9151, 9155, 9156, 9158, 9161, 9165, 9168, 9206, 9208, 9210, 9219, 9221, 9231, 9250, 9497, 9551, and 10053.

because they contained information provided or generated by Detainee Affairs personnel. Detainee Affairs determined that portions of each document contained information exempt from release under exemption (b)(1), citing sections 1.4(a), (b), (c), and/or (d) of Executive Order 12958, (b)(5), or (b)(6). No substantive information remained in this document after asserting the exemptions and therefore we recommended withholding the document in its entirety.[7]

## EXPLANATION OF JUSTIFICATION FOR WITHHOLDING DETAINEE AFFAIRS INFORMATION IN FULL OR IN PART

14. All the documents discussed above (which included documents found during our search and also documents referred to us by other organizations) were reviewed line-by-line and document-by-document to achieve maximum disclosure consistent with the provisions of the FOIA. This review included a determination for each document withheld in part or in its entirety that no further information could be released without risk of disclosure of the information protected and exempted from disclosure under one or more FOIA provisions. The following paragraphs describe the Office of Detainee Affairs' rationale for withholding entire documents or portions of documents pursuant to FOIA Exemptions (b)(1), (b)(5), and (b)(6).

## EXEMPTION 1:  CLASSIFIED INFORMATION

15.  5 U.S.C. § 552 (b) (1) states that the FOIA does not apply to matters that (A) are specifically authorized under criteria established by an Executive Order to be kept SECRET in the interest of national defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive Order.

---

[7] Documents withheld in full are listed on the *Vaughn* index beginning with Bates numbers 9132,  9141, 9151, 9147, 9149, 9155, 9161, 9165, 9168, 9206, 9208, 9210, 9497, 10053, 10060, 10061, and 10062.  Each entry reflects the basis for withholding the documents in their entirety.

16.   Detainee Affairs withheld information in several of the documents reviewed based on 5 U.S.C. 552(b) (1)[8]. I have reviewed the documents and the recommendations from personnel within Detainee Affairs and determined that the information withheld for this reason was properly classified and continues to meet the classification criteria of Executive Order 12958, as amended. The information withheld from the documents is classified at the SECRET level, which applies to information whose unauthorized disclosure could be expected to cause serious damage to the national security.[9]   I also determined that the information withheld under exemption (b)(1) could not be further segregated without releasing national security information.

17.   Section 1.1 of EO 12958, as amended, authorizes the classification of information owned, produced, or controlled by the U.S. government if it falls within one of the following seven classification categories specified in Section 1.4 of EO 12958:

    a.   military plans, weapons systems, or operations;

    b.   foreign government information;

    c.   intelligence activities (including special activities), intelligence sources or methods, or cryptology;

    d.   foreign relations or foreign activities of the United States, including confidential sources;

    e.   scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism;

    f.   United States government programs for safeguarding nuclear materials or Facilities;

    g.   Vulnerabilities or capabilities of systems, installations, projects or plans relating to the national security, which includes defense against transnational terrorism; or

---

[8] Information was withheld citing exemption (b)(1) from documents listed on *Vaughn* index beginning with Bates numbers 3476, 3485, 3492, 3500, 4959, 4960-4961, 4962-4964, 4965-4967, 4968, 4969, 4970-4971, 4972-4973, 5520, 9103, 9132, 9141, 9147, 9149, 9151, 9155, 9156, 9158, 9161, 9165, 9168, 9206, 9208, 9210, 9219, 9221, 9250, 9497, 10053, and 10081. Each of these entries on the index indicates the section 1.4 of Executive Order 12958 cited in support of the exemption.
[9] Section 1.2(a)(2), Executive Order 12958, as amended.

    h.  Weapons of mass destruction.

18.  In this case, information was withheld from the documents reviewed by Detainee Affairs under Sections 1.4 (a), (b), (c), and (d).  The specific reason cited for each document is reflected in the *Vaughn* index.  Where multiple agencies reviewed and provided input on a particular document, the exemptions asserted by my organization are preceded by the code "ODA."

## Information Concerning Military Plans & Operations

19.  Where the FOIA exemption (b)(1), 1.4 (a) is entered for a particular document in the *Vaughn* index, information was withheld from the corresponding document to protect military plans and operations.  Section 1.4(a) of E.O.12958 recognizes that the disclosure of information pertaining to military operations can cause harm to national security. Detainee Affairs documents and information withheld under this exemption include military plans and operations associated with the movement of detainees or personnel to and from Guantanamo Bay, Cuba.  This information, if released, would reveal internal detention operations and intelligence gathering activities at JTF-GTMO.  Additionally, this information, if released, would reveal the nature of sensitive military operations and diplomatic efforts involving foreign governments.  Publicly airing this information would jeopardize future cooperative efforts with the foreign government and risk undermining continuing efforts.  In sum, publicly releasing this classified information would severely compromise JTF-GTMO's ability to conduct detainee movement operations at Guantanamo and the ability of Detainee Affairs in its continued efforts in working with foreign governments on issues involving detainee transfers and repatriation.  The disclosure of this information would reasonably be expected to cause serious damage to our national security.

**Foreign Government Information**

20.  Where the exemption (b)(1), 1.4(b) appears for a particular document in the *Vaughn* index,

certain foreign government information was withheld from the corresponding document .

Section 6.1 of Executive Order 12958, as amended, provides in pertinent part that:

> "Foreign Government Information" means: (1) information provided to the
> United States Government by a foreign government or foreign governments, an
> international organization of governments, or any element thereof, with the
> expectation that the information, the source of the information, or both, are held
> in confidence;

21.  Detainee Affairs documents and information withheld under this exemption include

correspondence between various U.S. government agencies regarding detainee intelligence

reports, transfers and military plans and operations associated with the movement of detainees or

personnel to Guantanamo and within the camp.  These documents include information provided

to the United States from foreign governments in diplomatic exchanges concerning these

detainees and their status.  This information, if released, would reveal internal confidential

discussions regarding detainee transfers/releases and detention operations related to the detainees

and their status and movement.  The information obtained from the foreign governments

involved was provided to us with the understanding, which governs all diplomatic exchanges,

that the information will remain confidential.  The inability to maintain this confidentiality would

chill our relations with foreign governments.  This inevitably would impact the ability of the

United States to obtain information necessary to conducting detainee operations and transfers

and to gather necessary intelligence in the war on terror.  The disclosure of this information

would reasonably be expected to cause serious damage to our national security.  Further

explanation of the need to withhold this type of intelligence information is found in the

Declaration of Alice Ritchie.

## Information Concerning Intelligence Activities

22. Where the exemption (b)(1), 1.4(c) appears for a particular document in the *Vaughn* index, information was withheld from the corresponding document to protect intelligence activities. Several of the documents reviewed by Detainee Affairs contained summaries of information obtained from intelligence sources and as a result of activities conducted by intelligence personnel at Guantanamo Bay, Cuba and within other U.S. government agencies. In addition to revealing the intelligence sources and methods, this information, alone or combined with other information, would reveal the details and extent of intelligence developed by the United States and activities undertaken to develop that intelligence. Conversely, it would also reveal areas where the United States lacks intelligence or has yet to fully develop potential leads and sources. Public release of this information would seriously hamper efforts by the United States government to gather and exploit such intelligence because it could reasonably be expected that terrorists or organization linked to terrorism would exploit the information to evade or interfere with intelligence gathering activities. Furthermore, this information, if released, would tend to reveal the methods and actions taken and yet to be taken by United States Government personnel in gathering intelligence concerning the Plaintiffs as well as other organizations linked to terrorism or terrorist related activities. The disclosure of this information would reasonably be expected to cause serious damage to our national security. Further explanation of the need to withhold this type of intelligence information is found in the Declaration of Admiral Harry Harris.

### Foreign Relations or Foreign Activities of the United States

23.  Where the exemption (b)(1), 1.4(d) appears for a particular document on the *Vaughn* index, information pertaining to foreign relations and the foreign activities of the United States (including confidential sources) was withheld from the corresponding document.  The information withheld from these documents involves confidential sources and foreign activities of the United States in relation to the capture, transfer, and detention of detainees.

24.  Maintaining the confidentiality of sources is essential to conducting detainee operations and in pursuing diplomatic agreements concerning transfer of detainees.  Information from foreign sources is obtained with the express or implied understanding that the identity of the source, including foreign officials, will be kept in confidence.  A breach of this confidentiality could cause the source to become reluctant to provide information in the future and put the source at risk from individuals who are impacted by the information provided.  For similar reasons, release of a source's identity would discourage other potential sources from assisting the United States.  Ultimately, this would impact the ability of the United States in conducting detainee operations and securing agreements concerning transfer and release of detainees.  The disclosure of this information would reasonably be expected to cause serious damage to our national security.  Further explanation of the need to withhold this foreign government information is found in the Declaration of Alice Ritchie.

### EXEMPTION (b)(5)

25.  Where the FOIA exemption (b)(5) is entered on the *Vaughn* index, information has been withheld because it involves the deliberative process involving detainee operations and transfers.  This includes review of draft memoranda concerning interactions with foreign governments concerning detainees and predeliberative documents concerning detainee operations and transfer

decisions. These documents contain the opinions, recommendations, and policy proposals by Detainee Affairs personnel that are intended to guide senior policy makers and other United States government agencies in making final decisions involving detention policy and concerning the continued detention or transfer of detainees.

26. My office, as well as other organizations within the Department of Defense and other U.S. government agencies, must be able to engage in open, frank discussions on matters of policy and practice, both internally and with each other, as reflected by the contents of these documents. Release of this information would seriously erode the free exchange of information within and between Detainee Affairs, OSD Policy and other United States Government agencies who are working closely in executing programs concerning detainees and detention operations. It would limit candid discussions and recommendations concerning, among other things, Detainee Affairs' efforts to transfer and repatriate detainees.

## EXEMPTION (b)(6)

27. Where the FOIA exemption (b)(6) appears for a particular document on the *Vaughn* index, information has been withheld because it contains the names or other information which could be used to identify civilian and military personnel assigned to the Office of Detainee Affairs. The disclosure of this information would constitute a clearly unwarranted invasion of the individuals' personal privacy.

28. As noted earlier, Detainee Affairs personnel perform an important mission in support of the Global War on Terror. Their duties require them to address sensitive issues related to the transfer or release of detainees and detainee operations. This exposes them to sensitive, classified information concerning organizations and individuals with ties to extremist causes. These factors can make Detainee Affairs personnel prime targets for harassment and harm by

individuals or groups hostile to the mission performed by Detainee Affairs. Additionally, the issue of continued detention and efforts to transfer detainees has and continues to receive widespread attention in the media and various human rights groups. This intense scrutiny makes it more likely that a release of information that identifies a particular civilian or military member assigned to Detainee Affairs (other than those appointed public officials) would lead to harassment, humiliation, or threat to his or her safety. Accordingly, any possible public interest in releasing the names of United States Government personnel is far outweighed by the privacy and safety interests of the individual so identified in the documents.

## CONCLUSION

29. All of the documents addressed have been carefully reviewed by Detainee Affairs personnel for reasonable segregation of non-exempt information. I have reviewed and concur in their recommendations concerning information withheld from the documents and the reasons asserted under the FOIA for the information so withheld. I have determined that no further information can be disclosed without disclosing information warranting protection under the law.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 17th day of July 2006.

Charles D. Stimson

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEPHEN H. OLESKEY,<br><br>ON BEHALF OF GUANTANAMO DETAINEES<br>LAKHDAR BOUMEDIENE;<br>MOHAMED NECHLA; MUSTAFA AIT IDIR;<br>SABER LAHMER; HADJ BOUDELLA;<br>BELKACEM BENSAYEH,<br><br>     Plaintiff,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF<br>DEFENSE and UNITED STATES<br>DEPARTMENT OF JUSTICE<br><br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 05-10735 RGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF COL JOE E. ETHRIDGE, JR.**

I, COL Joe E. Ethridge, Jr., declare as follows:

(1) I am currently the Commander of the Department of Defense Criminal
Investigation Task Force (CITF), Fort Belvior, Virginia. I have been in Command of
CITF since May 15, 2005. Prior to assuming command of CITF, I was assigned as the
Officer in Charge of CITF's Iraq Office from October 2004 through March 2005. Prior to
that I was the Chief of CITF's Personnel, Plans, and Integration Division (PPI), from July
2004 through September 2004.

(2) Under the direction of the Secretary of the Army, CITF conducts worldwide criminal investigations to substantiate or unsubstantiate alleged or suspected war crimes or acts of terrorism committed by certain individuals against US persons, property or interests. The CITF is a joint, operational, criminal investigative task force, comprised primarily of Special Agents from the US Army Criminal Investigation Division, the US Air Force Office of Special Investigations, and the US Navy Criminal Investigation Service. Special Agents assigned to CITF conduct law enforcement interviews of suspects and memorialize records of these interviews on documents known as CITF Form 40s. The product of CITF investigations are used to determine whether jurisdiction and appropriate chargeable offenses exist for the cases to be brought before military commissions.

(3) As Commander, I ultimately supervise all personnel assigned to CITF. Due to the nature of my position, I am familiar with the procedures followed by CITF in responding to requests for information from its files pursuant to the provisions of the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Specifically, I am aware of the actions that have been taken at CITF in response to the request of Steven Oleskey for records concerning individuals held by the United States at overseas detention centers whom he is representing in pending litigation in US Federal Courts. The statements contained in this declaration are based on my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

2

## PURPOSE OF THIS DECLARATION

(4) This declaration describes the record system at CITF, provides an accounting of CITF documents determined to be responsive to Plaintiffs' requests and a justification of information withheld from CITF records pursuant to FOIA exemptions (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(E), and (b)(7)(F) in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

## EXPLANATION OF CITF'S RECORD SYSTEM

(5) Special Agents assigned to CITF conduct law enforcement interviews of persons suspected of involvement in international terrorism at locations throughout the world and memorialize records of these on CITF Form 40s. Form 40s are scanned or transmitted electronically to a database accessible at several locations, including CITF Headquarters. In addition, other CITF documents, such as transfer recommendations, jurisdictional assessments and case analysis are routinely created by CITF personnel and stored electronically in hard copy and in CITF computer databases.

## CITF RECORDS RESPONSIVE TO
## PLAINTIFFS' FOIA REQUESTS

(6) Using electronic search programs known as I2MS and Orion Magic, and a manual review of files, CITF employed the names (and aliases/aka's/identifying numbers) of the subjects of the request as search terms that identified documents that appeared to be responsive to Plaintiffs' request. The search encompassed all CITF records created since its inception in 2002. Hard copy records were also manually

3

reviewed by CITF employees to identify other documents responsive to the request. Each page of these records were subsequently bates stamped beginning with number 01103 through 03075.

## EXPLANATION OF FORMAT USED FOR THE
## JUSTIFICATION OF DELETED MATERIAL

(7) All documents provided were processed to achieve maximum disclosure consistent with the provisions of the FOIA. Every effort was made to provide Plaintiffs with all material in the public domain and with all reasonably segregable portions of releasable material. The FOIA exemptions asserted as grounds for nondisclosure of the documents are FOIA Exemptions (b)(1), (b)(2), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(E), and (b)(7)(F).

(8) Copies of the documents, on their face, contain coded categories of exemptions which detail the nature of information withheld pursuant to the provisions of the FOIA. To further describe the information withheld in more detail than that provided in this declaration could identify the very material that is being protected. No reasonably segregable, non-exempt portions were withheld from Plaintiffs. The coded categories are provided to aid the Court's review of the explanations of FOIA exemptions used to withhold the protected material. Accordingly, a review of this information will reveal that all material withheld is exempt from disclosure pursuant to a FOIA exemption or it was so intertwined with protected material that segregation was not possible without revealing the underlying protected material.

(9) The coded format is used in this case to assist the Court and the Plaintiffs in

4

reviewing the information withheld within the context of the documents themselves. Each instance of information withheld pursuant to the FOIA on the attached documents is accompanied by a coded designation that corresponds to the categories listed below. For example, if (b)(7)(C)-1 appears on a document, the (b)(7)(C) designation refers to Exemption (b)(7)(C) of the FOIA concerning "Law Enforcement Records - Unwarranted Invasion of Privacy." The numerical designation (-1) following the "(b)(7)(C)" narrows the main category to the more specific subcategory, "Names and Identifying Information of CITF Special Agents." Listed below are the categories used to explain the FOIA exemptions asserted to withhold protected material:

5

## SUMMARY OF JUSTIFICATION CATEGORIES

| CODED CATEGORIES | INFORMATION WITHHELD |
|---|---|
| Exemption (b)(1) | Classified Information |
| Exemption (b)(2) | Internal Agency Personnel Rules and Practices |
| (b)(2) – 1 | Non-numeric detainee ISN |
| (b)(2) – 2 | CITF file number |
| (b)(2) -- 3 | GTMO reference number |
| (b)(2) – 4 | Address/phone number/e-mail address |
| (b)(2) – 5 | Intelligence Report identification numbers |
| Exemption (b)(5) | Inter/Intra-agency documents |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney Work-product |
| Exemption (b)(6) | Third Party Privacy |
| Exemption (b)(7) | Law Enforcement Records |
| Exemption (b)(7)(A) | Pending Law Enforcement Investigation |
| Exemption (b)(7)(C) | Unwarranted Invasion of Personal Privacy – Law Enforcement Records (claimed in conjunction with (b)(6)) |
| (b)(7)(C) – 1 | Names and identifying information of US Government Personnel |
| (b)(7)(C) – 2 | Names and identifying information of other detainees and other non-US Government third parties |
| (b)(7)(C) – 3 | Names and identifying information of "persons of interest or subjects of criminal investigations. |
| Exemption (b)(7)(E) | Law Enforcement Technique |
| Exemption (b)(7)(F) | Information Which Could Endanger the Life or Safety of Third Parties |

## EXEMPTION (b)(1)
## CLASSIFIED SECRET MATTERS

(10) Neither the Commander of CITF nor any other member of this organization has original classification authority. Significant portions of the responsive material was marked "SECRET" or with a higher classification. The DoD CITF, through the DoD Office of General Counsel, referred all classified material in the responsive documents to the Agency that is its original classification source. Those agencies will determine whether to invoke the b(1) FOIA Exemption for Classified Information and assert these exemptions in separate declarations from this one.

