# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STEPHEN H. OLESKEY, ) <br> ) <br> ON BEHALF OF GUANTANAMO INTERNEES ) <br> LAKHDAR BOUMEDIENE, MOHAMED ) <br> NECHLA, MUSTAFA AIT IDIR, SABER ) <br> LAHMAR, HADJ BOUDELLA, AND ) <br> BELKACEM BENSAYAH, ) <br> ) <br>       Plaintiff, ) <br> ) <br>       v. ) <br> ) <br> UNITED STATES DEPARTMENT OF DEFENSE ) <br> AND UNITED STATES DEPARTMENT OF ) <br> JUSTICE, ) <br> ) <br>       Defendants. ) <br> ) | Civil Action No. 05 10735 RGS |

## MOTION FOR LEAVE TO FILE MEMORANDUM IN EXCESS OF PAGE LIMIT

Pursuant to Local Rule D. Mass. 7.1(b)4, Stephen H. Oleskey ("Plaintiff"), on behalf of

Lakhdar Boumediene, Mohamed Nechla, Mustafa Ait Idir, Saber Lahmar, Belkacem Bensayah

and Hadj Boudella ("Requesters"), requests that the Court grant its motion for leave to file a

memorandum in support of its Rule 56(f) Motion to Deny or, in the Alternative, Continue

Defendants' Motion for Summary Judgment that is in excess of the page limit set out in Local

Rule D. Mass. 7.1(b)4.  A copy of the proposed memorandum of law in support of Plaintiff's

Rule 56(f) Motion to Deny or, in the Alternative, Continue Defendants' Motion for Summary

Judgment is attached hereto as Exhibit 1.

Defendants have consented to the relief sought in this Motion.

Dated:  June 23, 2008                    Respectfully submitted,


                                         /s/ Lauren G. Brunswick_____
                                         Lauren G. Brunswick (BBO# 660996)
                                         WILMER CUTLER PICKERING
                                           HALE and DORR LLP
                                         60 State Street
                                         Boston, MA 02109
                                         Tel.: (617) 526-6000
                                         Fax:  (617) 526-5000

                                         *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent out electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Lauren G. Brunswick
Lauren G. Brunswick

Dated: June 23, 2008

# EXHIBIT 1

**ORAL ARGUMENT REQUESTED**

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STEPHEN H. OLESKEY, ) <br><br> ON BEHALF OF GUANTANAMO INTERNEES ) <br> LAKHDAR BOUMEDIENE, MOHAMED ) <br> NECHLA, MUSTAFA AIT IDIR, SABER ) <br> LAHMAR, HADJ BOUDELLA, AND ) <br> BELKACEM BENSAYAH, ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> UNITED STATES DEPARTMENT OF DEFENSE ) <br> AND UNITED STATES DEPARTMENT OF ) <br> JUSTICE, ) <br><br> Defendants. ) | **Civil Action No. 05 10735 RGS** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56(f) MOTION TO
DENY OR, IN THE ALTERNATIVE, CONTINUE DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(f), Stephen H. Oleskey ("Plaintiff"), on behalf of Lakhdar

Boumediene, Mohamed Nechla, Mustafa Ait Idir, Saber Lahmar, Belkacem Bensayah and Hadj

Boudella ("Requesters"), submits this memorandum in support of his motion requesting that the

Court deny the United States Department of Defense ("DoD") and the United States Department

of Justice's ("DoJ") (collectively, "the government") Motion for Summary Judgment ("Motion")

or, in the alternative, order a continuance for discovery relating to the government's search at

Guantanamo.

Denial of the Motion is appropriate because the government has failed to demonstrate the adequacy of its search in response to Plaintiff's Freedom of Information Act ("FOIA") request. If the Court does not deny the government's Motion at this stage, discovery will be necessary to permit Plaintiff to develop facts essential to oppose the government's Motion on the grounds that its searches were inadequate. Plaintiff offers the following statement of points and authorities in support of his motion.

## I.    INTRODUCTION AND BACKGROUND

Plaintiff submitted FOIA requests on September 24, 2004 (the "Requests"), seeking records pertaining to the ongoing detention of Requesters, all held without charge at the United States Naval Base at Guantanamo Bay, Cuba ("Guantanamo") since January 20, 2002. In October of 2004, DoD granted Plaintiff's request for expedited processing of these Requests. On April 13, 2005, when not a single document responsive to the Requests had been produced, Plaintiff filed the instant action. See 5 U.S.C. §552(a)(6)(A)(i).

Following the filing of the complaint, and pursuant to an agreement with Plaintiff, the government finally conducted searches of several agencies for documents responsive to the Requests.[1] On May 22, 2008, the government moved for summary judgment regarding the adequacy of its searches. Pursuant to discussions at the March 5, 2008 status conference and the scheduling order entered by this Court on the same day, Plaintiff is to respond to the government's motion in two parts. First, Plaintiff has filed herewith his Rule 56(f) discovery

---

[1] On July 28, 2005, the parties agreed that the government would produce documents responsive to the Request by September 28, 2005. This timeframe was extended at the government's request on two occasions. See Defendant U.S. Dep't of Defense's Consent Motion to Modify Production Schedule, Oleskey v. Dep't of Defense, No. 05 10735 RGS (D. Mass. Sept. 28, 2005); Defendant U.S. Dep't of Defense's Consent Motion to Modify Production Schedule, Oleskey v. Dep't of Defense, No. 05 10735 RGS (D. Mass. April 1, 2006). Ultimately, over the course of the two years that followed, the government produced various documents along with Vaughn indices which listed many thousands of relevant documents that it had withheld in full or in part. Subsequent to the production of these documents, Plaintiff repeatedly notified the government of several broad, directly relevant categories of documents that the government's search had ignored or overlooked. See Part II(B)(2) infra. The government has not responded to most of the omissions Plaintiff has identified.

motion requesting the denial of summary judgment or, in the alternative, a continuance to permit discovery. Such discovery would provide facts showing the inadequacy of the government's search for responsive documents, which is an issue of material fact central to Plaintiff's opposition to the government's Motion.

II.    ARGUMENT

    A.    **A Plaintiff Is Entitled to Discovery Under Rule 56(f) If the Government Has Not Provided Facts Central to Plaintiff's Opposition.**

Federal Rule of Procedure 56(f) exists to ensure that summary judgment not be prematurely granted. Price v. General Motors Corp., 931 F.2d 162, 164 (1st Cir. 1991). Under Rule 56(f), if a party lacks access to facts that are essential to justifying its opposition, this Court may "(1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed. R. Civ. P. 56(f).

In the FOIA context, if a plaintiff does not have access to facts regarding the adequacy of the government's search, the government's summary judgment motion should be denied or discovery should be granted under Rule 56(f). See, e.g., Bangoura v. United States Dep't of the Army, 2006 U.S. Dist. LEXIS 93149, at *18 (D.D.C. 2006) (granting interrogatories and a deposition to assess the adequacy of a FOIA search). The adequacy of the government's search is an issue of material fact to be decided at summary judgment. See Maynard v. Central Intelligence Agency, 986 F.2d 547, 560 (1st Cir. 1993); Kyle v. U.S. Dep't of Health and Human Services, 1989 U.S. Dist. LEXIS 14635, at *8 (D. Mass. 1989). The government bears the burden of proof in demonstrating the adequacy of its search, and summary judgment is premature if the government has not provided sufficient facts to meet this burden. 5 U.S.C. § 552(a)(4)(B); Carney v. U.S. Dep't of Justice, 19 F.3d 809, 812 (2d Cir. 1994).

The inquiry into the adequacy of a FOIA search is fact-intensive and depends upon the context of each individual case. Maynard, 986 F.2d at 559. To be adequate, a search must be "reasonably calculated to uncover all relevant documents." Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983). The agency need not uncover all documents, but it must at least search "all locations likely to contain documents responsive to the FOIA request." Judicial Watch, Inc. v. Dep't of Defense, 2006 U.S. Dist. LEXIS 44003, at *5 (D.D.C. 2006). Courts should assess the reasonableness of a search "consistent with congressional intent tilting the scale in favor of disclosure." Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 27 (D.C. Cir. 1998) (citations omitted).

Since the government must search all locations likely to contain responsive documents, a plaintiff is entitled to know where responsive documents are kept so that it may determine whether the agency "us[ed] methods which can be reasonably expected to produce the information requested," Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). The agency "cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999) (citations omitted); see also Miller v. United States, 779 F.2d 1378, 1385 (8th Cir. 1985) (noting that the government is required to make "a diligent search for [responsive] documents in places in which they might be expected to be found." (emphasis added)).