## EXEMPTION (b)(2)
## INTERNAL AGENCY RULES AND PRACTICES

(11) 5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the internal personnel rules of an agency." This exemption protects routine internal administrative matters and functions of an agency that have no effect on the public at large. Disclosure of this information could impede the effectiveness of CITF's internal law enforcement investigative procedures.

### (b)(2)-1 Non-Numeric Detainee ISNs

(12) Exemption (b)(2)-1 has been asserted to protect non-numeric detainee sequence ID Numbers and Title Numbers of CITF documents from disclosure. A sequence number and non-numeric code is assigned to every detainee. CITF routinely uses these non-numeric and numeric codes in referring to detainees, due to the large number of similar names among detainees and the variations in the spelling of these

7

names using the Latin Alphabet.

(13) If CITF discloses these non-numeric ID numbers, individuals who have no need to know this information could potentially access these documents within a database or search databases for reference to these documents. They could also cross-reference these numbers with other released documents to attempt to determine the identity of specific detainees, agents, or others mentioned in the CITF reports. These identities are protected under Exemption (b)(7)(C), below. Routine, internal administrative information such as these ID numbers serve no public benefit and there is no indication that there is a legitimate public interest in disclosure of these numbers. Disclosure of these numbers, however, would impede CITF's effectiveness by allowing unauthorized individuals potentially to access to sensitive information within CITF or other Agency's database systems or identify the identity of individuals in CITF reports. Therefore this information is withheld pursuant to Exemption (b)(2)-1.

### (b)(2)-2 CITF File Number

(14) Exemption (b)(2)-1 has been asserted to protect CITF file numbers from disclosure. A file number is assigned to each document. These numbers are unique to each document.

(15) If CITF discloses these file numbers, individuals who have no need to know this information could potentially access these documents within a database or search databases for reference to these documents. They could also cross-reference these numbers with other released documents to attempt to determine the identity of specific detainees, agents, or others mentioned in the CITF reports. These identities are protected

8

under Exemption (b)(7)(C), below. Routine, internal administrative information such as these file numbers serve no public benefit and there is no indication that there is a legitimate public interest in disclosure of these numbers. Disclosure of these numbers, however, would impede CITF's effectiveness by potentially allowing unauthorized individuals to access sensitive information within CITF or other Agency's database systems or identify the identity of individuals in CITF reports. Therefore this information is withheld pursuant to Exemption (b)(2)-2.

## (b)(2)-3 GTMO Reference Numbers

(16) Exemption (b)(2)-3 has been asserted to protect GTMO reference numbers. Detainees and others are assigned unique identification number. At times, these numbers are used in lieu of Detainees' or others' names.

(17) If CITF discloses these reference numbers, individuals who are not affiliated with CITF or the U.S. Government could use these numbers to access CITF, GTMO or other Government database systems in an attempt to retrieve information about particular persons. In addition, disclosure of these numbers may facilitate disclosure of the identity of a detainee or other person and that person's relationship to sensitive investigations involving suspected members of terrorist organizations. Cross referencing of documents could allow recipients of these numbers to discover the identity of the person's identity and their relationship to disclosed material. This could jeopardize the persons' privacy and potentially their safety, if they divulged information which could make them a target of vengeful extremists. The identity of detainees and others are exempt under Exemption (b)(7)(C) and should not be circumvented by requiring disclosure of these numbers.

9

Routine, internal administrative information such as these numbers serve no public benefit and there is no indication that there is a legitimate public interest in disclosure of these numbers. Disclosure of these numbers, however, would impede CITF's effectiveness by allowing unauthorized individuals to access sensitive information within CITF or other Agency's database systems related to detainees or to identify detainees and specific information closely related to these detainees. Detainee counsel are cleared and have access to classified material and it would be possible for these counsel to use the released numbers and their context to determine the identity of individuals protected by reference to a numeric code in classified documents they can legitimately review in their status as counsel. Therefore this information is withheld pursuant to exemption (b)(2)-3.

### (b)(2)-4 Address/phone numbers/e-mail address

(18) Exemption (b)(2)-4 has been asserted to protect the addresses, phone numbers and e-mail addresses of persons named or referred to in the documents.   These contact numbers primarily belong to US Government employees, but at times they belong to detainees or third parties.

(19) If CITF discloses these contact numbers it would expose persons to harassment or dangerous acts. The individuals under investigation are suspected of belonging to terrorist organizations with Global reach. These organizations have shown the propensity to harm innocent people in order to stir feelings of terror in order to intimidate others into accepting their world view and policies. At the very least, release of officials or third parties contact information will put those individuals in fear for their safety from the time they are released until the foreseeable future. With today's

10

technology, it is not difficult for terrorists to use contact information to locate and intimidate or harm others. Routine, internal administrative information such as these numbers serve no public benefit and there is no indication that there is a legitimate public interest in disclosure of these numbers. Disclosure of these numbers, however, would impede CITF's effectiveness by allowing the possibility that terrorists would access contact information and put third parties in fear of harm or actual harm. Therefore this information is withheld pursuant to exemption (b)(2)-4.

### (b)(2)-5 Intelligence Report Identification Numbers

(20) Exemption (b)(2)-1 has been asserted to protect Intelligence Report identification numbers, contained in CITF documents, from disclosure. A unique identification number is assigned to Intelligence Reports known as IIRs and TDs. These reports are referenced in CITF documents to the extent they have law enforcement related information pertaining to the investigation of suspected terrorists and war criminals.

(21) The report numbers were not intended for external release and were meant only to be used within official Government channels. If CITF discloses these report numbers, individuals who have no need to know this information could potentially access these documents within a database or search databases for reference to these documents. They could also cross-reference these numbers with other released documents to attempt to determine the identity of specific detainees, agents, or others mentioned in the CITF reports. These identities are protected under Exemption (b)(7)(C), below. Routine, internal administrative information such as these file numbers serve no public benefit and there is no indication that there is a legitimate public interest in disclosure of these

11

numbers. Disclosure of these numbers, however, would impede CITF's effectiveness by potentially allowing unauthorized individuals to access sensitive information within CITF or other Agency's database systems or identify the identity of individuals in CITF reports. Therefore this information is withheld pursuant to Exemption (b)(2)-2.

## EXEMPTION (b)(5)
## DELIBERATIVE PROCESS

(22) 5 U.S.C. § 552 (b)(5) exempts from disclosure, "inter-agency or intra-agency memorandums of letters which would not be available by law to a party...in litigation with the agency." As such, it has been construed to exempt intra or inter-agency information between subordinates and superiors involving open and frank discussions of policy not intended for or expected to be released to the public, and which, if released would discourage further open and frank discussions of policy issues. In addition, the exemption protects intra or inter-agency information concerning proposed policies prior to the adoption of these policies, and information that would cause public confusion if disclosed because the reasons and rationales noted were not in fact ultimately the grounds for the agency action or decision. Finally, the exemption also protects attorney work product and material containing confidential legal advice not discoverable in litigation.

## EXEMPTION (b)(5)-1 Deliberative Process Privilege

(23) The general purpose of the deliberative process privilege is to "prevent injury to the quality of agency decisions," (NLRB v. Sears, Roebuck & Co., 421 U.S.

12

132, 151 (1975); see also Attorney General's Memorandum for Heads of all Federal

Departments and Agencies Regarding the Freedom of Information Act (Oct. 12, 2001).

Three policy purposes have been held to constitute the bases for this privilege: (1) to

encourage open, frank discussions on matters of policy between subordinates and

superiors; (2) to protect against premature disclosure of proposed policies before they are

finally adopted; and (3) to protect against public confusion that might result from

disclosure of reasons and rationales that were not in fact ultimately the grounds for an

agency's action.

(24) Traditionally, there are two requirements which must be met for the

deliberative process privilege to be invoked. First, the decision must be predecisional,

e.g. "antecedent to the adoption of an agency policy," (Jordan v. United States

Department of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc)). Second, the

communication must be deliberative, e.g. "a direct part of the deliberative process in that

it makes recommendations or expresses opinions on legal or policy matters," (Vaughn v.

Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975)).

(25) Information was withheld from the documents with bates numbers 01261

through 01266, 01395 through 01397, 01913 through 01915, 02103 through 02110,

02148 through 02160, 02632 through 02639, and 02710 through 02715. The documents

are CITF investigative summaries concerning detainees who are the subject of the FOIA

request, prepared by a special agent with CITF. They were intended to allow supervisory

agents and prosecutors to assess the merits of the case and to guide future investigative

efforts. As such they are intra-agency documents. They were created prior to completion

of the investigation to aid in determining whether further investigative efforts were

13

warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing investigative summaries feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(26) Information was withheld from the documents with bates numbers 01267 through 01351 and 01954 through 2027. The documents are CITF prosecution memorandum concerning five of the detainees who are the subject of the FOIA request, prepared by a special agent with CITF. They were intended to allow supervisory agents and prosecutors to assess the merits of the case, consider potential charges, and to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing prosecution memorandum to feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that CITF agents would be dissuaded from preparing memorandum with candid, honest opinions due to fear that

14

such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(27) Information was withheld from the documents with bates numbers 01353 through 01362. The documents are e-mail messages between a CITF Special Agents and individuals at other DoD offices concerning criminal investigation of the detainees who are the subject of the FOIA request. They were intended to allow coordination between agents and intelligence personnel to assess the merits of the case and to guide future investigative efforts. As such they are intra-agency documents, within DoD. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents communicating via e-mail feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that CITF agents would be dissuaded from including candid, honest opinions in e-mail due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

15

(28)    Information was withheld from the documents with bates numbers 01363

through 01375. The documents are internal e-mail messages between a CITF Special

Agents and other CITF personnel concerning criminal investigation of the detainees who

are the subject of the FOIA request. They were intended to allow discussion and

coordination between agents and other CITF personnel, who are agents and analysts, to

assess the merits of the case and to guide future investigative efforts. As such they are

intra-agency documents. They were created prior to completion of the investigation to

aid in determining whether further investigative efforts were warranted and if so, the

direction of these efforts. This would lead to the adoption of a policy towards the further

investigation/prosecution of these cases. It is important that special agents

communicating via e-mail feel free to express their recommendations and candid

assessments of cases. If such recommendations were routinely released, it can be

expected that CITF agents would be dissuaded from including candid, honest opinions in

e-mail due to fear that such opinions and recommendations would be used by persons

outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to

the very heart of the deliberative process privilege which is afforded to this agency under

the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the

information within these documents.

(29)    Information was withheld from the documents with bates numbers 01425

through 01441. The documents are CITF "30 day" case summaries concerning detainees

who are the subject of the FOIA request, prepared by a special agent with CITF. They

were intended to allow supervisory agents and prosecutors to assess the merits of the case

and to guide future investigative efforts. As such they are intra-agency documents. They

16

were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing investigative summaries feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(30) Information was withheld from the documents with bates numbers 01506 through 01520 and 01524 through 01526. The documents are CITF case agent notes concerning detainees who are the subject of the FOIA request, prepared by a special agent with CITF. They were intended to allow supervisory agents and prosecutors to assess the merits of the case and to create an internal record to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing their notes feel free to express their recommendations and candid assessments of cases within these purely internal documents. If such recommendations

17

were routinely released, it can be expected that agents would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within this document.

(31) Information was withheld from the documents with bates numbers 01539 through 01540, 01552 through 01557, 01567, 02791 through 02793, 03012 through 03024, and 03029 through 03035. The documents are CITF case summaries concerning detainees who are the subject of the FOIA request, prepared by a special agent with CITF. They were intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing investigative summaries feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the

18

information within these documents.

(32) Information was withheld from the documents with bates numbers 01867 through 01870, 01872 through 01875, 01878 through 01881, and 1891 through 1894. The documents are internal e-mail messages between CITF personnel concerning criminal investigation of the detainees who are the subject of the FOIA request. They were intended to allow discussion and coordination among CITF personnel, who are agents and analysts, to assess the merits of the case and to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. These e-mail contain analysts assessments and opinions as to the on-going criminal investigations. These opinions would contribute to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that analysts providing opinions via e-mail feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that CITF analysts would be dissuaded from including candid, honest opinions in e-mail due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(33) Information was withheld from the documents with bates numbers 01877, 01898 through 01900, and 01903 through 01904. The documents are internal e-mail

19

messages between a CITF Special Agents and other CITF personnel concerning criminal investigation of the detainees who are the subject of the FOIA request. They were intended to allow discussion and coordination between agents and other CITF personnel, who are agents and analysts, to assess the merits of the case and to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. They contain the candid assessments and opinions of case agents as to the cases under investigation. These opinions would contribute to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents communicating via e-mail feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that CITF agents would be dissuaded from including candid, honest opinions in e-mail due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(34) Information was withheld from the documents with bates numbers 01928 through 01943. The documents are threat assessments from the CITF Commander to the DoD General Counsel concerning detainees who are the subject of the FOIA request. They were intended to inform the DoD OGC of CITF's law enforcement assessment of the threat associated with the release of certain detainees and to comments on the law

enforcement interest in continued detention. As such they are intra-agency documents within the DoD. They were created prior to completion of the investigation to aid in determining whether release of particular detainees was warranted. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases as well as to whether the detainees would be released and if so, under what conditions. It is important that the CITF Commander feel free to express his recommendations and candid assessments of cases, especially in light of the fact that various entities were forwarding their own, independent recommendations to DoD OGC. If such recommendations were routinely released, it can be expected that Agencies such as CITF would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts or could be used in isolation to create confusion about US policy towards release of a particular detainee. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(35) Information was withheld from the documents with bates numbers 02028 through 02102. The documents are CITF intelligence summaries concerning the detainees who are the subject of the FOIA request, prepared by an attorney assigned to CITF. They were intended to allow agents and prosecutors to assess the merits of the case, consider potential charges, and to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the

21

direction of these efforts. This would lead to the adoption of a policy towards the further

investigation/prosecution of these cases. It is important that CITF personnel preparing

intelligence summaries feel free to express their recommendations and candid

assessments of cases. If such recommendations were routinely released, it can be

expected that CITF personnel would be dissuaded from preparing memorandum with

candid, honest opinions due to fear that such opinions and recommendations would be

used by persons outside the Agency to interfere with investigative efforts. Such a

"chilling effect" goes to the very heart of the deliberative process privilege which is

afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this

instance to protect the information within these documents.

(36) Information was withheld from the documents with bates numbers 02111

through 02136. The documents are CITF data sheets concerning detainees who are the

subject of the FOIA request, prepared by a special agent with CITF with information

included that was produced by CITF analysts. They were intended to allow supervisory

agents and prosecutors to assess the merits of the case and to guide future investigative

efforts. As such they are intra-agency documents. They were created prior to completion

of the investigation to aid in determining whether further investigative efforts were

warranted and if so, the direction of these efforts. This would lead to the adoption of a

policy towards the further investigation/prosecution of these cases. It is important that

special agents and analysts preparing investigative summaries feel free to express their

recommendations and candid assessments of cases. If such recommendations were

routinely released, it can be expected that subordinates would be dissuaded from

providing candid, honest opinions due to fear that such opinions and recommendations

22

would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(37) Information was withheld from the documents with bates numbers 02169 through 02183. The document is a CITF report of investigation concerning detainees who are the subject of the FOIA request, prepared by a special agent with CITF with information included that was produced by CITF analysts. It was intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts. As such is an intra-agency document. It was created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents and analysts preparing reports of investigation feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(38) Information was withheld from the documents with bates numbers 02315 through 02356. The documents are assessments by CITF concerning detainees who are

23

the subject of the FOIA request. They were intended to inform other agencies of CITF's law enforcement assessment of the recommendation by CITF concerning disposition of detainee cases. As such they are inter-agency documents. They were created prior to completion of the investigation to aid in determining the appropriate disposition of particular detainee cases. This recommendation would lead to the adoption of a policy towards the further investigation/prosecution of these cases as well as to whether the detainees would be released and if so, under what conditions. It is important that CITF personnel feel free to express recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that Agencies such as CITF would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts or could be used in isolation to create confusion about US policy towards release of a particular detainee. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(39) Information was withheld from the documents with bates numbers 02388 through 02389 and 02716 through 02719. The documents are CITF collection plans concerning detainees who are the subject of the FOIA request, prepared by a special agent with CITF with information included that was produced by CITF analysts. They were intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts. As such is an intra-agency document. It was created prior to completion of the investigation to aid in determining whether further

24

investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents and analysts preparing collection plans feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(40) Information was withheld from the documents with bates numbers 02432 through 02443. The document is a CITF tracking sheet for requests for information concerning detainees who are the subject of the FOIA request, prepared by a special agent with CITF. It was intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts. As such is an intra-agency document. It was created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing summaries of investigative activities feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions

25

due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(41) Information was withheld from the documents with bates numbers 02625 through 02639. The document is a CITF jurisdictional assessment known as a "reason to believe" (RTB) memorandum concerning detainees who are the subject of the FOIA request, prepared by an attorney with CITF with information included that was produced by CITF analysts. It was intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts. It is also intended ultimately to be used to seek Presidential approval to try detainees before Military Commissions. As such is an intra-agency and inter-agency document. It was created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. It is also used to assess whether Commissions have jurisdiction to try cases. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that CITF attorneys preparing RTB memos feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is

26

afforded to this agency under the FOIA.  Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(42)  Information was withheld from the documents with bates numbers 02642 through 02709.  The documents are CITF intelligence reports concerning detainees who are the subject of the FOIA request, prepared by a special agent with CITF with information included that was produced by CITF analysts.  They were intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts.  As such they are intra-agency documents.  They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts.  This would lead to the adoption of a policy towards the further investigation/prosecution of these cases.  It is important that special agents and analysts preparing intelligence reports feel free to express their recommendations and candid assessments of cases.  If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts.  Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA.  Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

(43)  Information was withheld from the documents with bates numbers 02860 through 02875, and 03003 through 03011.  The documents are CITF situation reports concerning detainees who are the subject of the FOIA request, prepared by a special

27

agent with CITF. They were intended to allow supervisory agents and prosecutors to assess the merits of the case and to guide future investigative efforts. As such they are intra-agency documents. They were created prior to completion of the investigation to aid in determining whether further investigative efforts were warranted and if so, the direction of these efforts. This would lead to the adoption of a policy towards the further investigation/prosecution of these cases. It is important that special agents preparing situation reports feel free to express their recommendations and candid assessments of cases. If such recommendations were routinely released, it can be expected that subordinates would be dissuaded from providing candid, honest opinions due to fear that such opinions and recommendations would be used by persons outside the Agency to interfere with investigative efforts. Such a "chilling effect" goes to the very heart of the deliberative process privilege which is afforded to this agency under the FOIA. Therefore, Exemption (b)(5)-1 is asserted in this instance to protect the information within these documents.