If a plaintiff is not provided with sufficient information regarding the production and maintenance of records, it will be unable to adequately assess the reasonableness of the search procedures and "cannot present facts essential to justify its opposition," as required by Rule

56(f).  Fed. R. Civ. P. 56(f).[2]  In such a situation, Rule 56(f) contemplates either denial of the

summary judgment motion or an order granting discovery to uncover the essential facts for the

plaintiff's opposition to summary judgment.

> **B.     Discovery Should Be Granted Under Rule 56(f) Because the Government Has Not Provided Facts Necessary to Assess the Adequacy of Its Search.**

> **1.     Searches at Guantanamo Were Not Reasonable.**

In a typical FOIA action, discovery as to the adequacy of an agency's search might be

unnecessary because most government agencies use a standardized and well-tested protocol,

which is designed to respond to FOIA requests competently and thoroughly.  For example, DoD

has 548 offices that are devoted exclusively to FOIA matters, each staffed with personnel trained

to handle FOIA requests.  See DoD FOIA Improvement Plan at 4, <u>available at</u> Archive of

Columns by the Office of the Secretary of Defense,

http://www.dod.mil/pubs/foi/FOIA_improvement_plan.pdf (last visited June 20, 2008).  These

offices are overseen by the Office of the Secretary of Defense and Joint Staff FOIA Requester

Service Center ("FOIA Service Center"), whose three specialized branches—the Internal

Processing Branch, the Appeals, Policy , and Litigation Branch, and the Program Management

Branch—are designed to address specific needs of FOIA requesters.  The FOIA Service Center

has an entire handbook on FOIA requests.  <u>See</u> OSD/JS FOIA Requester Service Center

---

[2] Guarding against prematurely granting summary judgment is particularly important in the FOIA context for two reasons.  First, FOIA exists to ensure transparency and accountability in government.  The very purpose of the law is to provide more information to the public.  <u>See, e.g.</u>, <u>Providence Journal v. U.S. Dep't of Army</u>, 981 F.2d 552, 556 (1st Cir. 1992) (noting that FOIA seeks to prevent "the development and application of a body of 'secret law'" and ordering the Department of the Army to disclose material regarding internal Army investigations to newspaper that requested documents through FOIA).  Rule 56(f) furthers this purpose by granting a party time to explore the sufficiency of the government's search of records and provision of information.

Second, FOIA litigation presents a unique inequality of information between the parties that is not present in typical civil litigation.  As the Ninth Circuit has noted, "[i]n a FOIA case, the government agency has control of the information.  This creates a situation where 'the court is deprived of the benefit of informed advocacy to draw its attention to the weaknesses in the withholding agency's arguments.'"  <u>Church of Scientology</u>, 991 F.2d at 563 (citations omitted).  Given the desire for transparency and the inequality of information that prevents courts and litigants from being able to assess either the adequacy of the government's search or the legitimacy of the government's withholdings, Rule 56(f) motions are especially opportune in FOIA cases.

Website, <u>available at</u> Archive of Columns by the Office of the Secretary of Defense,

http://www.dod.mil/pubs/foi/ (last visited June 20, 2008).  DoJ employs a similar structure to

ensure compliance with FOIA, including a lengthy handbook that is updated regularly.  <u>See</u>

USDOJ: OIP: Freedom of Information Act Guide, <u>available at</u> Archive of Columns by the

Department of Justice, http://www.usdoj.gov/oip/foia_guide07.htm (last visited June 20, 2008).

     In stark contrast to the stability and competence demonstrated by the typical agency

FOIA office, the procedures for keeping and searching records at Guantanamo, to the degree that

any exist at all, have undergone constant and at times drastic changes in the six years the prison

has been in operation there.  As a result, they are inconsistent and unreliable.  From the time the

first prisoners were interned there, procedures at the base have been characterized by chaos.  <u>See,</u>

<u>e.g.</u>, Erik Saar & Viveca Novak, <u>Inside the Wire</u> 160 (2005) ("we lacked an organized procedure

for determining which of [the detainees] should stay and which should go"); James Yee, <u>For God</u>

<u>and Country</u> 54 (2005) ("there were no standard operating procedures in place for distributing

reading materials").  In describing his experiences at Guantanamo, Chaplain James Yee noted

that during his time at the base he quickly began "to understand just how disorganized the

mission was."  <u>Id.</u>  Chaplain Yee noted that "[b]ecause there were no precedents for the

operation at Guantanamo, things were slowly being figured out.  Soldiers often had to improvise

solutions to everyday problems."  <u>Id.</u>  He found that this lack of established procedures "wasn't

how things typically worked in the military, and [he] was sure that it maximized the potential for

error."  <u>Id.</u>  The lack of organization also extended to systems that normally would have existed

for maintaining records.

     The disorganized nature of and lack of procedures for record keeping at Guantanamo

render a typical FOIA search, confined exclusively to readily-accessible files and databases,

almost certainly inadequate. A FOIA search must seek out responsive records where they are likely to be found. See Valencia-Lucena, 180 F.3d at 326; Oglesby, 920 F.2d at 68; Miller, 779 F.2d at 1385. At a base characterized by disorganization, an adequate search would have to begin with fundamental inquiries into what documents exist and where they were kept. Plaintiff now seeks discovery to determine whether such inquiries were made and how the government's searches addressed the unusual record keeping obstacles presented by Guantanamo.

The manner and speed with which the Guantanamo prisons were set up, the absence of any history or systems of prisoner records that might have served as a foundation, and the unusual way the prison mission was managed highlight the need for closer scrutiny here. Unlike a typical agency office, the prison facility was run by a joint task force, referred to as "JTF." The JTF was comprised of military personnel from the Army, Navy and Marines. All had roles, which have changed over time, in managing the prisons at the base. And, in most cases, the JTF personnel dealing on a day-to-day basis with prisoners were reservists, not career military personnel. At Guantanamo those transient members of the recently created JTF were forced to deal with dramatic changes in how prisoners were managed, as public awareness and concern about the facility grew. The lack of any pre-existing record keeping system, frequent changes in personnel from different, independent service branches—each with differing record keeping customs and who, as reservists, had less experience than career personnel with normal military record keeping systems, would have combined to make Guantanamo among the most challenging locations at which to conduct an adequate FOIA search for an experienced search team. And absent a staff experienced in FOIA searches, which surely was not present at Guantanamo, discovery into the adequacy of the search is not only appropriate, it is necessary.

Guantanamo does not maintain a stable, long-term staff to produce, retain or search for records responsive to FOIA requests.  Guantanamo personnel serve at the base for only short periods of time before rotating elsewhere.  See e.g., Tim Golden, *The Battle for Guantanamo*, N. Y. TIMES MAGAZINE, Sept. 17, 2006 at 60 ("At that point, in the spring of 2005, he had little time to consider an answer. Tensions in the camp were surging, as the detainees tested a fresh rotation of Army and Navy guards."); Kaylee LaRocque, *Navy Security Battalions Deploying to Cuba to Help with Operations*, http://www.navy.mil/search/display.asp?story_id=17016 (last visited June 20, 2008) ("'We were established to relieve the current rotation serving in Guantanamo Bay,' said Cmdr. Ken Deal, commander of the Navy Provisional Guard Battalion JTF GTMO.").  As such, many of those once responsible for creating and keeping records at Guantanamo likely were not available to facilitate the FOIA searches conducted in response to Plaintiff's Requests.  However, neither the government's affidavits nor its Motion refer to even a single consultation with former Guantanamo personnel with record keeping duties.

Indeed, by the government's own admission, responsive documents have been misplaced due to frequent personnel turnover at the base.  For example, Respondent Ait Idir informed Plaintiff of a particularly savage beating he had received from guards at Guantanamo that had been videotaped.[3]  Since the video had not been acknowledged or produced by the government, Plaintiff specifically identified and requested it in an April 21, 2006 e-mail to Assistant United States Attorney Mark Quinlivan.  The government then admitted that it had "located a videotape and documents responsive to each of [Plaintiff's] requests," but stated that "as a result of

---

[3] This video involved an incident in February or March 2004 in which Guantanamo personnel required Requester Mustafa Ait Idir and approximately 40 other men to turn in their pants to camp authorities.  When he objected because his religion required that he cover his knees when he prays, an Immediate Reaction Force (IRF) Team was brought in.  After being subdued, Mr. Ait Idir was beaten to the point of paralysis.  The recording of this incident fell squarely within FOIA Request 13 ("Records concerning any contact, communication or interaction between any military personnel or special forces unit and Requesters").

changing JTF-GTMO personnel, this information cannot be located at the present time." See

JTF-GTMO Affidavit (emphasis added).[4]

In multiple instances, the government has suggested it failed to maintain records at

Guantanamo responsive to Plaintiff's Requests. For example, the government states that it could

not locate any manifest records concerning detainees that were held by U.S. Transportation

Command because these records are only held for 90 days. Motion at 15. Similarly, when

confronted with demands by a court to see records DoD had relied on to illegally confine a

prisoner, the government has indicated that it has not retained information collected during the

Requesters' Combatant Status Review Tribunals ("CSRTs"). See Bismullah v. Gates, No. 06-

1197, slip op. at 7-8 (D.C. Cir. Oct. 3, 2007). Such information might be located if the

government were to undertake a more diligent search of records that do remain, as it has been

ordered to do in the context of CSRT review proceedings. Id. at 8.