## **EXEMPTION (b)(5)-2 Attorney Work-Product Privilege**

(44) The attorney work-product privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation. The purpose of this privilege is to protect the adversarial trial process by insulating the attorney's preparation from scrutiny (Jordan v. United States Department of Justice, 591 F.2d 753, 775 (D.C. Cir. 1978)(en banc), civil proceedings and administrative proceedings (McErlean v. United States Department of Justice, No. 97-7831, 1999 WL 791680, at *7 (S.D.N.Y. Sept. 30, 1999) amended (S.D.N.Y. Oct. 29, 1999).

(45) Information contained in the document with bates numbers 02625 through 02369 was withheld pursuant to Exemption (b)(5)-2. This document was prepared by an attorney who is a legal advisor for CITF. It is a legal assessment as to whether a detainee meets the jurisdictional threshold for trial at Military Commissions. It is intended for internal assessment within CITF as to investigative emphasis and, when in final form, is to be forwarded to the President for his determination as to whether a case is authorized for trial at a Commission. As such it is an intra-agency and inter-agency document. As a whole, the legal opinion concerns a jurisdictional assessment. The attorney drafting the memorandum anticipated the possibility of a Commission case arising out of the direct subject matter of the memo and clearly the memorandum was prepared in anticipation of Commission proceedings. The memorandum was not intended to be released to the public and its release would be premature, given the likelihood that this case will go to trial.

## EXEMPTION (b)(6) PRIVACY INTEREST

(46) The Government may withhold information about individuals contained in personnel and medical files and similar files when the disclosure of such information "would constitute a clearly unwarranted invasion of privacy." When withholding information pursuant to this exemption, the agency is required to balance the privacy interests of the individuals mentioned in the documents against any public interest in disclosure. In asserting this exemption, each piece of information was examined to determine the degree and nature of the privacy interest of any individual whose name and/or identifying data appear in the document at issue. The public interest in disclosure of the information is determined by whether the information in question would inform the

29

plaintiff or the general public about CITF's performance of its mission to investigate individuals suspected of committing offenses related to international terrorism in which charges may be brought before military commissions. There is no legitimate public interest in the information withheld pursuant to Exemption (b)(6). Information categorically withheld includes names of third parties to include Government agents and detainees who have not waived the release of their names as part of this request, and telephone numbers and e-mail addresses of personnel mentioned in released documents. Disclosure would subject personnel to unwanted and unwarranted personal intrusion. In addition, the identities of Government personnel are exempt from disclosure in these law enforcement records under Exemptions (b)(7)(C)-1, (b)(7)(C)-2, (b)(7)(C)-6 and (b)(7)(F). Disclosure of their telephone numbers or e-mail accounts would allow their identities to be easily discovered and circumvent the protections under Exemption (b)(7)(C) and (b)(7)(F).

## EXEMPTION (b)(7)
## INVESTIGATORY RECORDS COMPILED FOR
## LAW ENFORCEMENT PURPOSES

(47)  5 U.S.C. § 552 (b)(7) exempts from disclosure certain "records compiled for law enforcement purposes."  The CITF is a joint law enforcement task force whose sole, overarching mission is to conduct law enforcement investigations.  Thus all documents included as responsive were prepared by CITF and as such are records compiled for law enforcement purposes.

30

## EXEMPTION (b)(7)(A)
### Records or Information that Could Reasonably be Expected to Interfere with Enforcement Proceedings

(48) This exemption authorizes the withholding of information compiled for law enforcement purposes to the extent that production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings. All responsive documents directly involve law enforcement proceedings that are pending and prospective. All documents involve pending cases against suspected members of terrorist organizations that have declared war against and attacked the United States homeland.

(49) The criminal investigation of the six Algerian detainees, who are the subject of this request, is active. Out of over 450 detainees currently held at Guantanamo Bay, Cuba, 180 have cases that are being actively pursued in the Major Case Branch (MCB) of CITF. These 180 cases have been determined to be likely to result in prosecution and merit active, continuous investigative efforts. The requesters' cases are 6 of these cases, and have been assigned to the Planners and Financiers Unit (PFU) investigative unit within the CITF. CITF Agents have determined that these individuals appear to be subject to the President's Military Order of 13 November 2001 and thus, are subject to Military Commission Instruction Number 2 and to be tried for war crimes or participating in acts of terrorism. In addition, CITF agents deem the case to be appropriate for prosecution at such time as the investigation is complete. They have prepared a draft "Reason to Believe," document setting forth the facts that lead to this conclusion and supporting the jurisdictional determination. When the investigation is complete, the

31

CITF Commander will forward this document to the President of the United States for approval.

(50) While the investigations have been active since early 2002, they continue to be the subject of intensive activity. There is a special agent investigator in the PFU who is assigned to this case and he currently spends 40% of his work time on these six cases. This investigation continues to be routinely reviewed by the supervisory unit chief in charge of PFU. Over 80 requests for assistance from CITF to other agencies have been completed on these six cases and others are pending. Several leads are outstanding and will potentially shed significant light on the facts when answered and reviewed. There are no plans to suspend the investigation of these suspects and they are expected to remain under investigation until leads are exhausted and the case is forwarded to the Office of Military Commissions for prosecution.

(51) The information requested by the detainees' counsel would not be released to him at this point in the process under the discovery procedures. Based on the information obtained thus far in these investigations, it is reasonable to believe that release of what is essentially the case file would hinder CITF's ability to continue to collect evidence to be used in a Commission case or exculpatory evidence. The release of this information could taint future evidence gained from persons with foreknowledge of the contents of released documents. Release of the case file information could pose a threat to the safety of the investigators based on the nature of the investigations. Future witnesses could refuse to provide information because of the release of their statements and previous witnesses could be subject to retribution from members of terrorist organizations if their identities are disclosed or discerned. Because there are multiple

32

suspects involved, release of this information would allow them to synchronize their explanations, especially since they are all represented by the same attorney who is the requester and presumably would access to publicly released information through him. Premature release of this information would also alert these detainees and others to certain witnesses and potential leads and provide the opportunity for them to interfere in the future collection of evidence.

(52) None of the responsive documents were prepared by CITF personnel with the expectation that they would be released to the public at this time, and none of them have been publicly released. They were prepared with the expectation that they would be held internally and used in evaluating whether the individuals interviewed committed offenses that could be processed in accordance with a discovery process under the oversight of Military Commissions created by Executive Order. These documents are categorized by CITF as "for official use only" and "law enforcement sensitive." The material in the listed documents that can be released without jeopardizing pending law enforcement proceedings and risking national security or an interference with future proceedings cannot reasonably be segregated from material that would not. Therefore, the documents are exempt from release in their entirety.

(53) Any information provided by these suspected detainees in law enforcement interviews in which the detainee gives details of the detainee's prior locations and travels, affiliation with other suspects, and activities in conjunction with terrorist organizations should be excluded where it pertains to an ongoing investigation. A document by document review confirmed that the information in those documents fit into this category. The release of this information will allow the detainees to review their prior

33

statements and conform future statements to their past representations, making it difficult in future interviews to determine the veracity of statements. Release would also jeopardize national security by informing terrorist organizations of the quality and volume of information provided by detainees about their organizational structures and methods.

(54) Information in the documents withheld in under Exemption (b)(7)(A) will be released as the cases to which they pertain are resolved, when it is determined that the information has been released publicly in some other form, or when it is determined that release will not have an effect on pending law enforcement proceedings. As noted above, all documents contain information compiled for law enforcement purposes. These cases are pending referral to Military Commissions and it is likely they will be prosecuted. Release of information pertaining to these cases at this time can reasonably be expected to cause harm to the proceedings and to the national security of the United States. Applicability of this exemption can be justified on a categorical basis of types of records involved. See, NLRB v. Robbins Tire & Rubber Co., 437 US 236; The responsive documents are grouped by category below. Each category contains a function description of the material contained therein and the rationale as to why the material must be withheld under Exemption b(7)(A).

(55) **Interview Summaries – FM 40s**: Documents at bates numbers 01103 through 01248, 01782 through 01794, and 01796 through 01805 are FM 40 interview summaries, prepared by CITF special agents. These documents summarize law enforcement interviews with detainees who are the subject of this FOIA request that were conducted by CITF special agents. They primarily contain the substance of statements

34

made by the detainees who were interviewed. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to conform future answers to those already provided and would allow collusion in responses. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought.

(56) **Investigative Summaries**: Documents at bates numbers 01249 through 01266, 01395 through 01397, 01442 through 01460, 01527 through 01530, 01535 through 01565, 01567 through 01572, 01575 through 01581, 01907 through 01909, 01913 through 01917, 01944 through 01953, 02028 through 02136, 02148 through 02168, 02184 through 02210, 02390 through 02430, 02444 through 02469, 02621 through 02624, 02632 through 02728, 02762 through 02765, 02770 through 02802, 02851 through 02876, 02880 through 02899, 02911 through 03039, and 03043 through 03075 are CITF investigative summaries, prepared by CITF special agents and analysts. These documents summarize law enforcement investigations up to the date they were prepared. They contain summaries of evidence, outstanding leads, investigative plans, and candid comments as to the relative strength of evidence and possible charges. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to conform future answers to the evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative

35

and prosecutorial efforts before such discovery is regulated by a judicial process.

(57) **Prosecution Memorandum**: Documents at bates numbers 01267 through 01351 and 01954 through 02027 are prosecution memorandum, prepared by CITF special agents. These documents summarize evidence contained in case files and developed through investigative activities and analyze this material in terms of potential charges, based on input from attorneys at CITF and the Office of Military Commissions and analysts. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to conform future answers to those already provided and would allow collusion in responses. It could taint future testimonial evidence if a subject of a future interview is aware of this evidence. Witnesses who would otherwise be willing to cooperate in the investigation may be uncooperative if it appears material collected is being released. If the material allows witnesses to be identified, it could put their safety in jeopardy. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. Finally, release of this information could allow the defense counsel for these detainees to obtain more material than they would through the discovery process.

(58) **Electronic (E-mail) Communication Among CITF Personnel and with External Intelligence Analysts**: Documents at bates numbers 01352 through 01375, 01850 through 01851, and 01854 through 01904 are e-mail messages among CITF special agents and between these special agents and intelligence analysts at other agencies. These documents are candid discussions of the evidence collected thus far, the quality of this evidence and possible future investigative activities and leads. They

36

primarily contain the statements of special agents and analysts. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to analyze the investigative activities to this point and attempt to interfere with future investigative efforts. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. The statements were not intended for public release and taking portions of these candid discussions out of context could create a false impression reflecting on the case as a whole. Such actions could prejudice potential fact finders to be predisposed to believe or disbelieve the guilt or innocence of a suspect before charges are brought.

(59) **Power-point Presentations**:  Documents at bates numbers 01376 through 0379 and 018066 through 0849 are power-point presentations prepared by CITF special agents concerning detainees who are the subject of this FOIA request. These documents summarize known affiliations and investigative leads. They primarily contain an analysis by CITF special agents. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to analyze the investigative activities to this point and attempt to interfere with future investigative efforts. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would allow detainees to conform their answers to the information known by CITF special agents.

(60) **Requests for Assistance (RFAs)**:  Documents at bates numbers 01380 through 01394, 0398 through 01424, 0905 through 01906, 01918 through 01927, 02432

37

CAS

through 02443, 02556 through 02620, and 03040 through 03041 are RFAs, prepared by CITF special agents, addressed to external agencies. These documents request specific points of information pertaining to the investigation of detainees that are the subject of this FOIA request. They primarily contain requests prepared by CITF special agents. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the RFAs at this time would allow the suspects to analyze investigative efforts and allow them to take active steps to block access to further evidence. It would also allow them to begin preparing a defense before charges are formally brought. Taken out of context, these RFAs may lead others to misrepresent investigative efforts and cause others to refuse to cooperate with investigations.

(61) **30 Day Case Reviews**:  Documents at bates numbers 01425 through 01441 are CITF 30 Day Case Reviews, prepared by CITF special agents and analysts. These documents are periodic summaries of law enforcement investigations up to the date they were prepared. They contain summaries of evidence, outstanding leads, investigative plans, and candid comments as to the relative strength of evidence and possible charges. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to conform future answers to the evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before such discovery is regulated by a judicial process.

38

(62) **Cell Text Message**:  The document at bates number 01461 is a copy of a cell text message sent from one detainee named in this FOIA request to another person. It contains the text of the message.  Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statement at this time would allow the suspects to analyze the investigative activities to this point and attempt to interfere with future investigative efforts.  It would allow detainees to conform their answers to the information known by CITF special agents.  This material would be subject to discovery after charges are filed, but its release at this point would be premature.

(63) **Photos**:  The documents at bates numbers 01462 through 01502 are purportedly copies of photos of the detainees who are the subjects of this FOIA and some members of their families.  They contain minimal or no text, and primarily contain photos or people.  Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution.  Releasing the photos at this time would allow the suspects to analyze the investigative activities to this point and attempt to interfere with future investigative efforts.  It would allow detainees to assess the depictions of them and certain family members and determine what information is possessed by the US Government. This material would be subject to discovery after charges are filed, but its release at this point would be premature.

(64) **Agent Notes**:  Documents at bates numbers 01503 through 01520, and 01524 through are CITF investigative agent notes, prepared by CITF special agents and analysts. These documents summarize law enforcement investigations up to the date they were prepared.  They contain summaries of evidence, outstanding leads, investigative

39

plans, and candid comments as to the relative strength of evidence and possible charges. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the notes at this time would allow the suspects to conform future answers to the evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before such discovery is regulated by a judicial process.

(65) **Analyst Report**: The documents at bates number 01521 is a report prepared by a CITF analyst. The document summarizes the activities and conclusions of a CITF analyst up to the date they were prepared. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the report at this time would allow the suspects to conform future answers to the evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before such discovery is regulated by a judicial process.

(66) **Summary of Law Enforcement Interviews**: Documents at bates numbers 01522 through 01523 are summaries of law enforcement interviews, prepared by CITF special agents. These documents summarize law enforcement interviews with detainees who are the subject of this FOIA request as well as other detainees that were conducted by CITF special agents. They primarily contain the substance of statements made by the

detainees who were interviewed. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects to conform future answers to those already provided and would allow collusion in responses. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought.

(67) **Interview Preparation Notes**: Documents at bates numbers 01526, 01528 through 01529 and 01566 are interview preparation notes, prepared by CITF special agents and analysts. These documents set forth law enforcement preparation for interviews that were pending when the notes were prepared. They contain drafts of questions to be raised in future law enforcement interviews with detainees who are the subject of this FOIA request. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the notes at this time would allow the suspects to analyze the types of questions and ares of concern raised in interviews and conform future answers to the evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before such discovery is regulated by a judicial process.

(68) **List of Potential Witnesses**: Documents at bates numbers 01582 through 01587 are lists of potential witnesses prepared by CITF special agents and analysts. These documents list anticipated witnesses and those believed to have information

41

relevant to the further investigation and prosecution of suspects who are the subject of this FOIA request. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the list at this time would allow the suspects to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would also allow intimidating threats or acts of violence to be directed towards potential witnesses and cause witnesses to become uncooperative, out of fear their cooperative acts or statements would be made public.

(69) **Referral of Abuse Allegation**: The documents at bates numbers 01910 through 01912 is a referral of an allegation of abuse made by one of the detainees who is a subject of this FOIA request. The referral was prepared by and signed by the Chief of CITF's Investigations Division. This documents sets forth the allegation made by the detainee and the context in which the detainee made the allegation. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the referral at this time would allow the suspects to analyze the allegation and allow them to use the factual circumstances to block further investigative efforts. It would also allow them to begin preparing a defense before charges are formally brought. Taken out of context, this referral may lead others to misrepresent the legitimacy of the allegation and would not allow the Government to rebut this claim. This information would be subject to discovery requests at the appropriate time in the proceedings, but to order its release now would be inappropriate.