### 2. The Government's Submission Suggests the Search Was Inadequate and Raises Questions of Fact to be Explored in Discovery.

#### a. *Agencies Used a One-Size-Fits-All Approach to Searching.*

The government's own affidavits suggest that the search procedures used by several of

the agencies involved with the administration of Guantanamo were not designed to address the

realities of record keeping at the base. The government concedes that many agencies restricted

their searches to certain electronic databases, See, e.g., Motion at 7, despite the fact that,

especially during the initial years of Requesters' confinement, there were no centralized

---

[4] This was not the first time the government has claimed to have lost a video depicting brutality inflicted by guards at the base. Steven H. Miles' book, Oath Betrayed, recounts a training exercise at Guantanamo during which American soldier Sean Baker donned a prisoner's uniform and pretended to be a prisoner. Guantanamo personnel, unaware that Baker was not in fact a detainee, choked him and slammed his head into the floor, resulting in severe brain trauma and seizures that Mr. Baker continues to experience several times a week. Although this training exercise was filmed, the videotape was reported to be "lost." See Steven H. Miles, Oath Betrayed 123-24 (2006). Similarly, Eric Saar and Viveca Novak quoted one Guantanamo officer as stating that "what usually happens" to recordings the government is not pleased with is that "[t]he tape will disappear." See Erik Saar & Viveca Novak, Inside the Wire 136 (2005).

procedures in place at Guantanamo to create or maintain records in centralized electronic
databases.

Questions of material fact exist as to how long such electronic databases have been in
place and, accordingly, whether they should have been relied upon to contain a complete record
of all documents potentially responsive to Plaintiff's Requests. Such a determination is essential
to evaluating the Motion. For instance, Plaintiff's independent research revealed that the
Detainee Information Management System ("DIMS"), the electronic database that the Joint
Detention Group ("JDG") uses to maintain information on each prisoner including "[a]ny
information concerning detainee operations as to a particular detainee...," Motion at 8, was not
implemented until sometime in 2003, a full year after Requesters arrived at Guantanamo. See
Kathleen T. Rhem, Automated System Helps Guantanamo Guards Track Detainees, Am. Forces
Press Service, Feb. 17, 2005, available at Archive of Columns by the Department of Defense,
http://tinyurl.com/6ja9y7 (last visited June 20, 2008).

Another example of this "one size fits all" approach at Guantanamo is the government's
discussion of the search by Detainee Operations, the agency in charge of the movement of
detainees to and from Guantanamo. See Motion at 8. Although the government claims to have
conducted a "thorough review of its files and databases for '[r]ecords concerning the transport of
Requesters from Bosnia and Herzegovina to GTMO," its "search did not identify and [sic]
records pertaining to the six detainees that were responsive to plaintiff's FOIA request." Id.
That Detainee Operations, the agency that certainly documented the Requesters arrival at
Guantanamo, failed to find a single record relating to any of the Requesters who—
indisputably—were transported from Bosnia and Herzegovinia ("Bosnia") to Guantanamo
strongly suggests that the search of Detainee Operations files was inadequate. Lending further

10

credence to the proposition that Detainee Operations' search was inadequate is the fact that another agency, United States Transportation Command ("TRANSCOM"), located many documents relating to Requesters' transport. See e.g., OLE3507 (referring to detention of Requesters by U.S. forces at Eagle Base in Tuzla, Bosnia); OLE3531-OLE3532 (containing details regarding Requesters' trip from Europe to Guantanamo).

i.     Government Affidavits Highlight Search Shortcomings.

Inconsistencies among the government's affidavits highlight the unreliability of the government's searches.  A review of the collective affidavits produced by the government reveals that, virtually without exception, the agencies with direct responsibility with respect to Guantanamo operations (i.e., those with the most relevant documents), conducted the least fruitful searches.  For instance, while the U.S. European Command, an agency based far from Guantanamo and with only limited involvement with Requesters, found 1,921 responsive documents, agencies like Detainee Operations, the Office of Detainee Affairs and the Joint Staff—agencies that directly oversee the collection of information at the base and have done so on a daily basis for more than 6 years—located a paltry 0, 15 and 32 responsive documents, respectively.  See Motion at 7-8, 12-14.

A review of the affidavits submitted by agencies with responsibility at Guantanamo demonstrates differences in the manner in which information is stored and collected there in comparison to other more traditional facilities.  Thus, that a search that may have been adequate for an agency with records elsewhere was not necessarily adequate at Guantanamo.  For example, a search of an electronic database might be sufficient for an agency like the Criminal Investigation Task Force ("CITF"), which interviews persons and then stores each interview in a

standardized form (CITF Form 40) in a centralized database accessible at several locations.[5]    In

contrast, agencies that operate at Guantanamo lack a comparable centralized database.[6]    Files for

Detainee Operations, for example, are maintained not in a database, but "in an Excel Spreadsheet

and in folders maintained on computer hard drives." Motion at 8.  There is no indication that

Detainee Operations maintains a centralized indexing system that would enable it to determine

which records are kept and where they are kept.  The government's Motion assserts, without

support, that Detainee Operations "conducted a thorough review," but, in contrast to the nearly

2,000 documents resulting from the search of CITF's centralized database, not a single document

was produced following the search of Detainee Operations' spreadsheet and hard drives.  Id.

Similarly, the Office of Detainee Affairs kept records in hard copy files and files on shared

computer drives rather than in a centrally indexed electronic database.  Id at 13-14.[7]    These

record-keeping practices raise material questions of fact as to the sufficiency of the government's

search methods; questions which may be addressed if Plaintiff is allowed discovery.

   *b.*  ***Overlooked Categories of Documents Suggest the Inadequacy of Searches and Highlight the Need for Discovery.***

  Although the agency's affidavits are entitled to a presumption of good faith, they may be

held insufficient if they are conclusory in nature.  Maynard, 986 F.2d at 559-60.  Affidavits must

adequately "describe at least generally the structure of the agency's file system which makes

further search difficult."  Church of Scientology of Cal. v. I.R.S., 792 F.2d 146, 151 (D.C. Cir.

1986).  A blanket statement that no responsive documents were found, when it is clear that

---

[5] Indeed, the search of CITF resulted in almost 2,000 pages of responsive records.  Motion at ADD PAGE
[6] The government contends in its Motion that the Joint Detention Information Management System ("JDIMS"), the database searched by the Joint Intelligence Group, is "a central clearinghouse for intelligence information compiled on each detainee," Motion at 7, but in a declaration in the Bismullah case the government admitted that JDIMS "does not and could not hold all information that is in the possession of the United States Government regarding a particular detainee" and in fact contains "[o]nly information classified at the SECRET level and below."  See Declaration of Rear Admiral (Retired) James M. McGarrah at 5, Bismullah v. Gates, No. 06-1197 (D.C. Cir. May 31, 2007), available at http://tinyurl.com/58gjbp.
[7] With no indexing system, the government performed rudimentary key word searches to look for documents.  Motion at 13.

responsive documents can and do exist, is insufficient.  See, e.g., Bangoura v. United States

Dep't of the Army, 2006 U.S. Dist. LEXIS 93149, at *17 (D.D.C. Dec. 8, 2006) (finding

affidavits inadequate where responsive documents were found after agency had stated that no

more documents existed).  Summary judgment has been held inappropriate even in the presence

of good faith affidavits where the Requester can present countervailing evidence that calls

agency's search procedures into question.  See, e.g., Founding Church of Scientology v. Nat'l

Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979).  In particular, "positive indications of

overlooked material cause substantial doubts about the caliber of the agency's search."  Kyle,

1989 U.S. Dist. LEXIS 14635, at *8-9.

      Plaintiff has identified numerous positive indications of broad categories of responsive

and immediately available documents that the government has neither acknowledged in its

affidavits nor produced to Plaintiff.  These examples indicate that the government's search was

inadequate, and raise questions of material fact as to the sufficiency of the government's search,

which should be explored in discovery.

          i.     Medical Records

      The government initially failed to identify even a single medical record belonging to any

Requester, notwithstanding the fact that such records were specifically requested by Plaintiff,

and that they are among the rare Guantanamo files kept in the routine course of camp

administration.  See Request 10.[8]  Indeed, the government only began to identify and produce

Requesters' medical records after Plaintiff specifically noted their absence from the

government's productions and indicated Plaintiff knew such records existed.  See Ex. A (E-mail

from Lynne Soutter to Mark Quinlivan (July 15, 2005)).  Even then, the government's

production of medical records omitted significant categories of medical records, until Plaintiff

---

[8] "Medical records and information concerning requesters…"

13

specifically identified and requested them. See Ex. B (Letter from Mark T. Quinlivan to Melissa A. Hoffer (Jan. 11, 2006)). And, as discussed below, some categories of medical records known to exist, such as medical treatment request forms still are entirely absent from the produced materials.