(70) **"Line-through" Assessment Memeos**: Documents at bates numbers 01928 through 01943 are "line-through" assessment memos, prepared by CITF special agents,

42

analysts and attorneys. These documents summarize evidence contained in case files and developed through investigative activities and analyze this material. They also set forth a conclusion by CITF personnel as to the threat if particular detainees are released. These assessments are ultimately signed by the CITF Commander and provided to the other agencies who use these in making their own threat assessment. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the assessments at this time would allow the suspects to analyze evidence collected to this point and information known to the Government. Suspects could use this to conform future answers to those already provided and would allow collusion in responses. It could taint future testimonial evidence if a subject of a future interview is aware of this evidence. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. If taken out of context, the assessments could be used to create a false impression of the overall character of the case. Finally, release of this information could allow the defense counsel for these detainees to obtain more material earlier than they would through the discovery process.

(71) **Intelligence Reviews**: The documents at bates number 02142 through 02143 and 02357 through 02387 are intelligence reviews prepared by a CITF analyst. The documents list other intelligence reports relevant to the law enforcement investigation of detainees that are the subject of this FOIA request. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the reviews at this time could allow the suspects to match other released material to their cases and thus allow them insight into

43

the manner in which their cases are being investigated. It could also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before the material is released in discovery that is regulated by a judicial process.

(72) **Intelligence Assessments**: Documents at bates numbers 02144 through 02147 are CITF intelligence assessments, prepared by CITF analysts. These documents summarize intelligence products and investigative actions up to the date they were prepared. They contain these summaries as well as analysts candid comments as to the relative strength of evidence and possible future investigative actions. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the assessments at this time would allow the suspects insight into evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before discovery is regulated by a judicial process.

(73) **Report of Investigation**: The document at bates numbers 02169 through 02183 is a CITF Report of Investigation prepared by CITF special agents and analysts. The document summarizes law enforcement investigations up to the date they were prepared. They contain summaries of evidence, outstanding leads, investigative plans, and candid comments as to the relative strength of evidence and possible charges. Release of these documents would reasonably be expected to interfere with the further

44

investigation of these cases and their prosecution. Releasing the report at this time would allow the suspects to conform future answers to the evidence already collected. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. It would expose outstanding leads to possible interference and provide a roadmap to future investigative and prosecutorial efforts before such discovery is regulated by a judicial process.

(74) **Case Log**: Documents at bates numbers 02211 through 02232, 02303 through 02314, and 02470 through 02532 are lists of detainees under investigation, including the detainees that are the subject of this FOIA request. This log was prepared by CITF special agents and analysts. These documents lists detainees who are under criminal investigation. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the list at this time would allow the suspects to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought.

(75) **Operational Lists**: Documents at bates numbers 02233 through 02249, 02388 through 02389, 02470 through 02532, and 02553 through 02555 are operational lists prepared by CITF special agents and analysts listing persons of interest to law enforcement investigations, lists of investigative leads, and priority lists of law enforcement cases of interest. These documents list persons, leads and cases with operational priorities. Release of these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the list at this time would allow the suspects to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. Suspects

45

would be able to assess the relative weight the Government is placing on investigation of their cases. It would also allow intimidating threats or acts of violence to be directed towards potential witnesses and cause witnesses to become uncooperative, out of fear their cooperative acts or statements would be made public.

(76) **Phone Contacts**: The document at bates number 2250 is a summary of phone contacts for one of the detainees who is named in this FOIA request. It was prepared by CITF agents and analysts. It contains a list and summary of contacts. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the contact list at this time would allow the suspects to analyze the investigative activities to this point and attempt to interfere with future investigative efforts. It would allow detainees to conform their answers to the information known by CITF special agents. This material would be subject to discovery after charges are filed, but its release at this point would be premature.

(77) **Alias List**: The document at bates numbers 02251 through 02302 is a summary of aliases used by the detainees who are the subject of this FOIA request as well other detainees not related to this request. It was prepared by CITF analysts. It contains a list and description of aliases in spread-sheet format. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the alias list at this time would allow the suspects to analyze the information known to the Government in the context of law enforcement investigations and use this information to attempt to interfere with future investigative efforts. It would allow detainees to conform their answers to the information known by

46

CITF special agents. This material may be subject to discovery after charges are filed, but its release at this point would be premature.

(78) **Summary of Passport Information**:  The document at bates number 02431 is a summary of passport information for the detainees who are the subject of this FOIA request. It was prepared by CITF analysts. It contains a list and description of passport information in a spread-sheet format. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the passport information at this time would allow the suspects to analyze the information known to the Government in the context of law enforcement investigations and use this information to attempt to interfere with future investigative efforts. It would allow detainees to conform their answers to the information known by CITF special agents. This material may be subject to discovery after charges are filed, but its release at this point would be premature.

(79) **Processing, Assessment and Transfer List**:  The document at bates numbers 02315 through 02356 is a summary of operational processing, and threat and transfer assessment for the detainees who are the subject of this FOIA request as well as other detainees unrelated to this request. It was prepared by CITF agents and analysts. It contains a list and description of detainees and assessments in a spread-sheet format. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the background information and assessments at this time would allow the suspects to analyze the information known to the Government in the context of law enforcement investigations and use this information to attempt to interfere with future investigative efforts. It would allow

47

detainees to conform their answers to the information known by CITF special agents. This material may be subject to discovery after charges are filed, but its release at this point would be premature.

(80) **"Pocket Litter" Index**:   The document at bates numbers 02533 through 02552 is a summary of "pocket litter" obtained from the detainees who are the subject of this FOIA request as well as other detainees who are not related to this request. It was prepared by CITF analysts. It contains a list and description of "pocket litter," essentially material that was in the possession of the detainee when he was detained, in a spread-sheet format. Release of this document would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the "pocket litter" index at this time would allow the suspects to analyze the information known to and in the possession of the Government in the context of law enforcement investigations and use this information to attempt to interfere with future investigative efforts. It would allow detainees to conform their answers to the information known by CITF special agents. This material may be subject to discovery after charges are filed, but its release at this point would be premature.

(81) **"Reason to Believe" Memorandum**:   Documents at bates numbers 02625 through 02631 are "reason to believe" memorandum, prepared by CITF lawyers based on information supplied by CITF special agents and analysts. In addition, these documents draw on intelligence reports from external agencies. These documents summarize evidence concerning detainees that are the subject of this FOIA request, and state conclusions as to whether these detainees meets the jurisdictional requirements set forth by the President of the United States for trial before Military Commissions. Release of

48

these documents would reasonably be expected to interfere with the further investigation of these cases and their prosecution. Releasing the statements at this time would allow the suspects review a summary of all the information compiled in the investigation to date. It would allow them to conform future interview answers to those already provided and would allow collusion in responses. It could taint future testimonial evidence if a subject of a future interview is aware of this evidence. Witnesses who would otherwise be willing to cooperate in the investigation may be uncooperative if it appears the material they provided is being released. If the material allows witnesses to be identified, it could put their safety in jeopardy. It would also allow others to take active steps to block access to further evidence and to begin preparing a defense before charges are formally brought. Finally, release of this information could allow the defense counsel for these detainees to obtain more material than they would through the discovery process.

## EXEMPTION (b)(7)(C)
### Personal Information in Law Enforcement Records

(82) This exemption provides protection for personal information in law enforcement records. Information is exempt if disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy. The categorical withholding of information that identifies third parties in law enforcement records will ordinarily be appropriate under this exemption, given the traditional recognition of the strong privacy interests inherent in law enforcement records (SafeCard Services v. SEC, 926 F.2d 1197 (D.C. Cir. 1991); United States Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749 (1989)).

49

(83) The names and identifying information of the following categories of individuals have been categorically excluded throughout these law enforcement documents:

### Names and identifying information of US Government Personnel, labeled as b(7)(C)-1 information

(84) Disclosure of the names of US Government Personnel investigating suspected terrorists and their organizations would subject these personnel to harassment and annoyance in the conduct of their official duties and their private lives. These personnel includes Special Agents assigned to CITF and the FBI, as well as intelligence analysts, interpreters and support personnel. It also includes contractor personnel working with US Government personnel in these investigative efforts. Release of their names without their prior consent could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security. Nothing in these documents alleges any wrongdoing by any Government Personnel whose names are withheld that would justify any public disclosure of their identities. There is no legitimate public interest in the identities of these agents. Due to the breadth of privacy protection under Exemption (b)(7)(C) and potential harm resulting from release, any release of these names would be an unwarranted intrusion on the personal privacy of these individuals, even with respect to the discharge of their official duties.

50

**Names and identifying information of other detainees and third parties mentioned, labeled as b(7)(C)-2 information**

(85) Disclosure of the names of third parties mentioned in the released law enforcement documents would subject these persons to harassment and annoyance in the conduct of their private lives. Further, release of their names could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security. Most of the personnel who fall under this category are potentially unaware that their names have been mentioned. There is no legitimate public interest in the identities of these agents. Due to the breadth of privacy protection under exemption (b)(7)(C), and in light of the magnitude of harm that might befall individuals if they are identified in these investigations of suspected terrorists and their organizations, protection of their identities is appropriate. Therefore, any release of third party names would be an unwarranted intrusion on these persons' privacy.

**Names and identifying information of subjects of Criminal Investigations, labeled as b(7)(C)-3 information**

(86) Disclosure of the names of subjects of law enforcement investigations into potential terrorist activities and terrorist organizations would subject these persons to harassment and annoyance in the conduct of their private lives. Further, release of their names could jeopardize their safety and the safety of their family members, and cause undue worry and stress regarding their personal security. Most of the documents released under this request contain names of the subjects as well as summaries of their comments to investigators. Release of the subjects' names would allow their names to be matched

51

with their comments. Others taking issue with the disclosures could retaliate against the subjects either directly or through threats and attacks against family members or property. There is no legitimate public interest in the identities of these agents. Due to the breadth of privacy protection under exemption (b)(7)(C), and in light of the magnitude of harm that might befall individuals if they are identified in these investigations of suspected terrorists and their organizations, protection of their identities is appropriate. Therefore, any release of subjects' names would be an unwarranted intrusion on these persons' privacy.

(87)  Because the subjects of the FOIA request have waived their privacy rights to have their names and identifying information redacted, none of their names have been redacted.

### EXEMPTION (b)(7)(E)
### Records or Information the Discolsure of Which
### Would Disclose Techniques and Procedures for Law Enforcement
### Investigations or Prosecutions Which Could Reasonably be
### Expected to Risk Circumvention of the Law

(88)  This Exemption affords protection to all law enforcement information that would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(89)  Information contained in all responsive records relates to terrorist organizations and the homeland security of the United States. Information redacted under this Exemption is highly sensitive and should be shielded from disclosure as all

52

exempted material relates to law enforcement techniques and procedures and guidelines for law enforcement investigations into suspected war criminals and members of terrorist organizations.

(90) The limited amount of material redacted as exempt under (b)(7)(E) in documents listed below pertain to specific categories of information that relate to counter-terrorism law enforcement investigations.

(91) **Intelligence Gathering Techniques**: The document at bates numbers 01312 through 01328, 01352, 01954 through 02027, 02642 through 02709, 02762 through 02765, 02791 through 02793, and 03012 through 03024 contain information that, if released, would expose intelligence gathering techniques not generally known to the public. A further description of the material would allow the exempt material to be identified. Release of this information would allow suspected terrorist and war criminals to assess techniques employed by US Government investigators and create countermeasures. None of these techniques involve physical mistreatment of detainees. None of the material withheld under this exemption was intended for public release nor has it been released to the public. Release of any of the identified material would risk circumvention of law enforcement investigations and prosecutions.

(92) **Sources**: The document at bates numbers 02084 through 02102, 02111 through 02136, 02251 through 02302, and 02431 contain information that, if released, expose potential or current intelligence sources not generally known to the public. A further description of the material would allow the exempt material to be identified. Release of this information would allow suspected terrorist and war criminals access to these sources and allow them to harass, intimidate, threaten or harm these sources. None

53

of the material withheld under this exemption was intended for public release nor has it been released to the public. Release of any of the identified material would risk circumvention of law enforcement investigations and prosecutions.

(93) **Law Enforcement Techniques**: The document at bates numbers 01526, 01566, 01568 through 0570, 01891 through 01894, 01944 through 01946, 01950 through 01953, 02103 through 02110, 02159 through 02160, 02169 through 02183, 02211 through 02232, 02315 through 02356, 02388 through 02389, 02470 through 02478, 02710 through 02719, 02770 through 02788, 02860 through 02876, 02911 through 02913, 03029 through 03035, and 03052 through 03075 contain information that, if released, would expose law enforcement techniques associated with investigating suspected war criminals and terrorists, not generally known to the public. While the techniques set forth in the documents may be known to some degree, their usefulness in the context of CITF investigations is not commonly known by members of the public. A further description of the material could allow the exempt material to be identified, but in general terms the redacted material pertains to interview techniques and collection plans and methods of prioritization of cases. Release of these techniques would allow suspects to take steps to counter these investigative methods to circumvent law enforcement and prosecution.

(94) **External Coordination**: The documents at bates numbers 01871, 01916 through 01917, 01920 through 01927, 01947 through 01949, 02050 through 02063, 02432 through 02443, 02562 through 02574, 02577 through 02583, and 02600 through 02620 contain information that, if released, expose potential or current law enforcement techniques and sources by divulging entities with which CITF conducts external

54

coordination and the information that is the subject of this coordination. This information is not generally known to the public. A further description of the entities would allow the exempt material to be identified. Release of this information would allow suspected terrorist and war criminals knowledge of coordination activities and allow them to gain knowledge of the type and quality of information used in law enforcement investigations against them. None of the information withheld under this exemption was intended for public release nor has it been released to the public. Release of any of this information concerning coordination would risk circumvention of law enforcement investigations and prosecutions.

### EXEMPTION (b)(7)(F)
### Records or Information the Discolsure of Which
### Would Risk the Physical Safety of a Wide Range of Individuals

(95) Given that all investigations conducted by CITF involve suspected terrorism and threats to homeland security from groups that have declared war against the United States and carried out attacks against Americans within the US and abroad, disclosure of the identity of any of individuals associated with these investigations would jeopardize their personal physical safety, lives and well-being and that of their family members. Therefore, all exemptions asserted under (b)(7)(C) are also asserted and incorporated by reference under (b)(7)(F).

Pursuant to 28 U.S.C. § 1746, I declare the foregoing to be true and correct.

Executed this /6th day of June, 2006.

JOE E. ETHRIDGE, JR.
Colonel, US Army
Commanding

56

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
STEPHEN H. OLESKEY                                        )
                                                                         )
ON BEHALF OF GUANTANAMO INTERNEES  )
LAKHDAR BOUMEDIENE,                               )
MOHAMED NECHLA, MUSTAFA AIT IDIR,     )
SABER LAHMAR, HADJ BOUDELLA,               )          Civil Action No. 05-10735-RGS
AND BELKACEM BENSAYAH                          )
                                                                         )
                              Plaintiff,                            )
                                                                         )
                                                                         )
UNITED STATES DEPARTMENT OF                 )
DEFENSE AND UNITED STATES                     )
DEPARTMENT OF JUSTICE,                            )
                                                                         )
                              Defendants.                        )
                                                                         )
_____)

JOHN P. TAITT hereby declares pursuant to 28 U.S.C. § 1746, as follows:

      1.     At all times relevant to the events in this declaration, I was an Associate Deputy

General Counsel in the Office of General Counsel ("OGC") of the United States Department of

Defense ("DoD")[1].  In that capacity, I was responsible for, among other things, overseeing

litigation involving the DoD.  I am familiar with Plaintiff's September 28, 2004 Freedom of

Information Act ("FOIA") request that is the subject of this action and the documents produced

by the DoD and referred from various DoD agencies to other agencies within the United States

Government.  Unless otherwise indicated, the statements in this declaration are based upon my

personal knowledge and information obtained by me in the course of my official duties.

      2.     The purpose of this declaration is (i) to provide an overview of DoD's search and

production of records responsive to Plaintiff's September 28, 2004 FOIA request, (ii) to

---

[1]  As of July 9, 2006, I am an employee of the Department of the Army.

separately describe the search and referral process for the U.S. European Command Joint

Analysis Center; (iii) to describe the search for documents conducted within DoD GC in

response to Plaintiff's FOIA request and the nature of the information withheld from those

documents; and (iv) to provide an explanation for withholding certain documents originating

with certain U.S. Government agencies from the Plaintiffs.

3.     The FOIA in this case was submitted by an attorney "on behalf of" six individuals

detained by the Department of Defense at Guantanamo Bay, Cuba. These individuals

(hereinafter called "Plaintiffs") are being detained as enemy combatants[2] in the Global War on

Terrorism. On July 12, 2004, this attorney filed a "Petition for Writ of Habeas Corpus" in U.S.

District Court in the District of Columbia, on behalf of Requesters. (Case No. 1:04-cv-01166-

RJL). The case was dismissed by Judge Richard Leon on January 19, 2005 and an appeal is

currently pending in the Court of Appeals for the D.C. Circuit. (Case No. 05-5062).

## I.  OVERVIEW OF DoD's SEARCH AND PRODUCTION

4.     This section of this Declaration provides an overview of searches conducted and

documents provided by various DoD offices in response to the Plaintiffs' FOIA request. The

Department of Defense Office of Freedom of Information and Security Review (DoD FOIA)

received the Plaintiff's FOIA request in October 2004. After reviewing the request, DoD FOIA

determined that the agencies likely to have information responsive to the request were the

United States Southern Command (SOUTHCOM)[3], the Defense Intelligence Agency (DIA),

the United States Army Criminal Investigative Task Force (CITF), the Office for the

---

[2]   An enemy combatant is "an individual who was part of or supporting Taliban or al Qaeda forces, or
associated forces that are engaged in hostilities against the United States or its coalition partners. This
includes any person who has committed a belligerent act or has directly supported hostilities in aid of
enemy armed forces." See http://www.defenselink.mil/news/Jul2004/d20040707review.pdf.
[3]   Joint Task Force Guantanamo, or GTMO, is a subordinate command within SOUTHCOM.