<ol type="i" start="2">
<li>Standard Operating Procedure Manuals</li>
</ol>

The government has completely excluded from its production a category of documents central to Plaintiff's ability to oppose the government's Motion—the standard operating procedure manuals for Guantanamo ("SOPs"). These SOPs set out the procedure for producing and maintaining records that are essential for allowing Plaintiff and this Court to assess what documents exist and whether the government's search was "reasonably calculated to uncover all relevant documents." Weisberg, 705 F.2d at 1351.

Defendants neither identified nor produced a single copy of any SOP for Guantanamo. Plaintiff has come into possession of two versions of a manual entitled, "Camp Delta Standard Operating Procedures" ("Camp Delta SOPs").[9] Those manuals, as well as any previous or successive SOPs for Camp Delta or any other part of Guantanamo, are clearly responsive to Request 14, which seeks "[r]ecords relating to policies, procedures or guidelines governing conditions of detention, methods of interrogation, or treatment of detainees at Guantanamo." Given the repeated changes in administration at Guantanamo, prior and successive versions of these Camp Delta SOPs are particularly germane to understanding the circumstances of Requesters' confinement and the existence of other records that are responsive to the Requests. Despite their clear responsiveness to Plaintiff's Requests, no SOPs have been made available to Plaintiff or listed in any Vaughn indices produced by Defendants.

---

[9] Plaintiff shared portions of the Camp Delta SOPs with Defendants at the meeting immediately prior to the January 2008 status conference.

iii.    Activity Logs

The Camp Delta SOPs require that several different types of activity logs be kept in the

routine course of duty at Guantanamo.[10] Among the daily activity logs required by Camp Delta

SOPs are a "DA 1594 Daily Staff Journal" or "Duty Officer's Log,"[11] a "Military Police Desk

Blotter,"[12] Form CD-S341 (for Maximum Security Units),[13] and GTMO Form 509 (for

Segregation).[14] The Camp Delta SOPs also mandate that a "Field File" be kept for each detainee

that includes: (a) a Detainee Information Sheet, (b) a Detainee Supply Roster, (c) any DD 508s

(reports of/or recommendation for disciplinary action), (d) any CD-S341s and CD-S319s

(observation of self-injurious behavior forms), (e) a Detainee Refusal Tracking Record, and (f)

any Detainee Medical Request Complaints Forms.  See Camp Delta SOPs, Chapter 6-15(b).  To

monitor communication among detainees, the Camp Delta SOPs further require the government

to maintain a Communication Matrix and Link Diagrams that "on a monthly basis will track all

cross-block communication initiated and received by all detainees within Camp Delta," and

Leadership Matrices, which "track all discernable acts of leadership that occur within Camp

Delta."  See Camp Delta SOPs, Chapters 14-5, 14-6.  Despite the fact that all of the above

records are responsive to one or more of the Requests, not a single copy of any of these activity

---

[10] Aside from the logs listed below, Plaintiff also understands that each Requester was fingerprinted and possibly photographed at each of the several instances when he was moved between locations at Guantanamo.  Records of these fingerprints relate to the movement of Plaintiff at the base and should have been produced.

[11] Chapter 5-2(q) of the Camp Delta SOPs states that this is to be "used by each shift to document daily activity. The journal will at a minimum document show arrival times, headcount times and results, prayer call times, detainee requests to see JTF-GTMO, detainee movements and other significant operational activities."

[12] Chapter 5-2(t) states that the Military Police Desk Blotter, or Form DA 3997 is to be "used in the DOC to track daily activity in the camp.  At a minimum, it will be used to track detainee at the hospital, JTF escorts, everything that happens in the camp including contractor activities."

[13] Chapter 9-1(a)(5) mandates that this form be completed "[w]hen a detainee is sent to MSU [Maximum Security Units]" and is to "include offense committed and discipline imposed."

[14] Chapter 5-2(e) states that this form is used to document the inspection record of a prisoner in segregation.

logs was identified or produced to Plaintiff.  See Request 7[15]; Request 9[16]; Request 10[17]; Request 13[18]; Request 17.[19]

        iv.    Video Recordings

      The government has failed to produce any video recordings of diplomatic visits with

Requesters, despite the fact that such recordings were within the scope of Plaintiff's Requests

and despite positive indications that such videos exist.  Plaintiff understands that on July 27 and

28, 2004, Amir Pilav, Assistant Minister of Justice of the Ministry of Foreign Affairs of Bosnia,

interviewed Requesters Boudella, Boumediene, Nechla, and Ait Idir in Guantanamo.  Plaintiff

has learned that the United States videotaped and sound recorded these interviews and that DoD

has a copy of the Bosnian government's final report of the visit, as well as copies of all tapes,

transcripts, records of conversations, and any additional information gathered.  Plaintiff also

understands that a DoD representative was present during each of Mr. Pilav's meetings with

Requesters.  Plaintiff specifically requested "Records concerning access to Requesters granted or

denied to foreign governments or non-governmental organizations, including, but not limited to,

records relating to a visit from representatives of the government of Bosnia and Herzegovina to

Guantanamo in or about July 2004."[20]  Request 5.  All Requesters were also visited at

Guantanamo by representatives of the People's Democratic Republic of Algeria.  No record of

these visits was identified of produced.

---

[15] "Records concerning Requesters that contain information supplied by military police, the Joint Detention Operations Group, or other persons who monitor detainees in Guantanamo."
[16] "Records concerning Requesters that contain statements made by other Guantanamo detainees or terrorist suspects."
[17] "Medical records and information concerning Requesters."
[18] "Records concerning any contact, communication or interaction between any military personnel or special forces unit and Requesters."
[19] "Records of any investigations, inquiries, observations, or inspections relating to conditions of detention or interrogations at Guantanamo...."
[20] The Master Vaughn Index lists certain documents as relating to a "delegation visit," but it is unclear from the descriptions – some without dates – whether these items refer to Mr. Pilav's visit.  See Bates Nos. OLE 03975, 04456, 04562, and 04579.  Moreover, the entries make no reference to any videotape or sound recording of the interviews, nor to any briefing notes or final report.