Administrative Review of the Detention of Enemy Combatants (OARDEC)[4],  the Joint Staff,

the office the Undersecretary of Defense for Policy (Detainee Affairs), United States

Transportation Command (TRANSCOM), the United States Special Operations Command

(SOCOM), and the United States European Command (EUCOM) and other U.S. government

agencies.  In October 2004 and again in August 2005, DoD FOIA tasked each of these agencies

to conduct a search and provide any responsive documents to DoD FOIA.

5.    The sections below summarize the documents produced by each agency and

documents identified by each agency that required further review by other offices within DoD

and the United States Government.

### SOUTHCOM Search and Referral Process

6.    As noted above, DoD FOIA tasked SOUTHCOM and its subordinate command,

Joint Task Force – Guantanamo Bay, Cuba (GTMO), with conducting a search for records

responsive to the Plaintiffs' FOIA request.  In September 2005, GTMO found several

documents determined to be responsive to the Plaintiffs' request.[5]  *See* Declaration of Rear

Admiral Harry B. Harris, Jr. and Declaration of CAPTAIN Peter A. Husta for details

concerning the GTMO search and production of responsive documents.

7.    During the search, GTMO identified a number of potentially responsive

documents that either originated with or contained information that originated with the

following organizations:  United States Army European Command (USAEUR), United States

European Command (EUCOM), Department of State (State), and the Federal Bureau of

Investigation (FBI).  Additionally, GTMO identified certain documents that originated with

another government agency (OGA) that has requested not to be identified in this declaration or

---

[4]  This office originally reported to the Secretary of the Navy and now reports to the Deputy Secretary of
Defense.
[5]  These documents are listed on the *Vaughn* index at 3563-4006, 4007-4654, and 4984-5454.

in the FOIA production.[6]   Because GTMO was not the originator of these records or all the information contained within them, GTMO could not authorize their release.  Instead, GTMO referred these documents to DoD FOIA for further processing.  Due to the interaction between various organizations on intelligence matters related to the Global War on Terrorism, it is not unusual to find that some documents contain or comment on information that originated with several different organizations, nor is it unusual to have to refer a document consecutively through several different organizations.

8.     DoD FOIA examined each of the documents referred by GTMO to determine if they were duplicates of records already received from other organizations.  Packages containing the non-duplicative documents were then sent to the appropriate originating agency for review and release determinations, as discussed below.

9.     DoD FOIA referred 2 documents identified by GTMO to the United States Army Europe (USAEUR).  These documents were reviewed by the Command Security Officer for United States Army Europe, Mr. Carl Johnson, who determined that that the information in the documents had originated with the United States Army Intelligence and Security Command (INSCOM).  INSCOM ultimately determined that one document contained portions that were not exempt and that the other contained no segregable, non-exempt information.[7] *See* Declaration of Sue Butterfield.

---

[6] Certain U.S. Government agencies have requested that they not be identified by name in responding to this FOIA, as doing so would tend to reveal classified national security information.  Such agencies are referred to as "OGA" throughout this declaration and on the *Vaughn* index.  *See* Vaughn v. Rosen, 484 F. 2d 820 (D.C. Cir. 1973).  *See* paragraphs 105-107 for further explanation of the OGA's request.
[7] These documents are listed on the *Vaughn* index beginning with the Bates numbers 6480 and 9689, respectively.

10.    DoD FOIA also referred 6 documents[8] to EUCOM.  I believed that these files had been reviewed in January and that a determination had been made that they would be withheld in their entirety.  However, in creating the *Vaughn* index, I discovered that 5 of these files had not, in fact, been reviewed.[9]  On May 12, 2006, I e-mailed the EUCOM FOIA office and asked that these documents be reviewed.   Upon reviewing the documents, EUCOM determined that they should be referred to the United States National Intelligence Cell (USNIC).

11.    These documents were reviewed by the USNIC Office of the Director of Intelligence, or "J2[10]," by a staff member familiar with the information within the documents and rules concerning classification of information compiled by the USNIC.  This staff member determined that these documents were exempt from release in their entirety pursuant to 5 U.S.C. § 552(b)(1) as they contained information concerning intelligence activities, sources, and methods properly classified under section 1.4(c) of Executive Order 12958, as amended.  Specifically, the staff member determined that release of the information would reveal the source of the information and link that source to individuals and organizations that were the target of intelligence activities.  He further determined that release of this information would endanger the source and ongoing efforts to target extremists and associated terrorist organizations.  The recommendations of this staff member were forwarded to the EUCOM headquarters for consideration by an Original Classification Authority who, in term will prepare a declaration concerning these documents.

---

[8]  The documents are listed on the *Vaughn* index at 9999-10041.
[9]  The other document, which is listed on the *Vaughn* index at entry 10031-10038, is a duplicate of a document provided by the JAC which is listed at 5961-5968.
[10] In the normal course of reviewing classified information, local FOIA offices often will refer the classified documents to a subject matter expert for review of the information and for recommendations concerning release.

12.    DoD FOIA referred 3 documents identified by GTMO to State.  State determined that 1 document was a duplicate of another document that had already been referred to it (by DIA) and that the remaining 2 were exempt in their entirety from release.[11] *See* Declaration of Alice S. Ritchie.

13.    DoD FOIA referred two sets of documents identified by GTMO to the FBI, one consisting of 213 pages and the other consisting of 43 pages.[12]  The FBI determined that these documents were exempt from release under the FOIA, citing 5 U.S.C. 552(b)(7)(A).  *See* Declaration of David M. Hardy.

14.    DoD FOIA referred 27 documents identified by GTMO to an OGA.  This agency determined that all 27 documents[13] were classified and that no portions of the documents could be released without revealing protected national security information.

**Defense Intelligence Agency Search and Referral Process**

15.    During its search, DIA identified several responsive documents.[14] *See* Declaration of Brian Scott Kinsey.  DIA also identified several documents that originated with the USAEUR, EUCOM, State and GTMO.  Additionally, DIA identified certain documents that originated with an OGA.

16.    DoD FOIA examined each of the documents to determine if they were duplicates of records already received from other organizations.  Packages containing the non-duplicative documents were then sent to the appropriate originating agency for review and release determinations, as discussed below.

---

[11]  These documents are listed on the *Vaughn* index at 9533-9542.
[12]  These documents are listed on the *Vaughn* index at 3164-3375 and 3563-3607.
[13]  These documents are listed on the *Vaughn* index at 9865-9943.
[14]  These documents are listed on the *Vaughn* index at 3135-3163 and 3375-3398.

17.    DoD FOIA forwarded 6 of the DIA documents to EUCOM for action by appropriate offices within USAEUR.  These documents were reviewed by the Command Security Officer for United States Army Europe, Mr. Carl Johnson, who determined that five documents in fact originated within INSCOM.[15] *See* Declaration of Sue Butterfield.  Mr. Johnson reviewed the last document and determined that is should be withheld in its entirety.[16]

18.    DoD FOIA referred 6 of the DIA documents to EUCOM for action at the headquarters level.  Upon review, EUCOM determined that portions of 1 of these documents could be released in part to the Plaintiffs.[17]  The remaining 5 documents were withheld in their entirety.[18]  *See* Second Declaration of Captain Joseph B. Hoeing, United States Navy.

19.    DIA identified 2 documents that required referral to the EUCOM Joint Analysis Center (JAC).  Due the highly classified nature of these documents, DoD FOIA was required to transmit them via a classified courier to the JAC's office in Molesworth, England.  Alerted that the JAC had at least some responsive documents, DoD FOIA directed the EUCOM FOIA office to transmit the Plaintiffs' FOIA request to the JAC so the JAC could search for any additional documents.  The original 2 documents referred from DIA were incorporated into the JAC search and production.

20.    DoD FOIA referred 8 documents identified by DIA to the State.  Following a review, State determined that 4 of these documents were releasable in part or in their entirety to

---

[15] These documents are listed on the *Vaughn* index beginning with Bates numbers 6466, 6469, 9684, 9683, and 9685.

[16] This document is listed on the *Vaughn* index beginning with Bates number 10087.

[17] This document is listed on the *Vaughn* index at 5526-5530.

[18] *See* Second Declaration of Captain Joseph Hoeing.  These documents are listed on the *Vaughn* index at 8239-8269.

the Plaintiffs.[19]  Four other classified documents were withheld in their entirety.[20]  *See*
Declaration of Alice S. Ritchie.

21.    DoD FOIA referred 20 documents from DIA to GTMO for review and release
determinations.[21]  Following its review, GTMO determined that the documents should be
withheld in their entirety.  *See* Declaration of Rear Admiral Harry B. Harris, Jr. and CAPTAIN
Peter A. Husta.

22.    DoD FOIA referred 20 documents identified by DIA to an OGA.  This agency
determined that 14 documents were responsive and non-duplicative of other documents already
reviewed by the agency in this case.[22]  The OGA determined that the documents were properly
classified and that no portions of the documents could be released without revealing protected
national security information.

23.    DoD FOIA referred approximately 12 pages identified by DIA to an OGA.  Upon
review, the OGA determined that the documents were not responsive to the Plaintiff's request.

---

[19]  These documents are listed on the *Vaughn* index at 5488-5497.
[20]  These documents are listed on the *Vaughn* index at 9525-9532.
[21]  These documents are listed on the *Vaughn* index at 4732-4802.
[22]  These documents are listed on the *Vaughn* index at 9944-9988.

**U.S. Army Criminal Investigative Task Force Search and Referral Process**

24.    In August 2005, CITF personnel conducted a search of CITF records for items responsive to the Plaintiffs' Request.  CITF identified approximately 354 records[23] created by CITF personnel that were responsive to the Plaintiffs' request.  Additionally, CITF identified 23 responsive documents that originated with the FBI.[24]

25.    Of the 354 records identified as originating with CITF, approximately 140 contained classified national security information.  The classified information in these documents in each instance was derived from information developed by other United States Government and DoD agencies.  Since CITF is not an original classification authority (OCA), each of these classified documents had to be carefully reviewed to determine the agency from which the information derived.  In several cases, the documents had to be referred to multiple DoD components and other United States Government agencies.

26.    DoD FOIA examined each of the documents to determine if they were duplicates of records already received from other organizations.  Packages containing the non-duplicative documents were then sent to the appropriate originating agency for review and release determinations, as discussed below.

27.    CITF, through DoD FOIA, referred documents to GTMO,  FBI, State, DIA, USAEUR, EUCOM, INSCOM, and two OGAs.  (The USAEUR documents were further referred to INSCOM.  EUCOM in turn further referred the 19 documents it received to the JAC, which ultimately determined it had no equities in the classified portions of the document).  The *Vaughn* index entries for Bates range 1806 to 3076 indicate which documents were classified and therefore reviewed by one or more of these agencies.   The index also reflects the

---

[23]  These documents are listed on the *Vaughn* index at 1103-3076.
[24]  These documents are listed on the *Vaughn* index at 8106-8208.

exemptions claimed against the document where the agency determined that it had equities in the information.[25]

28.    DoD FOIA referred the 23 FBI documents identified by CITF as responsive to the Plaintiff's request to the FBI for review.  The FBI determined that these documents were exempt in their entirety under 5 U.S.C. § 552(b)(7)(A) and that portions were exempt under other FOIA exemptions which are reflected on the *Vaughn* index entries for these documents. *See* Declaration of David M. Hardy.

**Office for the Administrative Review of Detained Enemy Combatants (OARDEC) Search and Review Process**

29.    OARDEC is an organization within the DoD that is responsible for several processes involving detained enemy combatants at Guantanamo.  Between August 2004 and March 2005, OARDEC conducted Combatant Status Review Tribunals (CSRTs) for each detainee held at Guantanamo, including the six Requesters.  These were fact-based proceedings which provided a forum for detainees to contest their status as enemy combatants.  A panel of three military officers presided over each of these hearings.  See

http://www.defenselink.mil/releases/2004/nr20040730-1072.html.

30.    Following the CSRT proceedings for each detainee, OARDEC assembled a package containing summaries (both classified and unclassified) of the evidence reviewed by the CSRT and a discussion of the basis for the Tribunal's decision.  OARDEC included in the CSRT packages documents from other DoD and United States Government agencies that were reviewed by the Tribunal, many of them classified.

---

[25]  *See* the following declarations for further explanation of the exemptions asserted regarding these documents:  GTMO – Declaration of Rear Admiral Harry B. Harris, Jr. and CAPTAIN Peter A. Husta; FBI - Declaration of David M. Hardy; State – see paragraphs 91-102 of this declaration; DIA – Declaration of Brian Kinsey; INSCOM – Declaration of Sue Butterfield; OGAs – paragraphs 105-107 of this declaration.

31.    On or about August 19, 2006 OARDEC conducted a search of its system of records in its Arlington, Virginia office for documents responsive to the Plaintiff's FOIA request.  OARDEC determined that it did not have any responsive records other than the CSRT package created for each of the Plaintiffs following their hearings and the documents described in paragraph 32. [26]  At the time of the OARDEC search, these CSRT packages had already been provided to counsel for the Plaintiffs as part of the habeas corpus litigation then underway in the United States District Court for the District of Columbia.  The Department of Justice publicly filed an unclassified version of the CSRT package.  Counsel for the Plaintiffs also received a copy of the classified package under the terms of a protective order.  Plaintiffs therefore already had access to the unclassified, releasable portions of the CSRT.  Furthermore, since the classified documents in the full package were generated by agencies outside of OARDEC who were already processing this FOIA request, OGC advised OARDEC that they did not need to refer the classified materials to the other agencies, nor re-produce the unclassified version to Plaintiffs.

32.    OARDEC identified 7 documents in its files that concerning allegations of abuse made by some of the Plaintiffs.  Since OARDEC is not exercise original classification authority, the documents were referred to GTMO for a classification review and release

---

[26]  OARDEC also conducts Administrative Review Boards (ARBs) which annually conduct proceedings to make an assessment of whether there is continued reason to believe that the detained enemy combatant poses a threat to the United States or its allies, or whether there are other factors bearing upon the need for continued detention, including the enemy combatant's intelligence value in the Global War on Terror. Based on this assessment, the ARB can recommend that individuals should be released, should be transferred to the control of another country (usually their country of origin) or should continue to be detained by the DoD.   See http://www.defenselink.mil/releases/2004/nr20040915-1253.html.  OARDEC began conducting ARBs in December of 2004.  See http://www.defenselink.mil/releases/2004/nr20041214-1830.html.  At the time of the OARDEC search in August 2004, ARBs had not yet been convened for the Requestors.

determination.  Following a review, GTMO determined that portions of each document were releasable to the Plaintiffs.[27]

**Joint Staff Search and Referral Process**

33.     In August 2005, the Joint Staff conducted a search for records responsive to the Plaintiff's request. The Joint Staff identified and produced 32 documents that were responsive to the Plaintiffs' request. *See* Exhibit A, Declaration of William J. Kane concerning details of the search.[28]  *See also* Exhibit B, Declaration of Colonel Barry Coble.  The Joint Staff recommended referral of several of these documents to GTMO, Detainee Affairs, and EUCOM.

34.     DoD FOIA referred 13 of the Joint Staff documents to GTMO FOIA for review and release recommendations.[29]  GTMO determined that 6 documents were releasable in part.[30] The remaining 7 documents were withheld in their entirety.[31]  *See* Declaration of Rear Admiral Harry B. Harris, Jr. and CAPTAIN Peter A. Husta.

35.     DoD FOIA referred 4 documents to Detainee Affairs for review and release determinations.[32]  Initially, Detainee Affairs determined that all 4 documents were exempt in their entirety from release, citing to 5 U.S.C. 552(b)(1), (2), (5), and (6).  Detainee Affairs has since reconsidered these documents and determined that portions of each are releasable to

---

[27]  These documents are listed on the *Vaughn* index at 4723, 4724, 4725, 4726, 4727, 4728, 4731 and 4729-4730.

[28]  Mr. Kane's declaration indicates that the Joint Staff search identified 5 documents responsive to the Plaintiff's request.  These documents are listed on the *Vaughn* index at 3425-3505A.  These 5 documents were, in fact, larger staffing packages containing discrete, segregable documents.  "Document 1" covers the documents at Bates range 3425-3437.  "Document 2" covers the documents at Bates range 3428-3441.  "Document 3" covers the documents at Bates range 3442-3471.     "Document 5" covers the documents at Bates range 3472-3505A.  Document 4 was not responsive to the Plaintiffs' request.

[29]  These documents are listed on the *Vaughn* index at 3446-3459, 3460-3464, 3465-3471, 3476, 3477-3478, 3479-3482, 3483-3486, 3487-3490, 3495-3498, 3491-3494, 3499-3501, and 3503-3505.

[30]  These documents are listed on the *Vaughn* index at 3445, 3449-3459, 3477-3478, 3483-3486, 3493-3494, and 3499-3501.

[31]  These documents are listed on the *Vaughn* index at 3446-3448, 3460-3464, 3465-3471, 3479-3483, 3487-3491, 3495-3499, and 3503-3505.

[32]  These documents are listed on the *Vaughn* index at 3476, 3484, 3492, and 3500.

Plaintiffs.  These documents, will be provided to the Plaintiffs with appropriate redactions.  *See* Declaration of Charles S. Stimson.

36.    DoD FOIA referred 6 documents to the EUCOM FOIA office for review and release determinations.[33]  EUCOM determined that these documents were exempt in their entirety under 5 U.S.C. 552(b)(1) as the information contained in the documents pertaining to military plans and operations.  A supporting declaration from an appropriate EUCOM official is forthcoming.