Aside from diplomatic visits, the Camp Delta SOPs required that many other events be recorded by video and/or audio and that written logs be maintained. Records should exist of recordings of interrogations, interviews, cell extractions (for example, forced cell extractions by the Immediate Reaction Force ("IRF")), cell block disturbances, disciplinary incidents, shaving of beards, medical procedures (for example, documenting insertion of nasal feeding tube, force feeding, vaccinations, or tooth extraction) and photographs of the physical condition of Requesters (for example, documenting bruises, lacerations, or rashes). Based on information provided to counsel by Requesters, such records should exist and therefore should have been produced in response to the Requests. See, e.g., Camp Delta SOPs, Chapter 5-10(d)(8) (requiring videos of use of pepper spray); Camp Delta SOPs, Chapter 32-10(d) (requiring videos for any Mass Casualty Incidents); SOPs, Chapter 5-2 (providing for possible videos whenever there is a daily incident report); SOPs, Chapter 6-15(d)(3)(b) (providing for videos when contraband is found); Request 6[21]; Request 10[22]; Request 13.[23]

Notwithstanding the fact that such recordings fall squarely under Plaintiff's Requests, to date, the government has acknowledged the existence of only *one* responsive video of any type (the video depicting the incident involving Mustafa Ait Idir discussed above), and even then it only acknowledged the existence of the video after Plaintiff specifically brought it to the government's attention. See Declaration of Captain Peter A. Husta, ¶¶ 12-13, n. 8 (referencing Bates No. 10063) (July 7, 2006). The government's own Camp Delta SOPs belie any assertion that only the single video exists. Indeed, the improperly withheld Camp Delta SOPs set out strict requirements for both the recording of these incidents and the maintenance of these videos,

---

[21] "Records of interrogations of Requesters while in the custody of the United States…including…Any photographs, video, audio, digital or other contemporaneous recordings of the interrogations…."
[22] "Medical records and information concerning Requesters…."
[23] "Records concerning any contact, communication or interaction between any military personnel or special forces unit and Requesters."

covering levels of detail as specific as where the cameraman and each IRF member should stand,

how lighting is to be used during the filming, how many spare videotapes are required, what each

IRF member should say to the camera, when the recording should start and stop, and—most

importantly for purposes of this case— how the video recording should be catalogued and

stored.[24]

Given the obligation both to videotape all incidents and catalogue the video recordings,

the government's belated assertion that only one video tape exists is highly dubious. The claim

is even more suspect when taken in light of consistent public statements by former Army

National Guard Specialist Christopher Arendt, who was a member of IRF teams and on occasion

---

[24] Chapter 24-7(c) of the Camp Delta SOPs requires that the Administrative NCO bring a video camera to record every IRF action. Several other applicable chapters then explore the minutiae of filming to ensure that the event is successfully and completely recorded. For example, Chapter 24-3(5) requires that a second Administrative NCO bring not one but two extra video tapes to ensure proper recording, and Chapter 24-9(g) requires that the video and other evidence of the IRF action be forwarded to the record keeper to be kept as evidence. During the recording itself, the Standard Operating Procedures explicitly directs where each IRF Team member should stand (in order to best be recorded) and ensures that an officer actively work to ensure that the person recording the action is able to capture the entire event. Chapter 24-7(d) states that:

> Once all members of the IRF Team have put on their equipment . . . they will move to the sally port outside the affected block. . . . **The camera operator will ensure he is following the IRF Camera Operator checklist and each step is completed. The PL and/or SOG must ensure that the camera operator captures the imagery and information he is required for each step.** The recording will start with the PL or SOG stating the detainee's ISN(s), block number(s), reason(s) for the use of the IRF, a brief description of the events leading up to the IRF, who authorized the use of the IRF Team, and the current date and time. The IRF will then line up in front of the cameraman by position, starting with the IRF Team Leader and will at a minimum state; their name, rank, position on the IRF Team, their duties and responsibilities and that they will use the minimum amount of force necessary to complete the mission. The IRF Team members that have equipment will show the equipment to the camera to ensure that it is in working order and not damaged. (emphasis added).

For its part, the Camera Operator checklist referenced in Chapter 24-7(d) contains such requirements as:

- "Camera Operator coordinates with CC/PL/SOG to ensure adequate light will be available in the cell,"
- "Camera Operator positions himself near the cell door so he can capture all communication with detainee and that the detainee is seen on film,"
- "Camera Operator will ensure that when the team enters the cell, as much of the cell area is captured on film as possible (not zoomed in on one individual),"
- "Camera Operator will ensure that non-essential personnel do not step in front of the camera,"
- "Camera Operator will film medical check of the detainee and decon process,"
- "Camera Operator will film medical's opinion of the condition of the detainee," and
- "Camera Operator turns in this form with video disk to Detention Services Branch."

himself videotaped IRF actions, and former Military Policeman Sean Baker, who also

participated in cell extraction operations at Guantanamo, that every single IRF incident is in fact

videotaped.  See Testimony of An Army National Guard Specialist, Center for Study of Human

Rights in the Americas, March 15, 2008 and Testimony of a Military Policeman, Center for the

Study of Human Rights in the Americas, November 3, 2008, available at Archive of Columns by

the Center for the Study of Human Rights in the Americas,

http://humanrights.ucdavis.edu/projects/the-guantanamo-testimonials-project (last visited June

20, 2008).

Plaintiff has reason to suspect the existence of numerous other videos of Requesters that

the government has failed to acknowledge or produce.  For example, in addition to the one video

regarding Mr. Ait Idir that the government has acknowledged, the IRF subjected Mr. Ait Idir to

incidents of violence on other occasions in 2003, around or during the Ramadan holiday, and in

February and March 2004.  Plaintiff also understands that the Joint Task Force visited Mr. Ait

Idir following such incidents.  Based on National Guard Specialist Christopher Arendt's

statement and the Camp Delta SOPs, all of these incidents should have been videotaped.

However, Defendants have not acknowledged or produced any records relating to these events,

nor have they mentioned them in the Vaughn Indices.

Also absent from Defendants' production, as well as the Vaughn Indices, are videos

relating to the multiple occasions on which guards shaved Requester Boumediene's beard.

Videos of these incidents, too, should have been identified and produced in response to

Plaintiff's Requests.  Also overlooked by the government are all recordings of interrogations or

interviews of the Requesters by U.S. agents outside the U.S.  For instance, Federal Bureau of

Investigation agents twice interviewed Requester Bensayah in Bosnia in October 2001.  Mr.

Bensayah's Bosnian lawyer, Nermina Pivic, attended at least one such interview.[25]  Such records are clearly responsive to Request Number 4[26] and should have been produced to Requesters.

v.     Records of the Behavioral Science Consultation Team

The Department of Defense has created Behavioral Science Consultation Teams ("BSCT") of psychologists and psychological workers who consult with interrogators and make recommendations based upon the mental health and medical conditions of prisoners.  BSCT members reportedly consulted with Guantanamo interrogators on psychological factors relevant to each prisoner.[27]  Such records are responsive to Request 4 for "[r]ecords of the mental health or psychological conditions of Requesters" and should have been produced.

vi.     Medical Treatment Request Forms

The government has not acknowledged or produced a single Detainee Medical Request, despite the fact that the Chapter 5-2(p) of the Camp Delta SOPs require JTF to complete Detainee Medical Requests "to pass on detainee non-urgent or emergency medical requests to Medical."  The request forms that should have been completed in connection with each of these requests fall squarely within Request 10[28] and Request 11.[29]

vii.     Diplomatic Notes

The government has overlooked the several diplomatic notes ("dipnotes") that were exchanged between Bosnia and the U.S. Embassy in Sarajevo or between Algeria and the U.S.

---

[25] Mr. Kirsch made this specific request on November 14, 2006 by telephone to Mr. Quinlivan.
[26] "Records of communication with, interrogations and interviews of…Requesters while in the custody of Bosnia and Herzegovina."
[27] The Vaughn Indices reference BSCT-related Standard Operating Procedures, such as the SOP beginning Bates No. OLE 05362, but no BSCT records specific to any particular Requester.
[28] "Medical Records and information concerning Requesters…."
[29] "Records concerning any physical or psychological conditions to which Requesters were subject while in U.S. custody…."

Embassy in Algiers.[30] See Ex. C (Letter from Lynne Soutter to Mark T. Quinlivan (June 14,

2007)). These notes fall within the scope of various requests, including Request 1[31] and Request

5[32], and Plaintiff has brought them to the attention of the government on multiple occasions, but

they were neither produced by the government nor identified in the Vaughn indices. See, e.g.,

Ex. D (Letter from Lynne Soutter to Mark T. Quinlivan (January 16, 2008)); Ex. C (Letter from

Lynne Soutter to Mark T. Quinlivan (June 14, 2007)).

viii.    Interview or Interrogation Notes

Plaintiff has also learned of interrogation plans or other reports pertaining to Requesters

created or maintained by the interrogation team. Plaintiff understands these plans were approved

by the Interrogation Team Chief, the Executive Officer and the Commander of the Interrogation

Section for each detainee.[33] These plans and reports are responsive to Request 6[34] but none were

identified or produced to Plaintiff.