### Detainee Affairs Search and Referral Process

37.    The Office of Detainee Affairs (Detainee Affairs), a component of the Under Secretary of Defense for Policy, completed a search of its records in May 2005 and identified fifteen documents that were potentially responsive to Plaintiffs' request.  I reviewed these files and determined that 5 documents previously had been referred to JTF GTMO by the Joint Staff. Further, I determined that 2 documents were not responsive to paragraphs 1 -13 or 16 of the Plaintiff's FOIA request.  The remaining eight documents were withheld in their entirety by Detainee Affairs.  *See* Declaration of Charles S. Stimson.

38.    In May 2005 Detainee Affairs personnel completed a search of its system of records and identified 8 records responsive to the Plaintiff's request.  One of these documents was a duplicate of a document previously reviewed and determined as exempt from release in its entirety by State.[34]  Detainee Affairs determined that each of the remaining documents[35] were exempt in their entirety, citing FOIA exemption 5 U.S.C. § (b)(1), (5), and (6) for specific portions of each document deemed exempt. *See* Declaration of Charles C. Stimson.

---

[33]  These documents are listed on the *Vaughn* index at 3427, 3429-3430, 3431-3432, 3433, 3434-3437, and 3440-3441.
[34]  The State Department document is listed on the *Vaughn* index at 9208-9209.  *See* Declaration of Alice S. Ritchie for basis for exemptions.
[35]  These documents are listed on the *Vaughn* index at 4959-4973.

**TRANSCOM Search and Referral Process**

39.    Between August 2 and August 24, 2005 the TRANSCOM FOIA office caused a search to be conducted within TRANSCOM and its component units Air Mobility Command (AMC), Military Sealift Command (MSC), and Surface Deployment and Distribution Command (SDDC) for records pertaining to the Plaintiffs.  TRANSCOM identified and provided to DoD FOIA 14 responsive documents.[36]   In responding to DoD FOIA, the TRANSCOM FOIA office noted that, in accordance with Air Force Manual 37-139, Air Force Records Maintenance, airlift manifests are maintained for a period of 90 days by AMC.  As a result, AMC no longer had manifest records concerning Plaintiffs at the time of the TRANSCOM search.

40.    DoD FOIA referred several of the TRANSCOM documents to the Joint Staff and EUCOM for review and release determinations.  The Joint Staff reviewed 2 documents and determined that portions of these documents relating to military plans and operations were exempt from release under 5 U.S.C. § 552(b)(1).[37]  *See* Exhibit C, Declaration of Colonel Paul Strickland.[38]  Additionally, the Joint Staff withheld the names of United States military personnel from these documents pursuant to 5 U.S.C. §552(b)(6).

41.    DoD FOIA referred all 15 documents  provided by TRANSCOM to the EUCOM FOIA office for review and release determinations.[39]  EUCOM determined that 1 document in its entirety[40] and portions of the remaining documents were exempt from release pursuant to 5 U.S.C. § 552(b)(1). EUCOM further withheld the names and identifying information of military

---

[36]  These documents are listed on the *Vaughn* index at 3506-3562.
[37]  These documents are listed on the *Vaughn* index at 3523-3528 and 3539-3542.
[38]  Colonel Strickland's declaration indicates that he reviewed one document.  The Joint Staff staffing package contained 8 pages, which correspond to the documents listed on the *Vaughn* index at 3523-3528 and 3539-3542.
[39]  These documents are listed on the *Vaughn* index at 3506-3562.
[40]  This document is listed on the *Vaughn* index at 3509-3510.

personnel within the documents pursuant to 5 U.S.C. §552(b)(6).   A supporting declaration

from an appropriate EUCOM official is forthcoming.

## SOCOM'S Search and Referral Process

42.     In a September 21, 2005 letter to DoD FOIA, the Deputy Chief of Staff for the

United States Special Operations Command reported that a comprehensive search was

conducted within SOCOM in response to the Plaintiffs' request and that no responsive

documents were located.

## II.  EUCOM JOINT ANALYSIS CENTER (JAC) SEARCH AND REFERRAL PROCESS

43.     In August 2005 the EUCOM FOIA office responded with a "no records" reply to

the Plaintiffs' FOIA.  As noted above, DoD FOIA later identified several documents that

required referral to the EUCOM Joint Analysis Center.  In consulting with DoD FOIA

regarding the referral process, the JAC found that that it had numerous responsive documents

concerning the Plaintiffs.  On or about September 9, 2005 the JAC began its review of its

system of records for documents responsive to the Plaintiffs FOIA request, a massive

undertaking that, in the end, required thousands of man-hours.    The JAC identified numerous

documents that were potentially responsive to the Plaintiffs' request.[41]  *See* Declaration of

CAPTAIN Joseph B. Hoeing for details regarding the JAC's search and production of

documents.

44.     The JAC also identified over 1,000 documents originating with 33 U.S.

government agencies or DoD components.  In late February 2006, the JAC began the process of

referring these documents to the appropriate FOIA offices for review and release

determinations.  Where several DoD offices fell under the umbrella of a parent command, the

---

[41]  These documents are listed on the *Vaughn* index at 5600-5825, 5910-5994, 6007-6284, 6288-6432, 7001-7046, 8270-9078, 9260-9486, 9553-9682, and 9691-9793.

JAC referred the document to the parent command FOIA office.  The JAC referred documents

to FOIA offices for EUCOM, SOUTHCOM[42], SOCOM, U.S. Central Command (CENTCOM),

INSCOM, CITF, National Ground Intelligence Center (NGIC), Naval Criminal Investigative

Service (NCIS), Headquarters of the U.S. Air Force Office of Special Investigations (OSI), U.S.

Air Force Air Intelligence Agency (AIA), DIA, FBI, State, DoD FOIA (for Pentagon agencies),

and two other U.S. Government agencies.

## JAC Documents Referred to EUCOM

45.     The JAC referred several documents to the EUCOM FOIA office for further

review by EUCOM components.  EUCOM FOIA sent approximately 52 classified documents[43]

to the Office of the Director of Intelligence ("J2") at The United States National Intelligence

Cell – Sarajevo (USNIC) for review and release recommendations back to EUCOM FOIA.  On

March 28, 2006, a staff member in the USNIC J2 responded to the EUCOM FOIA office via e-

mail and indicated all of the documents were exempt from release.  Thereafter, I requested

further explanation and justifications for exempting these documents and a declaration from an

appropriate EUCOM official supporting the exemptions claimed.  The EUCOM J2 staff

member, who is familiar with the information contained in the documents and rules concerning

classification of information compiled by the USNIC, later provided more detailed justifications

for withholding these documents 5 U.S.C. § 552(b)(1).  The Office of the Staff Judge Advocate

for EUCOM has received these inputs and is preparing a third declaration for signature by an

Original Classification Authority.

---

[42]  SOUTHCOM is the parent command to JTF GTMO.  All FOIA requests to GTMO are routed through
the SOUTHCOM FOIA office.
[43]  These documents are listed in the *Vaughn* index at 7047-7128, 7947-8026, and 9806-9864.

46.     The USNIC staff member determined that information in several documents[44] is classified under Section 1.4(c) of Executive Order 12958, as amended, because it relates to ongoing intelligence operations by, and the operational details of, an inter-agency counterterrorism task force.  Release of this information would compromise these ongoing intelligence operations.  In addition, these same documents contained information derived from sensitive sources, also classified under Section 1.4(c) of Executive Order 12958, as amended.

47.     The USNIC staff members determined that information contained in several documents[45] is classified under Section 1.4(c) of Executive Order 12958, as amended, because it relates to information provided by a source concerning extremist organizations and individuals.  Revealing this information would endanger the source of the information.  Additionally, this information would reveal the focus of intelligence activities as it would reveal individuals and organizations that are the targets of intelligence gathering activities.  Release of this information would compromise ongoing efforts to target extremist persons and organizations.

48.     The USNIC staff member determined that information contained in several documents[46] is classified under Section 1.4(c) of Executive Order 12958, as amended, because it relates to intelligence methods.  Release of the information would reveal an intelligence gathering method used by the United States in obtaining information and would therefore harm intelligence gathering operations.

---

[44]  These documents are listed on the *Vaughn* index at entries beginning with 9817, 9828, 9832, 9835, 9847 and 9852.
[45]  These documents are listed on the *Vaughn* index at entries beginning with 7047, 7049, 7051, 7053, 7055, 7058, 7060, 7066, 7076, 7077, 7079, 7081, 7085, 7095, 7097, 7099, 7113, 7128,  7947, 7953, 7956, 7959, 7967, 7979, 7983, 7988, 7992, 8004, 8006, 8008, 8010, 8014, 9806, 9811, 9817, 9826, 9847, 9999, 10007, 10014, 10024, and 10039.
[46]  These documents are listed on the *Vaughn* index at 7066, 7074, 7956, 7959, 7964, 9806, 9815, 9852.

49.     The USNIC staff member determined that information contained in several documents[47] is classified under Section 1.4(a) of Executive Order 12958, as amended, because it relates to military operations.  Specifically, the information in the documents reveals military operations relating to the U.S. government's counterterrorism campaign in a region of the world.

50.     The USNIC staff member determined that information contained in several documents[48] is classified under Section 1.4(b) of Executive Order 12958, as amended, because it relates to information obtained from a foreign government.

51.     The USNIC staff member determined that information contained in several documents[49] is classified under Section 1.4(d) of Executive Order 12958, as amended, because it relates relations with a foreign government and the foreign activities of the United States. Release of this information would undermine the relationship with that government.

52.     EUCOM FOIA received approximately 16 documents for further review by USAEUR.  Five of these documents were sent on a Secret computer e-mail system and approximately 11 were sent on a Top Secret system.  The 5 documents sent on the Secret system were subsequently referred to the INSCOM FOIA office for review.  The INSCOM FOIA office determined that 3 of these files were duplicates of documents previously referred and reviewed and that the remaining documents[50] should be withheld in full.  *See* Declaration of Susan Butterfield.

---

[47]  These documents are listed on the *Vaughn* index at 9852 and 9847.

[48]  These documents are listed on the *Vaughn* index at 7060, 7118, 7125, 7972, 8012 and 9121.

[49]  These documents are listed on the *Vaughn* index at 7953, 9835, 9847, and 9852.

[50]  These documents are listed on the *Vaughn* index beginning with entries 7147 and 7149. *See* Declaration by Susan Butterfield.

53.     Of the 11 documents sent on the Top Secret system, USAEUR determined 1
document[51] was originally classified by the Italian government as "Secret," a classification
marking retained by the United States pursuant to paragraph 1.6(e) of Executive Order 12958,
as amended.  USAEUR sent this document to the Italian government seeking permission to
release the document or otherwise declassify the information if it could be declassified.  No
response has been received to date.  *See* Declaration of Fred Johnson.  A second document sent
by the JAC was a duplicate of this document.

54.     Mr. Johnson reviewed a third document[52] and initially determined that the
document required further research to determine which agencies had equities in the document.
I spoke to Mr. Johnson on July 7, 2006.   Mr. Johnson informed me that, upon further review,
he determined that the document contained classified national security information and could
not be released.  Specifically, the information in the document contains intelligence source
information, intelligence methodology and activities, properly classified under Section 1.4(c) of
Executive Order 12958, as amended, and therefore exempt from release under 5 U.S.C. §
552(b)(1).  This document is therefore being withheld in its entirety.

55.     Mr. Johnson determined that the remaining documents originated with units
within INSCOM.  These documents were thereafter sent by the JAC to the INSCOM FOIA
office in late May 2006 via the Top Secret e-mail system.  In total, INSCOM received 8
documents consisting of approximately 128 pages.[53]  All of these documents are classified at
the "Secret" level or above.  The INSCOM FOIA office did not immediately learn that these
documents had been sent for review, and as a result, review of the documents did not begin
until late June 2006.  Immediately upon discovering the documents, the INSCOM FOIA office

---

[51]  This document is listed on the Vaughn index at 10110-10111.
[52]  This document is listed on the *Vaughn* index at 10112-10113.
[53]  These documents do not of yet are listed on the *Vaughn* index.

commenced a classification review of these documents. On July 13, 2006 I learned that the

INSCOM FOIA office completed its review and determined that all documents are exempt in

their entirety from release. Since some of these documents are classified above the "Secret"

level, they must be hand delivered. We will receive the documents on July 17, 2006 and will

immediately prepare an index and obtain a second declaration from INSCOM supporting the

claimed FOIA exemptions.

## JAC Documents Referred to SOCOM

56.    The JAC referred 4 documents to the SOCOM FOIA office. The SOCOM FOIA

office determined that 1 document was a duplicate, 2 documents required referral to

CENTCOM,[54] and 1 document was responsive to the Plaintiffs' request.[55] The SOCOM Initial

Denial Authority, Brigadier General George J. Flynn, determined that the body of this

document was exempt from release under 5 U.S.C. § 552(b)(1) because it contained

information relating to intelligence activities, intelligence sources, methods, or cryptology and

was classified in accordance with Section 1.4(c) of Executive Order 12958, as amended. He

further determined that release of this information would give an adversary valuable insight on

U.S. intelligence collection and vulnerabilities. In addition, the message names and information

associating current military personnel with SOCOM were withheld in accordance with 5 U.S.C.

§ 552(b)(3), citing to 10 U.S.C. § 130(b) and (b)(6).

## JAC Documents Referred to CENTCOM

---

[54]  These documents originated with GTMO and were part of the documents released by DoD in
September 2005. These two documents are listed on the *Vaughn* index at 3912-3918 and 3919-3926.
[55]  This document is listed on the *Vaughn* index at 10042-10047.

57.    The JAC referred one document to the CENTCOM FOIA office, which, in turn determined that the document originated within a component of JTF GTMO.  This document was reviewed by JTF GTMO and released by the DoD to Plaintiffs in September 2005.[56]

### JAC Documents Referred to INSCOM

58.    The INSCOM FOIA office received 9 documents from the JAC as part of the initial JAC referral process.  Two of these documents were duplicates.  The INSCOM FOIA office determined that the remaining 7 documents were exempt in their entirety from release under 5 U.S.C. 552(b)(1), (2), and (6).[57]  *See* Declaration of Sue Butterfield.

### JAC Documents Referred to CITF

59.    CITF received 12 documents in two separate e-mails from the JAC for review. The first e-mail contained 5 documents.  The Staff Judge Advocate for CITF reviewed these documents and determined that they were not responsive to the Plaintiffs' request.  I also reviewed the documents and concur in that assessment.  The second e-mail contained 7 documents, 2 of which were duplicates.  Of the remaining documents, 3 were already reviewed and determined to be exempt from release under exemptions (b)(7)(A).[58] CITF further determined that the remaining 2 documents were not responsive, but nonetheless would be exempt from release for the same reason.

### JAC Referral to NGIC

60.    The NGIC received 3 documents from the JAC.  The NGIC determined that 2 documents were non-responsive to the Plaintiffs' request.  The third document was a duplicate of one of the other documents reviewed by NGIC.

### JAC Referral to NCIS

---

[56] This document is listed on the Bates index at 4451-4453.
[57] These documents are listed on the *Vaughn* index at 7129-7150.
[58] These documents are listed on the *Vaughn* index at 1786-1787, 1788-1789, and 1790.

61.    Headquarters NCIS received 1 document from the JAC for review and determined that the document was not responsive to the Plaintiffs' request.

### JAC Referral to AFOSI

62.    Headquarters AFOSI received two documents from the JAC, which were reviewed by the AFOSI Deputy Director of Counterintelligence for Strategy.  He determined that the documents were exempt in their entirety under 5 U.S.C. § 551(b)(1) because they contain information properly classified under section 1.4(b) and (c) of Executive Order 12958, as amended.  In preparing the *Vaughn* index, I reviewed these documents and determined that they are not responsive to the Plaintiffs' request.[59]

### JAC Referrals to AIA

63.    The JAC referred 1 document to the Air Force Information Warfare Center through the Air Force Air Intelligence Agency (AIA) FOIA office.  The AIA Security Officer responsible for reviewing documents for declassification purposes determined that portions of this document were properly classified under Section 1.4(c) of Executive Order 12958 as it relates to intelligence activities.  Specifically, in accordance with the applicable Air Intelligence Center classification guide, the information withheld concerns specific intelligence operations. In addition, I determined that a portion of this document that contains a reference to another intelligence report is exempt under 5 U.S.C. 552 § (b)(2).[60]

### JAC Documents Referred to DIA

---

[59]  These documents are listed on the *Vaughn* index at 10048-10052.  Having determined that these documents are not responsive, I did not include the AFOSI justifications for the exemptions.
[60]  The rationale for withholding this type of information is set forth in paragraphs 27 and 28 of the Declaration of CAPTAIN Peter A. Husta and is incorporated here by reference.

64.    DIA received 42 documents form the JAC.  Of these, DIA determined that 4 documents were duplicates of documents[61] previously reviewed by DIA, 5 documents required referral to other agencies, 5 were duplicates of other documents provided, and 12 were determined to be non-responsive to the Plaintiff's request.  Of the remaining 15 documents, DIA determined that 5 documents[62] were exempt in their entirety and portions of 10 others[63] were exempt from release.  *See* Declaration of Brian S. Kinsey.  Later, in compiling the *Vaughn* index, I noted one additional document referred by the JAC that did not appear in the materials previously referred to the DIA.  This document has been forwarded to the DIA FOIA office with a request for an expedited review.