---

[30] Plaintiff is specifically aware of the following notes: (a) September 2001 dipnote from U.S. Embassy in Sarajevo to Bosnian officials; (b) September 2001 dipnotes from U.S. Embassy in Sarajevo to Bosnian officials regarding an individual known by the nickname "Al Majd"; (c) October 17, 2001 dipnotes from U.S. Embassy in Sarajevo to Bosnian officials requesting arrest of certain Egyptians and Algerians residing in Bosnia; (d) October 19, 2001, reply by U.S. Embassy in Sarajevo to Bosnian authorities regarding analysis of telephone numbers of Requesters; (e) Letter dated between October 8 and 23, 2001 from Bosnian Judge Jasminka Putica to the U.S. Embassy in Sarajevo requesting the transcript of any intercepted calls between Requester Bensayah and any suspected al Qaeda members; (f) October 23, 2001 reply by the U.S. Embassy in Sarajevo to Bosnian Judge Putica; (g) dipnotes exchanged between Algerian officials and the U.S. Embassy in Algiers about Requesters, including without limitation, notes exchanged on or around October 2001 through January 2002; and (h) dipnotes exchanged between Bosnian Ministry of Foreign Affairs and U.S. Embassy in Sarajevo regarding requested visit with Bosnian nationals detained in Guantanamo.
[31] "Correspondence and records, including, but not limited to, notes, e-mail, and telephone records of communications between the federal government and the government of Bosnia and Herzegovina or any person or organization in Bosnia and Herzegovina concerning Requesters…"
[32] "Records concerning access to Requesters granted or denied to foreign governments or non-governmental organizations…"
[33] The Vaughn Indices reference documents detailing questions to be asked of each Requester, see e.g. Bates Nos. OLE 07097-07098 USNIC "Source Directed Requirements" detailing questions to be asked of ISN 10005, but it is not clear from the information provided whether these are interrogation plans approved by the Team Chief and others.
[34] "Records of interrogations of Requesters while in the custody of the United States requests production of all such records."

    *c.*  **The Government Mischaracterizes Plaintiff's Claims Regarding**
       **Overlooked Documents.**

The government attempts to downplay the significance of entire categories of overlooked

documents by arguing that "defendants are 'not required by the Act to account for documents

which the requester has in some way identified if it has made a diligent search for those

documents in the places in which they might be expected to be found.'"  Motion at 17 (<u>citing</u>

<u>Miller v. United States</u>, 779 F.2d 1378, 1385 (8th Cir. 1985)).  However, Plaintiff is not alleging

that the government missed one or even a few documents at Guantanamo, but rather that the

government missed several broad and directly-responsive *categories* of documents.[35]  Indeed,

given the chaotic administration, the lack of established procedures for record keeping, and the

constant turnover in staff at Guantanamo, only a search specifically targeted to overcome the

absence of an agency-type infrastructure and history could offer even the possibility of

identifying the responsive documents at Guantanamo.  In contrast to a single missed document,

which might be attributable to human error, the identification of several broad categories of

documents that have been overlooked casts serious doubt over whether the search was

sufficiently "diligent," as required by <u>Miller</u>.

   The government inaccurately suggests that Plaintiff is offering mere "speculation that

documents may exist."  Motion at 17.  As demonstrated by the preceding discussion of the

categories of documents that are known to exist and have been overlooked, Plaintiff is not

speculating.  The search the government carried out at Guantanamo was not designed to produce

all responsive documents.  And while the government's search need not actually produce all

responsive documents, it must at least be designed to do so.  <u>See</u> <u>Weisberg</u>, 705 F.2d at 1351.

---

[35] Plaintiff has conveyed its concerns regarding the government's failure to produce these documents or categories of documents to the government on multiple occasions, <u>see e.g.</u>, Ex. C-E (Letters from Lynne C. Soutter to Mark T. Quinlivan (June, 14, 2007, January 16, 2008, and November 9, 2007, respectively)), but Defendants have not yet made them available to Plaintiff.

Indeed, if a FOIA requester can demonstrate beyond mere speculation that categories of relevant documents were overlooked in the agency's search, summary judgment is inappropriate. <u>Kyle</u>, 1989 U.S. Dist. LEXIS 14635 at *8-9 (recognizing that "positive indications of overlooked material cause substantial doubts about the caliber of the agency's search."); <u>Valencia-Lucena</u>, 180 F.3d at 326.

### C.    Discovery is Necessary To Resolve These Issues Of Material Fact.

Given the lack of infrastructure for record keeping and positive indications of the inadequacy of the searches, the government's affidavits fail to articulate a sufficiently thorough search. Since facts regarding the adequacy of a search are material facts for summary judgment, Plaintiff is entitled under Rule 56(f) to dismissal of the government's motion or discovery targeted at ascertaining what records have been kept during Requesters' detention at Guantanamo and whether the search for such records was adequate. Discovery—including depositions, in particular—is appropriate in FOIA actions where there is doubt as to the adequacy of the agency's search. <u>See, e.g.</u>, <u>Giza v. Secretary of Health, Education & Welfare</u>, 628 F.2d 748, 751 (1st Cir. 1980) (finding discovery appropriate for "determining whether complete disclosure has been made, e.g., whether a thorough search for documents has taken place ..."); <u>Miccosukee Tribe of Indians of Fla. v. United States</u>, 516 F.3d 1235, 1240-43 (11th Cir. 2008); <u>Church of Scientology v. Harris</u>, 653 F.2d 584, 586 (D.C. Cir. 1981); <u>Weisberg v. Dep't of Justice</u>, 627 F.2d 365, 367 (D.C. Cir. 1980); <u>Voinche v. FBI</u>, 412 F. Supp. 2d 60, 71 (D.D.C. 2006); <u>Bangoura</u>, 2006 U.S. Dist. LEXIS 93149, at *17; <u>Jefferson v. Reno</u>, 123 F. Supp. 2d 1, 6 (D.D.C. 2000).

When the adequacy of the search has been called into question, courts permit depositions of both the custodian of the records and officials with personal knowledge of the underlying

circumstances pertaining to the creation of the documents, so as to evaluate whether the search procedures were sufficiently likely to produce relevant documents.  See Weisberg, 627 F. 2d at 367 (allowing for deposition not only of the custodian of the records, but also of FBI agents who had personal knowledge of the underlying circumstances of documents relating to the assassination of President Kennedy); Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice, 2006 U.S. Dist. LEXIS 34857, at *1-2 (D.D.C. 2006) (permitting depositions of (1) Associate Attorney General, (2) Director of the Office of Information and Privacy, (3) the individual responsible for assembly of documents responsive to the FOIA request, and (4) the attorney in charge of FOIA processing, in a case that involved a FOIA request for documents related to government's change of litigation strategy in ongoing tobacco litigation).  As the court in Weisberg noted, "[c]ourts have ample authority to protect agencies from oppressive discovery for example, by limiting the scope of permissible questioning and surely need not sanction depositions down to level of each individual participating in the search.  But the court becomes unduly restrictive when it bans further investigation while the adequacy of the search remains in doubt."  Weisberg, 627 F.2d at 371.

Discovery in the form of depositions is equally appropriate in FOIA actions involving national security matters.  See Church of Scientology v. Dep't of Army, 611 F.2d 738, 744 (9th Cir. 1979) (finding depositions necessary to determine which portions of documents held by the Army relating to the Church could be reasonably withheld for national security purposes); Halperin v. Dep't of State, 565 F.2d 699, 704 (D.C. Cir. 1977) (allowing for deposition in FOIA matter to determine whether deleted portion of a press conference by Henry Kissinger could adequately be withheld to protect the U.S. negotiating position in the strategic arms limitation talks with the Soviet Union).

24

Plaintiff seeks three types of discovery. First, Plaintiff seeks discovery of all documents that indicate what types of records are maintained, such as SOP-related documents that set out procedures for producing and maintaining records and indexing documents that catalogue the records that exist. Second, Plaintiff seeks responses to interrogatories identifying: (a) persons with knowledge over what and how records are and were kept at Guantanamo throughout the period of Requesters' captivity; and (b) persons who conducted the searches in this case. Finally, Plaintiff seeks to depose those individuals with personal knowledge of the creation and the maintenance of the records responsive to the Requests and those individuals who conducted the government's search. Such discovery will be narrowly tailored to address the adequacy of the search and could be conducted in a reasonable time.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the government's Motion or, in the alternative, permit a continuance of the Motion allowing for discovery.

Respectfully Submitted,

/s/ Lauren G. Brunswick
Robert C. Kirsch (BBO #541755)
Lynne C. Soutter (BBO #657934)
Lauren G. Brunswick (BBO # 660996)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000

DATED:   June 23, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent out electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Lauren G. Brunswick
Lauren G. Brunswick

DATED: June 23, 2008

# EXHIBIT A

## Soutter, Lynne

**From:** Soutter, Lynne
**Sent:** Friday, July 15, 2005 2:01 PM
**To:** 'mark.quinlivan@usdoj.gov'
**Cc:** Kirsch, Rob; Hoffer, Melissa
**Subject:** Medical Records Production

Mark,

When we spoke on Tuesday, you indicated that DOD would produce to us our clients' medical records this week and that you would update us with an exact date (which day this week) once you heard from DOD General Counsel.  I have not heard anything since we last spoke.  Will we be receiving the medical records today, as promised?