65.    Of the 5 documents requiring referral, 3 were duplicates of files already received from USNIC, GTMO, and an OGA.  One document[64] was referred to State and USAEUR and determined to be releasable in part.  State determined that the last document was a duplicate of one previously reviewed in conjunction with his FOIA.[65]

## JAC Documents Referred to the FBI

66.    The FBI reviewed approximately 140 documents[66] referred by the JAC.  The FBI determined that each of these documents was exempt from release in its entirety under 5 U.S.C. § 552(b)(7)(A) and that portions of many of these documents were also exempt under 5 U.S.C. § (b)(1), (2), (5), (6), or (7)(C)(D) and (F).  *See* Declaration of David M. Hardy for an explanation of the exemptions asserted by the FBI.

## JAC Documents Referred to the State Department.

---

[61] Of these, one was previously referred to SOUTHCOM and included in their September 2005 review.
[62] The documents exempted in their entirety by DIA are listed on the *Vaughn* index at 7151-7170A.
[63] These documents are listed on the index at 5849-5909.
[64] This document is listed on the *Vaughn* index at 10093-10095. USAEUR determined that it had no equities in the document and therefore did not recommend withholding information.
[65] This document is listed on the *Vaughn* index at 7171-7177.
[66] These documents are listed on the *Vaughn* index at 7456-7946.

67.    State reviewed 18 files referred from the JAC.  Four of these files were duplications within the JAC referral.  Of the remaining 14 documents, 4 were previously referred to and reviewed by State.[67]  State determined that 6 of the documents were exempt in their entirety citing exemptions under 5 U.S.C. § 552(b)(1), (b)(6) and (b)(7).[68]  The remaining 4 documents were released with portions exempted under 5 U.S.C. § 552(b)(1) and (b)(7).  *See* Declaration of Alice S. Ritchie.

### JAC Referral to DoD FOIA (for Pentagon Agencies)

68.    DoD FOIA and DoD GC received 36 files from the JAC for review.  I determined that 14 of the documents were not responsive to the Plaintiffs' request.  Four documents were referred to CITF for review and determined not to be responsive.  I also reviewed these documents and determined that they were not responsive to the Plaintiffs' request.

69.    Of the remaining documents, 17 contained information exempt from release under 5 U.S.C. § (b)(2) and (6).  Specifically, these documents contained the non-numeric portions of detainee internment serial numbers (ISN) assigned by JTF-GTMO.  This information is exempt under exemption (b)(2).[69]  For the same rationale set forth in paragraph 92 of this declaration, we have determined that the privacy interests of U.S. Government personnel mentioned in three of these documents [70]outweighs any public interest in the release of these names.

---

[67]  These documents are listed on the *Vaughn* index at 9529-9532, 9533-9540, 9541-9542, and 9532.
[68]  These documents are listed on the *Vaughn* index at 7171-7215.
[69]  We adopt, by reference, the rationale put forth for exempting the non-numeric portions of detainee ISN numbers set forth in by JTF-GTMO.  *See* Declaration of CAPTAIN Peter A. Husta, paragraph 26.
[70]  These documents are listed on the *Vaughn* index at 5841-5842, 5843-5844, and 5845-5848.

70.     The remaining document was referred to Detainee Affairs.  Detainee Affairs determined that this document was exempt from release in its entirety under 5 U.S.C. § 552(b)(1), (b)(5) and (6).[71]  *See* Declaration of Charles S. Stimson.

### JAC Referrals to Other Government Agencies

71.     The JAC referred approximately 73 classified documents[72] to an OGA.  This OGA reviewed the documents and determined that all 73 documents were exempt from release pursuant to 5 U.S.C. § 551(b)(1).  The OGA determined that each of these documents was properly classified, remained classified, and that no portions of the documents could be released without revealing national security information.  Specifically, the OGA determined that the documents contained information concerning intelligence sources and methods properly classified under Section 1.4(c) of Executive Order 12958, as amended.

72.     The JAC referred approximately 59 documents to an OGA.  This OGA reviewed the documents and determined that they were not responsive to the Plaintiffs' request.

### JAC Foreign Government Information Files

73.     During the course of its search, the JAC identified approximately 84 foreign language and 33 English documents that contain information or were apparently obtained from foreign government sources.[73]  The particular documents are not included in the *Vaughn* index and have not been provided to the Plaintiffs because they have not been reviewed by the proper agencies for review and release determinations.

74.     In conducting its search for documents, the JAC initially determined that these documents were exempt from release because they contained foreign government information

---

[71]  This document is listed on the *Vaughn* index at 10081-10085.
[72]  These documents are listed on the *Vaughn* index at 7216-7245.
[73]  These particular documents are not included in the Vaughn index and have not been provided to the Plaintiffs' as the JAC considers these documents exempt from release.

or were obtained from a foreign government.   During my review of a sampling of these

documents, I discovered that they appeared to lack classification markings found when

asserting an exemption under 5 U.S.C. §552(b)(1).  I further determined that the JAC did not

have information sufficient to invoke the statutory exemption concerning foreign government

information provided by 10 U.S.C. §130(b).  Based upon these findings, I requested the JAC to

conduct research concerning the origin of and the process by which the JAC received these

documents.[74]   This request was made in order to determine if the documents would need a

classification review by the Under Secretary of Defense for Intelligence (USD(I)), the office

delegated the authority to classify information once a FOIA request has been filed.[75]

75.    After conducting some additional research, the JAC further determined that these

documents came into the possession of a United States counterterrorism team in the foreign

country where the documents or the information contained in the documents originated.  These

documents were then provided to the United States National Intelligence Cell (USNIC) with

instructions that the documents were to be treated as "SECRET."  Subsequently, the USNIC

provided these documents to the JAC with instructions that the information was to be treated as

"SECRET."  Based upon this information, I instructed the JAC to begin preparing a package to

refer these documents to USD(I), to include an explanation of why these documents warranted

classification.

76.    In conducting the research for the USDI(I) referral, the JAC compared these

documents against several intelligence databases to ascertain whether any of the documents had

---

[74]  In the interim, I attempted to ascertain the significance of the "NATO/SFOR Unclassified"
classification marking.  I eventually referred several such documents to the Office of the United States
Representative to the NATO Military Committee, described in more detail later.  I instructed the JAC to
assist United States Representative in preparing a package for submission to the NATO Military
Committee.
[75]  *See* Executive Order 12858, as amended, Section 1.6(d).

been classified by other U.S. government agencies. In addition, the JAC reviewed the

properties of the electronic versions of the documents. Based on these reviews, the JAC

determined that 104 of the documents originated with a member organization of the North

Atlantic Treaty Organization, and 6 documents originated with USNIC. The JAC determined

that 7 documents, which were initially identified as foreign government documents, should

have been reviewed by the JAC.

## NATO Documents

77.    The JAC identified 104 documents that originated with a NATO organization.

Approximately 10 of these documents contain the marking "NATO/SFOR unclassified" and 1

contains the marking "NATO/SFOR Confidential." Additionally, the JAC determined, based

on the search of the intelligence databases, that a number of the other documents that originated

with NATO have the "NATO/SFOR Unclassified" designation.[76]

78.    The United States, as a member of NATO, is subject to NATO policies and rules

concerning the dissemination of information produced by NATO members. As a basic policy,

NATO information is the property of the originator and the dissemination of that information

requires the originators approval.[77] NATO unclassified information may only be released to

the other countries or individuals when such release would not be against the interests of

NATO.[78] The JAC considers the information in these documents to be sensitive in nature and

believes that release of the information would have a detrimental impact upon U.S. intelligence

gathering activities and also upon the originator within NATO. In instances where the issuing

---

[76] Documents identified by the JAC as originating with NATO but not carrying the "NATO/SFOR Unclassified" marking are being treated in the same manner and are being referred to the Military Committee, as discussed above.

[77] NATO Document MC 167/3 Release of NATO Classified and Unclassified Military Information to Non-NATO Nations and Organizations (September 13, 1996), paragraph 10(a).

[78] NATO Document MC 167/3 Release of NATO Classified and Unclassified Military Information to Non-NATO Nations and Organizations (September 13, 1996), paragraph 10(b).

authority for the document cannot agree to a release of the information, the decision concerning

release is referred for consideration to the NATO Military Committee which makes a final

decision concerning release.[79]

79.    The JAC has prepared these 104 files for referral to the Office of the United

States Representative to the NATO Military Committee (OUSR).  The OUSR will then provide

these documents by the NATO Military Committee for consideration of these documents for

release pursuant to the Plaintiffs' FOIA request.  A member of the OUSR will be meeting with

a member of the Military Committee on Monday, July 17, 2006 to discuss the process of this

review.  This office will update the Court and Plaintiffs once this request has been formally

filed and acted upon by the NATO Military Committee.  A decision by the Military Committee

not to release any portion of these documents would render that information exempt from

release pursuant to 5 U.S.C. § 552(b)(3) by incorporation of 10 U.S.C. § 130(c).[80]

### USNIC

80.    The JAC has referred the 6 documents identified above to the USNIC for review.

Additionally, the JAC is reviewing the remaining 7 documents and is in the process of

preparing a declaration to support any claimed exemptions.

### III.  DoD GC SEARCH AND REFERRAL PROCESS AND BASIS FOR WITHHOLDING OF INFORMATION

81.    The Office of the Department of Defense General Counsel (OGC) was not

initially identified by DoD FOIA as one of the agencies tasked to conduct a search for records

responsive to the Plaintiffs' FOIA request.  Upon reviewing documents provided by GTMO and

other agencies in September 2005, members of the DoD staff handling the Plaintiffs' FOIA

---

[79]  NATO Document MC 167/3 Release of NATO Classified and Unclassified Military Information to Non-NATO Nations and Organizations (September 13, 1996), paragraphs 5(a) and 10(b).
[80]  10 U.S.C. § 130(c) statutorily exempts (including from FOIA release) the disclosure of sensitive information of foreign governments and international organizations under certain situations.

request determined that a search of OGC's files was warranted.  Thereafter, personnel in OGC

undertook a search of our records systems.  This included electronic and email file systems,

both classified and unclassified.  The unclassified email system was searched electronically,

using key words relevant to the Requesters in the case.  This search produced numerous e-mails

which then were viewed individually to determine if they contained responsive information.

For the classified email system, an OGC staffer reviewed the individual email accounts of staff

members who regularly handle International Law matters related to detainees.   An OGC staffer

also searched the shared drives for both the classified and unclassified systems, using key

words relevant to the Plaintiffs' in this case.  Finally, an OGC staffer searched reviewed hard

copy files likely to contain responsive information maintained by the General Counsel's front

office and the International Affairs section of OGC.  Overall, OGC conducted a thorough

search likely to produce documents responsive to the Plaintiff's request.[81]

     82.    As a result of these searches, certain responsive documents were found.  Many of

these documents originated with other organizations and therefore needed to be referred for

review and release determinations, as discussed below.  The OGC records system included

various documents relating to the habeas cases that had been brought by the Plaintiffs.  These

documents included emails between DoD organizations and the Department of Justice

regarding our litigation strategy in the habeas case, comments on draft briefs and other

attorney-client and work product material.  These documents were deemed not to be responsive

to any of the requests in this case and therefore were not processed.

---

[81]  The OGC search for and review of its own documents was but a small component of the total effort
undertaken by OGC staffers in responding to the Plaintiffs' request.  As a very conservative estimate,
OGC staffers and persons detailed to OGC spent over 2000 man hours performing various necessary tasks
to respond to the Plaintiffs' request.  DoD FOIA estimates that it spent over 3000 man hours in
responding to the Plaintiffs' request.

83.     During the search, OGC identified a number of potentially responsive documents that either originated with or contained information that originated with the Joint Staff, Detainee Affairs, State, EUCOM, GTMO,  and an OGA.

84.     Through DoD FOIA, OGC forwarded certain documents[82] to Joint Staff for their review and recommendations concerning release of the documents.  *See* Exhibit C, Declaration of Colonel Barry Coble[83] and Exhibit D, Declaration of Colonel Paul C. Strickland[84].

85.     Through DoD FOIA, OGC forwarded certain documents[85] to Detainee Affairs for review and recommendations concerning release of the documents.  *See*  Declaration of Charles S. Stimson.

86.     Through DoD FOIA, OGC forwarded certain documents[86] to the State Department for review and recommendations concerning release of the documents.  *See* Declaration of Alice S. Ritchie and paragraphs 93 – 104, below.

---

[82]  The documents referred to Joint Staff will be reflected by a "JS" designation in the description column of the *Vaughn* index, along with a list of the exemptions being claimed by that organization.  These documents are listed on the *Vaughn* index at …………..

[83]  Colonel Coble's declaration indicated he reviewed documents 4-12 that were referred from OGC through DoD FOIA.  Documents 4-6 and 8–12 correspond, respectively, to the documents listed on the *Vaughn* index at 9221-9226, 9119-9123, 9154, 9155-9162, 10053-10056, 9132-9133, and 9149. Document 7 was not responsive to the Plaintiffs' request. Document 11 was a duplicate of 9154.

[84]  Colonel Strickland's declaration indicates that he reviewed three documents in the Joint Staff staffing package for this FOIA. Document 1 in his declaration corresponds to the document listed at 9169-9197, document 2 corresponds to the document listed at 9126-9128, and document 3 corresponds to the document listed at 9143-9145.

[85]  The documents referred to Detainee Affairs will be reflected by an "ODA" designation in the description column of the *Vaughn* index, along with a list of the exemptions being claimed by that organization. These documents are listed on the *Vaughn* index at 5516, 5520-5521, 9132-9133, 9141-9142, 9146, 9147-9148, 9149-9150, 9154-9154A, 9155, 9156-9157, 9158-9160, 9161-9162, 9165-9167, 9168, 9198, 9210-9212, 9221-9226, 9231-9232, 9233-9238, 9250-9251, and 10053-10056.

[86] The documents referred to the State Department will be reflected by a "State" designation in the description column of the *Vaughn* index, along with a list of the exemptions being claimed by that organization.

87.    Through DoD FOIA, OGC forwarded certain documents[87] to EUCOM for review and recommendations concerning release of the documents.  *See* Second Declaration of Joseph B. Hoeing.

88.    Through DoD FOIA, OGC forwarded certain documents[88] to JTF-GTMO for their review and recommendations concerning release of the documents.  *See* Declaration of Rear Admiral Harry B. Harris, Jr. and Declaration of CAPTAIN Peter A. Husta

89.    Through DoD FOIA, OGC forwarded certain documents[89] to OGA agency for review and recommendations concerning release of the documents.

### Explanation of Withholdings in DoD GC Documents

90.    Certain information was withheld from the documents found in OGC's system of records, based on exemption (b)(5) and (b)(6).

91.    **Exemption (b)(5):**  As noted in the *Vaughn* index for the responsive documents found in the OGC office, some of the documents contained information being withheld by our office under exemption (b)(5) as "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." This exemption was asserted when the information or documents at issue contain attorney work-product or attorney-client privileged material.  As noted in the index, this includes OGC's comments on draft documents prepared by other agencies, OGC's communications with the Department of Justice regarding matters involved in the litigation with the Plaintiffs.  As attorneys employed by the Department of Defense, OGC attorneys compiled the information in

---

[87]    These documents are listed on the *Vaughn* index at 9141-9142 and 9155.

[88]    These documents are listed on the *Vaughn* index at Bates numbers 9221-9226, 9244-9247 and 9487-9492.

[89]    The documents referred to Detainee Affairs will be reflected by an "OGA" designation in the description column of the *Vaughn* index, along with a list of the exemptions being claimed by that organization.  See paragraphs 105-107 for more information.  These documents are listed on the *Vaughn* index at 9155, 9156-9157, 9161-9162, and 10098-10099.

these documents as part of our preparation for various aspects of the ongoing litigation between DoD and the Plaintiffs, as well as in consultations with the attorneys at the Department of Justice who are representing us in the litigation  The public release of such work-product and attorney-client material would stifle the open and free discussions and exchange of ideas necessary in formulating litigation strategy.

92.    **Exemption (b)(6):**  The *Vaughn* index also references withholding under exemption (b)(6) by OGC.  This information consists of the names and phone numbers of various DoD personnel and is being withheld because the disclosure of such information "would constitute a clearly unwarranted invasion of [their] personal privacy."  This information does not shed light on the DoD's performance of its statutory duties or directly reveal the operations or activities of the federal government and there is no public interest in this information.

### Documents with State Department Equities

93.    In some cases, the State Department did not discuss certain responsive documents in its declaration, even though the withholdings were based on that organization's inputs and equities in the documents.  *See* Declaration of Alice Ritchie.  This often occurred when the contents of State Department telegrams or information were included verbatim into emails by DoD personnel, a phenomenon that occurred when DoD personnel downloaded the State Department telegram through a DoD system that collected those telegrams.  The content of the original telegram was identical to the "email version" of that telegram and the reasons for the withholding of the "email version" are the same as the reasons listed in the State Department declaration for why the actual telegram should be withheld, as referenced in the Declaration of Alice Ritchie.  Additionally, the OGC documents contained several drafts of telegrams prepared

by the State Department and edited by individuals at DoD.  While comments by DoD personnel

on the State department telegrams are being withheld under (b)(5) and (b)6), the underlying

telegram is being withheld by the State Department for the reasons listed in the Ritchie

Declaration.  The following documents contain information withheld at the request of the State

Department.

94.    Bates 9227-9228:  This document conveys to DoD addressees the text of a

SECRET embassy telegram regarding the request of a foreign government for information

about Guantanamo Bay detainees.  In addition to reporting the specifics of the request, the

message includes the Embassy's candid assessment of the motivation behind the request.  The

disclosure of the material in this document would cause damage to the foreign relations of the

U.S.  It is currently and properly classified and therefore exempt from disclosure under 5 U.S.C.

§552(b)(1).