Please let me know.

Also, as you know, our first conference with Judge Stearns is scheduled for July 28th.  I spoke to his clerk, Mary Johnson, and she said that in light of the tight timeframe, we can deliver the Joint Statement to the judge on the 28th, not five days prior as the Rules ordinarily require.  We will draft something for your review next week.

Lynne

Lynne Campbell Soutter
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
Tel:  (617) 526-6447
Fax: 617-526-5000
lynne.soutter@wilmerhale.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Wilmer Cutler Pickering Hale and Dorr LLP immediately -- by replying to this message or by sending an email to postmaster@wilmerhale.com -- and destroy all copies of this message and any attachments without reading or disclosing their contents. Thank you.

For more information about Wilmer Cutler Pickering Hale and Dorr LLP, please visit us at http://www.wilmerhale.com.

# EXHIBIT B



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

January 11, 2006

**VIA HAND DELIVERY**

Melissa A. Hoffer, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, MA 02109

    Re: <u>Oleskey</u> v. <u>Department of Defense, et al.</u>,

Dear Melissa:

    Pursuant to Rob Kirsch's request, the Department of Defense has obtained the medical x-rays of your clients, which have been transferred to the enclosed CD.

    If you should have any questions, please do not hesitate to contact me at (617) 748-3606.

               Sincerely,

               MARK T. QUINLIVAN
               Assistant U.S. Attorney

Enclosure

# EXHIBIT C

WilmerHale

June 14, 2007

**Lynne Campbell Soutter**

+1 617 526 6447 (t)
+1 617 526 5000 (f)
lynne.soutter@wilmerhale.com

*By First Class Mail and Email*

Mark Quinlivan
Assistant U.S. Attorney
U.S. Attorney's Office
1 Courthouse Way
Boston, MA 02210

Re:    Oleskey v. DOD, DOJ  - FOIA

Dear Mark:

We wanted to follow up on a couple of outstanding issues and raise a couple new ones.

First, we ask that the names of certain unnamed agencies, referred to as "other U.S. Government agencies (OGAs)" in the Vaughn indexes, be disclosed pursuant to FOIA. *See* Declaration of John P. Taitt, (Department of Defense General Counsel), ¶ 7, n.6, and ¶¶ 105, 106 (July 16, 2006).  There is no exemption under FOIA for such withholding.

Second, our independent investigation has shown us that a number of diplomatic notes were exchanged between Bosnia and the U.S. Embassy in Sarajevo or between Algeria and the U.S. Embassy in Algiers that fall within the scope of the Request but that are not identified in the Vaughn indexes provided, thus far.  The following specific documents fall within the Request:

a) September 2001 diplomatic note ("dipnote") from U.S. Embassy in Sarajevo to Bosnian officials regarding potential danger in Bosnia;

b) September 2001 dipnote from U.S. Embassy in Sarajevo to Bosnian officials regarding an individual known by the nickname "Al Majd";

c) October 17, 2001 dipnote from U.S. Embassy in Sarajevo to Bosnian officials requesting arrest of certain Egyptians and Algerians residing in Bosnia;

d) October 19, 2001, reply by U.S. Embassy in Sarajevo to Bosnian authorities regarding analysis of telephone numbers of Requesters;

e) Letter dated between October 8 and 23, 2001 from Bosnian Judge Jasminka Putica to the U.S. Embassy in Sarajevo requesting the transcript of any intercepted calls between Requester Bensayah and any suspected al Qaeda members;

f) October 23, 2001 reply by the U.S. Embassy in Sarajevo to Bosnian Judge Putica; and

WilmerHale

June 14, 2007
Page 2

    g) Dipnotes exchanged between Algerian officials and the U.S. Embassy in Algiers
       about Requesters, including without limitation, notes exchanged on or around
       October 2001 through January 2002.

The Defendants should produce the documents identified above or state the basis for withholding
them.

Third, the fact that so much of the diplomatic correspondence that we are aware of is not
captured in the State Department Vaughn declaration (Alice Ritchie Declaration (July 5, 2006)),
raises questions about the adequacy of the search for diplomatic documents, thus far. Another
targeted search is likely to turn up many more requested documents.

Fourth, we ask that the video of Requester Ait Idir be produced (Bates No. 10063).[1] There is no
valid basis for withholding this video under FOIA. National security is not implicated by the
forcible removal of a prisoner's pants, and embarrassment of the agency is not a grounds for
withholding under FOIA. Also, the documents associated with this video, which were misplaced
by DoD personnel, should be located and produced. *See* Declaration of Captain Peter A. Husta
(JTF-GTMO), ¶¶ 12-13 (July 7, 2006).

Fifth, we ask that all documents related to abuse of Mr. Ait Idir be produced. There is no valid
basis under FOIA for withholding documentation of abuse or allegations of abuse. Certain such
documents are described in the Declaration of Joe Ethridge, Jr., ¶ 69 and may be found at the
following Bates numbers: 1910-1911 (Memorandum from CITF discussing allegations of abuse
of Ait Idir - denied in full); 1912 (OARDEC memorandum outlining abuse allegation by Ait Idir
- denied in full); and 1374 (Internal CITF e-mail forwarding documents concerning allegations
of abuse by certain detainees, including 10003 [Nechla] and 10004 [Ait Idir] – denied in full).
Also, we are aware of specific incidents of violence against Mr. Ait Idir in 2003, around or
during the Ramadan holiday, and in February and March 2004. We understand that he was
visited by Joint Task Force officers as a result of such incidents.

Sixth, our independent investigation has also confirmed that in addition to the video of Requester
Mustafa Ait Idir, there are a number of other videos of Requesters, which were taken at the
prison in Guantanamo Bay. For example, we understand that each time a prisoner's beard is
shaved, the shaving is videotaped. Requester Lakhdar Boumediene's beard has been shaved off
on multiple occasions on camera, including on or about December 24, 2006, February 15 or 16,
2006, and during Ramadan in October 2005, after which he was placed in isolation for one

---

[1]      The video is discussed in the Declaration of Captain Peter A. Husta, ¶¶ 12-13 and at n. 8 (referencing Bates
No. 100063) (July 7, 2006) and is withheld according to the Declaration of Rear Admiral Harry B. Harris Jr. (JTF-
GTMO), ¶24 (July 7, 2006). Please note that Bates No. 10063 does not appear to be included in any of the Vaughn
indexes.

WILMERHALE

June 14, 2007
Page 3

month.  The Defendants should conduct a new search for video and audio recordings and related documents (such as, logs, summaries, analysis, etc.) relating to Requesters, identify the records, and either produce them or state the basis for withholding them.

Seventh, I wanted to follow-up on my email of March 12th, which attached a quick list of pages that we think are missing based on our review of the productions to date and the Vaughn Indexes.  We request copies of the listed pages that were, according to the Vaughn indexes, only partially withheld, and we would like to know the Defendants' position regarding the other missing pages.  A copy of that e-mail is attached.

Rob and I are happy to discuss these issues when you have time over the next couple of weeks.  I will be out of the office next week, but you may contact Rob (617.526.6779) in my absence.

Sincerely,

Lynne Campbell Soutter

cc: Rob Kirsch, Esq.
    Lauren Brunswick, Esq.
    Jenna Goldenberg, Esq.

# EXHIBIT D

WILMERHALE

January 16, 2008

**Lynne Campbell Soutter**

+1 617 526 6447 (t)
+1 617 526 5000 (f)
lynne.soutter@wilmerhale.com

*Via Email and First Class Mail*

Mark T. Quinlivan, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re: *Oleskey v. DoD, et al.*, No. 05-10735 (RGS)

Dear Mark:

Thank you for your letter of January 15, 2008, wherein Defendants respond to certain requests outlined by Plaintiff in a letter of November 9, 2007. I am writing to specifically address Defendants' response to Plaintiff's request for records of the Bosnian diplomatic delegation's 2004 visit to Guantanamo Bay, Cuba. Defendant Department of Defense ("DoD") states that it has no records of this visit, but as we discussed briefly over the telephone last week, Plaintiff has evidence to the contrary.

In anticipation of the call we are planning to have with you and DoD General Counsel before the status conference on Friday, we enclose a number of materials in our possession, which clearly show that DoD and the U.S. Department of State (a) demanded creation of certain records, and (b) would have been in possession of those records, relating to a July 2004 visit to Guantanamo Bay, Cuba by a Bosnian delegation headed by Minister Amir Pilav, at the time Plaintiff submitted his September 2004 Freedom of Information Act Requests to Defendants DoD and the Department of Justice.