95.    Bates 9079-9080, 9088-9089, 9090-9094, 9095-9096:  These documents convey

to DoD addressees the text of a classified embassy telegram transmitting the text of a letter

from the wives of the Algerian detainees at Guantanamo Bay.  In addition to conveying the text

of the letter, the Embassy comments candidly on the policy and political implications for U.S.

interests.  Disclosure of the Embassy comments, which are currently and properly classified,

would cause damage to U.S. foreign relations and are thus exempt from disclosure under 5

U.S.C. §552(b)(1).  Additionally, the correspondence from the wives is withheld under 5 U.S.C.

§552(b)(6) as its release would constitute unwarranted invasion of their personal privacy.

96.    Bates 9132-9133:  This document contains an unnamed DoD analyst's report,

complete with a policy recommendation, concerning the status of third country terrorism

detainees in Bosnia.  The material contains sensitive foreign government information, provided

in confidence, and discusses U.S. intelligence sources and methods.  Disclosure of the report, which is currently and properly classified under Section 1.4(b) of Executive Order 12958, as amended, would cause damage to U.S. foreign relations.  It is therefore  exempt from disclosure under 5 U.S.C. §552(b)(1).

97.     Bates 9114-9116 is a draft Department of State telegram concerning the disposition of certain detainees at Guantanamo Bay.  This document reflects DoD edits to a draft outgoing telegram providing guidance on the disposition of certain foreign detainees.  The entire text represents predecisional material exempted from disclosure under 5 U.S.C. §552(b)(5).  Portions are also currently and properly classified under Sections 1.4(b) and (d) of Executive Order 12958, as amended,  and thus are withheld under 5 U.S.C. §552(b)(1).

98.     Bates 9101-9102 reflects DoD's markup of a classified draft Department of State telegram addressing a response to the request of a foreign government regarding detainees at Guantanamo Bay.  Portions are also currently and properly classified under Sections 1.4(b) and (d) of Executive Order 12958, as amended, and were withheld under 5 U.S.C. §552(b)(1). Also, as a draft, the entire document is predecisional and is exempt from release under 5 U.S.C. §552(b)(5).

99.     Bates 9081-9083:  The currently and properly classified portion of this email relates to a diplomatic exchange between the Embassy and host government on third country nationals at Guantanamo Bay.  Release of this confidential diplomatic exchange, entered into by our foreign government interlocutors in the expectation of confidentiality, would erode access to such officials, thereby harming our ongoing foreign relations in Bosnia.  This information is currently and properly classified under Sections 1.4(b) and (d) of Executive Order 12958, as amended, and therefore exempt under 5 U.S.C. §552(b)(1).

100.  Bates 9543-9545:  This document is an email string between State and DoD personnel about information provided to the U.S. by a foreign government regarding Guantanamo Bay detainees.  Release of this material would violate the confidentiality in which it was provided, thereby damaging U.S. foreign relations.  This information is currently and properly classified under Sections 1.4(b) and (d) of Executive Order 12958, as amended, and therefore exempt under 5 U.S.C. §552(b)(1).

101.  Bates 9119-9121:  This document conveys DoD's recommendation regarding specific working changes to a classified draft State telegram.  This document is predecisional and deliberative and exempt under 5 U.S.C. §552(b)(5).

102.  Bates 9122-9123:  This document is a draft State telegram to Embassy Sarajevo, containing DoD's comments regarding the disposition of terrorist suspects in foreign custody. The text of the draft cable is currently and properly classified under Section 1.4 (a), (b), (c) and (d) of Executive Order 12958, as amended, and therefore exempt under 5 U.S.C. §552(b)(1).  It is also predecisional and deliberative and thus exempt under 5 U.S.C. §552(b)(5).

103.  Bates 9146 and 9149-9150:  These documents are the signed and draft copies of a memorandum to the Secretary of Defense.  These documents concern the U.S. position on the disposition of foreign terrorist suspects.  The information in these documents is currently and properly classified under Section 1.4(d) of Executive Order 12958, as amended, and is therefore exempt under 5 U.S.C. §552 (b)(1).  It also reflects the predecisional policy recommendation of State and is exempt under 5 U.S.C. §552(b)(5).

104.  Bates 9231-9332:  This document is an email exchange of views with respect to the policy governing the proper U.S. response to inquires regarding specific detainees at Guantanamo Bay.  In addition to being currently and properly classified under Section 1.4(d) of

Executive Order 12958, as amended, and exempt under 5 U.S.C. §552 (b)(1), this document

contains predecisional and deliberative material exempt from release under 5 U.S.C.

§552(b)(5).

### IV.  BASIS FOR WITHHOLDING INFORMATION BY CERTAIN U.S. GOVERNMENT AGENCIES

105.   In various places throughout this declaration and in several entries on the *Vaughn*

index, DoD refers to an "OGA" which is an acronym for Other Government Agency.  Several

documents responsive to the Plaintiff's FOIA request were created by[90] or contain information

originating with[91] other U.S. Government agencies (OGAs) who have requested to remain

anonymous.   I have been informed by the classification authorities of these agencies, through

their respective General Counsel offices, that neither the identities of these OGAs nor the

substance of the withheld information can be disclosed on the public record because such

disclosures would tend to reveal classified information.

106.   The information withheld from each of these documents by the respective OGAs

was reviewed by a person properly delegated and exercising Original Classification Authority

(OCA) under the provisions of Section 1.3 of Executive Order 12958, as amended.  The

purpose of the review was to ensure that information in these documents is currently and

properly marked as classified information and that and that no segregable portions of these

documents could be released without revealing national security information.  Based on their

---

[90]   Classified documents created by an OGA are listed on the Vaughn index at 7216 – 7245 and 9865-9998.
[91]   Documents created by another U.S. Government agency (e.g. CITF) that contain classified information supplied by an OGA are Bates numbered beginning with 1865, 1867, 1872, 1876, 1891, 1895, 1903, 1905, 1907, 1916, 1920, 1922, 1936, 1940, 1944, 1974, 1984, 2017, 2028, 2050, 2057, 2063, 2084, 2105, 2107, 2109, 2111, 2116, 2120, 2127, 2133, 2144, 2146, 2148, 2150, 2159, 2161, 2169, 2184, 2189, 2390, 2551, 2568, 2587, 2600, 2604, 2606, 2608, 2611, 2625, 2632, 2640, 2642, 2675, 2710, 2714, 2716, 2720, 2762, 2770, 2789, 2791, 2799, 2911, 2920, 2930, 2933, 2936, 2939, 2985, 2991, 2994, 2997, 3000, 3006, 3012, 3016, 3025, 3029, 3041, 3042, 9147, 9155, 9156, 9161, and 10098.

professional training, experience and subject matter expertise concerning the information contained in the documents, these OCAs determined that the documents originating with their respective agencies and portions of documents originating with other agencies contain national security information that reveals intelligence activities, intelligence sources, and intelligence methodology and are properly and currently classified under Section 1.4(c) of Executive Order 12958, as amended. The OCAs further determined that public release of the classified passages would cause serious or exceptionally grave damage to the national Security of the United States. Finally, the proponent OCA further determined that the documents withheld in their entirety contained no segregable non-exempt information. Accordingly, these documents were withheld from release under 5 U.S.C. §552(b)(1). The OCA's for these agencies also determined that associating a particular document with that agency would itself tend to reveal classified information, and that the identity of the agency was similarly exempt from release.

107. Each of the OGAs that have reviewed documents in connection with the Plaintiff's request and asserted exemptions reserve the right to submit, upon request of the Court, classified affidavits or declarations to further support and explain the basis for withholding information from the documents reviewed.

Executed this 16th day of July 2006.

John P. Taitt

**EXHIBIT A**

DECLARATION OF WILLIAM J. KANE, CHIEF OF THE INFORMATION
MANAGEMENT DIVISION, THE JOINT STAFF,
FOIA 06513-05

I, William J. Kane, declare upon penalty of perjury that the following is

true and correct:

1.  I am the Chief of the Information Management Division, Joint

Secretariat, Directorate of Management, The Joint Staff.  In this capacity

I manage the Freedom of Information Act Program, Records Management

Program, Research and Archiving Program and the Joint Staff

Declassification Project.

2.  That statements made herein are based on my personal knowledge,

upon information made available to me in my official capacity, and upon

determinations made by me in accordance therewith.

3.  As part of managing the Freedom of Information Act Program, I am

responsible for the performance of searches of the Joint Staff corporate

records to identify documents that may be responsive to particular FOIA

requests.  Documents located in the search are forwarded to the proper

component of the Joint Staff for review.  As part of Stephen H. Oleskey v.

United States Department of Defense and United States Department of

Justice, my FOIA staff was tasked to search for responsive documents

concerning six named detainees held at the Guantanamo Naval Base,

Cuba.

4.  My staff searched the Joint Staff Archives by using name and

keyword searches.  A search of the Joint Staff Action Tracking System

was conducted by date, name and keyword and the Joint Staff shared drive was searched by name and keyword. The search was exhaustive and thorough, and located five documents that were responsive to the request submitted by Mr. Oleskey. The documents were forwarded to the appropriate Joint staff component for review as FOIA 06513-05.


William J. Kane
GS-15
Chief, Information Management Division

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN H. OLESKEY ) | |
| ) | |
| ON BEHALF OF GUANTANAMO INTERNEES ) | |
| LAKHDAR BOUMEDIENE, ) | |
| MOHAMED NECHLA, MUSTAFA AIT IDIR, ) | |
| SABER LAHMAR, HADJ BOUDELLA, ) | Civil Action No. 05-10735-RGS |
| AND BELKACEM BENSAYAH ) | |
| ) | |
| Plaintiff, ) | DECLARATION OF |
| ) | COLONEL BARRY COBLE |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE AND UNITED STATES ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## DECLARATION OF BARRY B. COBLE
## COLONEL, UNITED STATES AIR FORCE

I, Barry B. Coble, declare under penalty of perjury that the following is true and correct:

1. I serve as the Division Chief for the Detainee Affairs Division (DAD), which functions under the authority and direction of the Deputy Director, War on Terrorism Directorate (DDWOT), J-5 Strategic Plans and Policy Directorate, Joint Staff. The DAD serves as the Joint Staff point of contact for detainee matters worldwide, and helps to develop policy recommendations and oversees detainee affairs to include matters related to any detained, non-coalition personnel under DoD control and apprehended in the Global War on Terrorism and/or US military operations.

2. I have been an officer in the United States Air Force for 25 years and have served as DAD Chief since 2004. As the DAD Chief, I oversee all administrative and operational duties performed by my staff.

3. The statements made herein are based upon my personal knowledge, upon information made available to me in my official capacity, and upon determinations made by me in accordance therewith.

4. In the course of my official duties at DAD, I have become familiar with Joint Staff processing of plaintiff's FOIA requests, and the ensuing lawsuit. Our office is responsible for reviewing FOIA requests for documents to validate the classification of working documents and make recommendations to the Original Classification Authority concerning the current and proper classifications of such documents. The documents at issue have been the subject of review in which my staff has participated. The purpose of the review has been to ensure that the previously marked "classified" information in the document is indeed classified and properly marked. I have reviewed the documents as well.

5. Based upon my professional training and experience, it is my opinion that the documents (from JSAP FOIA 06513-05, Doc 1, 2, 3, 5; JSAP FOIA 06625, Docs 4-12) contain national security information that reveals current military operations, intelligence activities, and foreign relations of the United States that is properly classified under paragraph 1.4(a) of Executive Order 12958, as amended. Public release of these classified passages would reveal how the United States conducts similar missions and operations and would thereby compromise the security of future plans and operations. This information, if released, would therefore cause serious damage to the national

security of the United States. In addition, these documents contain information that is deliberative in nature, and information that, if released, would constitute an unwarranted invasion of the personal privacy of individuals on the Joint Staff. At the unclassified level, the specific justification for our classification decisions with respect to these documents are set forth in the Vaughn Index.

6. Of the 13 documents identified in paragraph 5 above, nine have been released in part, with only classified and other protected information being withheld. The documents that have been released in part are, from JSAP FOIA 06513-05, Doc 1, 2, 3, and 5; and from JSAP FOIA 06625, Docs 4, 5, 7, 8, and 9.

7. Of the 13 documents identified in paragraph 5 above, four documents were withheld in their entirety because the classified information could not be segregated from the rest of the document and still have the released portions make sense. Those that have been retained in their entirety are from JSAP FOIA 06625, Docs 6, and 10-12.

I hereby declare that the preceding statements are true and correct to the best of my knowledge, information, and belief. Executed this 21st day of June, 2006.

BARRY B. COBLE, Colonel, USAF

# EXHIBIT C

UNCLASSIFIED


I, Paul C. Strickland, declare upon penalty of perjury that the following is

true and correct:


    1. I am the J-3 Current Operations, Joint Operations Directorate,

       Deputy Director for Regional Operations (DDRO), US Southern

       Command (SOUTHCOM) Division Chief (JODSOUTH).   The

       DDRO is responsible for coordinating, preparing, and briefing

       contingency plans, deployment orders, and execution orders to

       the Director of Operations (J-3) and the Chairman of the Joint

       Chiefs of Staff (CJCS).  JODSOUTH provides briefs to the CJCS

       through the DDRO on operational matters pertaining to the

       SOUTHCOM region.  JODSOUTH recommends to DDRO

       military force sourcing solutions and monitors US forces during

       daily operations and crisis situations.  JODSOUTH reviews

       rules of engagement, military courses of action, and decision

       briefs for consideration by the CJCS, the Secretary of Defense

       (SecDef), and the President.  JODSOUTH is the Joint Staff focal

       point for the Services, Combatant Commanders, and SecDef for

       all operational matters.

    2. That statements made herein are based on my personal

       knowledge, upon information made available to me in my


UNCLASSIFIED

UNCLASSIFIED

official capacity, and upon determinations made by me in accordance therewith.

3. In the course of my official duties as JODSOUTH Division Chief, I am familiar with processing FOIA requests. In the case of the Olesky FOIA reference documents, I am not the original classification authority. However, as tasked, it is our responsibility to validate the classification of working documents. In this case, the documents in question were marked classified prior to the plaintiff's FOIA request. My staff, and I, reviewed the documents to ensure the previously marked classified information in the documents is indeed classified and properly marked (FOIA 6513/01, 04-F-2832).

4. Based upon my professional training and experience, it is my opinion that document 1 contain classified national security information that reveals information on current military operations, international relations, and personal information. Public release of classified passages would cause serious damage to the national security of the United States.

5. All documents have been released in part with only classified and other protected information being withheld

6. The current basis for classification of national security information is found in Executive Order (EO) 12958, as amended by EO 13292. The information has been classified in

UNCLASSIFIED

accordance with Section 1.4a (military plans, weapons systems, or operations) of EO 12958 by the Original Classification Authority (OCA).

7. Release of the classified information in this document would compromise ongoing military operations in the War on Terrorism.

*Paul C. Strickland*

PAUL C. STRICKLAND, Col, USAF

The Joint Staff, J-3, DDRO

Joints Ops Directorate, Division Chief, Southcom

UNCLASSIFIED

**EXHIBIT D**

UNCLASSIFIED

official capacity, and upon determinations made by me in accordance therewith.

3. In the course of my official duties as JODSOUTH Division Chief, I am familiar with processing FOIA requests. In the case of the Olesky FOIA reference documents, I am not the original classification authority. However, as tasked, it is our responsibility to validate the classification of working documents. In this case, the documents in question were marked classified prior to the plaintiff's FOIA request. My staff, and I, reviewed the documents to ensure the previously marked classified information in the documents is indeed classified and properly marked (FOIA 06625-05, 04-F-2832).

4. Based upon my professional training and experience, it is my opinion that documents 1, 2, and 3 contain classified national security information that reveals information on current military operations, international relations, and personal information.

5. Document 1 (pages 1 – 6), 2, and 3 have been released in part with only classified and protected information withheld. Public release of classified passages would cause serious damage to the national security of the United States.

6. Document 1, pages 7 – 28, have been withheld in entirety because the classified information could not be segregated from

UNCLASSIFIED

UNCLASSIFIED

I, Paul C. Strickland, declare upon penalty of perjury that the following is true and correct:

1. I am the J-3 Current Operations, Joint Operations Directorate, Deputy Director for Regional Operations (DDRO), US Southern Command (SOUTHCOM) Division Chief (JODSOUTH).   The DDRO is responsible for coordinating, preparing, and briefing contingency plans, deployment orders, and execution orders to the Director of Operations (J-3) and the Chairman of the Joint Chiefs of Staff (CJCS).  JODSOUTH provides briefs to the CJCS through the DDRO on operational matters pertaining to the SOUTHCOM region.  JODSOUTH recommends to DDRO military force sourcing solutions and monitors US forces during daily operations and crisis situations.  JODSOUTH reviews rules of engagement, military courses of action, and decision briefs for consideration by the CJCS, the Secretary of Defense (SecDef), and the President.  JODSOUTH is the Joint Staff focal point for the Services, Combatant Commanders, and SecDef for all operational matters.

2. That statements made herein are based on my personal knowledge, upon information made available to me in my

UNCLASSIFIED

UNCLASSIFIED

the rest of the document and still have the released portions
make sense. Public release of classified pages would cause
serious damage to the national security of the United States.

7. The current basis for classification of national security
   information is found in Executive Order (EO) 12958, as
   amended by EO 13292. The information has been classified in
   accordance with Section 1.4a (military plans, weapons systems,
   or operations) of EO 12958 by the Original Classification
   Authority (OCA).

8. Release of the classified information in these documents would
   compromise ongoing military operations in the War on
   Terrorism.

*Paul C. Strickland*

PAUL C. STRICKLAND, Col, USAF

The Joint Staff, J-3, DDRO

Joints Ops Directorate, Division Chief, Southcom

UNCLASSIFIED