Enclosed please find the following documents:

1. Selected pages from Bosnia's Written Pleading (answer) to Applications (complaints) filed by Messrs. Boumediene, Boudella, Ait Idir, Nechla, Bensayah and Lahmar against Bosnia and Herzegovina in the European Court of Human Rights ("ECHR"). See especially paragraphs 10, 13, 15 and 53 – 56.

   "56.  In Guantanamo the Bosnia and Herzegovina official had an interview with the four Applicants, nationals of Bosnia and Herzegovina in the period between 27 and 28 July 2004.

   The report, a copy of which Bosnia and Herzegovina was obliged to send to the U.S.A., shows that the Bosnia and Herzegovina official was allowed to ask four Applicants questions previously agreed on by BIH authorities and in accordance with the conditions set by the U.S.A., mostly concerning intelligence collection

Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, Massachusetts 02109

Beijing    Berlin    Boston    Brussels    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington

WILMERHALE

Mark T. Quinlivan, Esq.
January 16, 2008
Page 2

> purposes. The interview was attended by a U.S. Department of Defense official,
> Mr. Jim Carlton. During the interview with the Applicants, all the four
> Applicants complained about bad conditions of detention and lack of medical
> care."

2. U.S. Department of State document outlining for foreign governments (in this case,
   Bosnia) terms of access to their nationals in Guantanamo. (This is an exhibit submitted
   by Bosnia with its Written Pleading to the European Court of Human Rights – referred to
   as a "Non-Paper".)

3. Diplomatic note from the Bosnian Ministry of Foreign Affairs to the U.S. Embassy in
   Sarajevo, Bosnia and Herzegovina, dated December 26, 2003 (10621-01-26603/2003),
   wherein Bosnia reiterates its request to visit with four Bosnian nationals detained in
   Guantanamo, Messrs. Boudella, Boumediene, Nechla, and Ait Idir, and providing other
   information as required by the U.S. (according to the DOS Non-Paper, attached at Tab 2),
   including name of Bosnian delegate, Amir Pilav, and list of questions he hopes to ask the
   men.

4. Diplomatic note from the U.S. Embassy in Sarajevo to the Bosnian Ministry of Foreign
   Affairs, dated July 15, 2004 (04-1176/S), granting Bosnia's request to have Assistant
   Minister of Justice Amir Pilav and an interpreter travel to Guantanamo. This letter
   outlines the following relevant requirements:

> "1. The United States will videotape and sound record the interviews between
> representatives of your government and the detainee(s). Your government
> representatives may photograph, videotape, or make sound recordings during
> interviews only with prior approval of the U.S. Department of Defense.
>
> 2. The U.S. Department of Defense must be provided a copy of your
> government's final report on the visit, in addition to copies of all tapes,
> transcripts, records of conversations, and other information gathered by your
> representatives at Guantanamo Bay. Such information should be delivered to the
> U.S. Embassy, Sarajevo, as soon as practicable following the visit to Guantanamo
> Bay. Before arrival in Guantanamo Bay, please provide the U.S. Embassy,
> Sarajevo, with the name of the official within your government who will have
> responsibility for providing this information.
>
> 3. U.S. Department of Defense security of law enforcement personnel will be
> present at all times during detainee interviews and the senior U.S. representative
> present may terminate an interview at any time.

WILMERHALE

Mark T. Quinlivan, Esq.
January 16, 2008
Page 3

4. It is important that your representatives brief U.S. officials at Guantanamo Bay, both before and after interviewing detainees. The purpose of the in-brief is to coordinate security procedures, familiarize your officials with our interview and other procedures, and to discuss the perspectives of your officials on the investigative, intelligence, and other information relevant to the particular detainees. The in-brief will also address any special concerns that your officials may have. At the conclusion of t he interviews with detainees, a follow-up briefing including your representatives and DoD officials will be scheduled at Guantanamo to address any remaining questions concerning matters, which were discussed during the detainee interview."

We hope to discuss a subsequent search for the above-mentioned recordings, reports and other such records and the adequacy of Defendants' searches to date during our upcoming call.

Best regards,

Lynne Campbell Soutter

cc: Robert C. Kirsch
    Lauren G. Brunswick
    Jenna Goldenberg

# EXHIBIT E

WILMERHALE

November 9, 2007

**Lynne Campbell Soutter**

+1 617 526 6447 (t)
+1 617 526 5000 (f)
lynne.soutter@wilmerhale.com

*By E-mail and First Class Mail*

Mark Quinlivan, Esq.
Assistant U.S. Attorney
U.S. Attorney's Office
1 Courthouse Way
Boston, MA 02210

Re: Oleskey v. DOD, DOJ - FOIA

Dear Mark:

I am writing to follow up on our August 29, 2007 Status Conference before Judge Stearns (the "Status Conference") and to inquire about additional materials responsive to Plaintiff's September 28, 2004 Freedom of Information Act Request (the "FOIA Request") which have yet to be identified or produced by the government.

First, as we discussed during the Status Conference, Defendants have not yet produced the *Vaughn* affidavits and indices from the United States Army Intelligence and Security Command ("INSCOM"), the Defense Intelligence Agency ("DIA"), and at least one additional government agency. Since the Status Conference, we have received only one additional affidavit from Defendants – the Declaration of Dorothy S. Beaty on behalf of the U.S. Department of Justice, Interpol U.S. National Central Bureau. During the Status Conference, Defendants indicated they would produce the outstanding *Vaughn* affidavits and indices by Thanksgiving. Please confirm that the Defendants will be producing the affidavits and indices from INSCOM, the DIA, and any other outstanding affidavits by this date.

Second, our independent investigation has revealed that in July 2004, Amir Pilav, Assistant Minister of Justice of the Ministry of Foreign Affairs of Bosnia and Herzegovina, interviewed certain of the Requesters (Hadj Boudella, Lakhdar Boumediene, Mohamed Nechle, and Mustafa Ait Idir) in Guantanamo. We have learned that the United States videotaped and sound recorded these interviews and that the U.S. Department of Defense has a copy of the Bosnian government's final report of the visit as well as copies of all tapes, transcripts, records of conversations, and any additional information gathered.

We ask that the videotapes and sound recordings of Mr. Pilav's interviews and any related reports of Mr. Pilav's visit be produced. These recordings and reports are responsive to Plaintiff's FOIA Request, which seeks "all records in any way relating to, pertaining to, or mentioning any or all of [the Requesters] and the detention of any or all of them by any and all persons or entities, including all persons acting on behalf of the United States." Compl., Attachment A at 1. In particular, the FOIA Request seeks "records relating to a visit from

WILMERHALE

Mark Quinlivan
November 9, 2007
Page 2

representatives of the government of Bosnia and Herzegovina to Guantanamo in or about July 2004." Id. at 2.

We do not believe that these records have been listed on the *Vaughn* indices produced by Defendants thus far in the litigation.[1] If we are mistaken, please identify the corresponding entries in the *Vaughn* indices.

Third, as we discussed at the Status Conference, because Defendants have not agreed to produce the video and records relating to the beating of Mr. Ait Idir we intend to seek *in camera* review of these materials. Please confirm that these materials are ready and available to ensure there will be no delay in addressing these issues after our motion is filed.

Fourth, Defendants still have not responded to all inadequately addressed requests, as laid out in my letter dated June 14, 2007. In particular, we renew our request for all videotapes of our clients/requestors – including recordings of shaving of beards in Guantanamo – and diplomatic correspondence about our clients, and ask for a statement from Defendants as to whether or not such materials have been identified and whether or not they will be produced. If they are being withheld, please also have those materials ready and available for *in camera* review.

Rob and I are happy to discuss these issues further. Please feel free to contact me at (617) 526-6447.

Very truly yours,

*Lynne C. Soutter /JMG*

Lynne Campbell Soutter

cc: Robert C. Kirsch, Esq.
    Lauren G. Brunswick, Esq.
    Jenna Goldenberg, Esq.

---

[1] The items listed on the main *Vaughn* Index as Bates Nos. 3975, 4456, 4562, and 4579 relate to the "delegation visit." However, it is unclear from the descriptions whether these items refer to Mr. Pilav's visit. Moreover, the entries do not appear to encompass the complete set of records related to Mr. Pilav's visit. In particular, the *Vaughn* indices do not identify a videotape or sound recording of the interviews.